ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
LAURIE L. LARGENT (153493)
MATTHEW I. ALPERT (238024)
JOSEPH J. TULL (339956)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
malpert@rgrdlaw.com
jtull@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SASKATCHEWAN HEALTHCARE EMPLOYEES' PENSION PLAN, and MARIO COLATO, <br><br> Plaintiffs, <br><br> vs. <br><br> BEYOND MEAT, INC., et al., <br><br> Defendants. | Case No. 2:23-CV-03602-MWF(AGRx) <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> DATE: April 8, 2024 <br> TIME: 10:00 a.m. <br> CTRM: 5A <br> JUDGE: Hon. Michael W. Fitzgerald |

4856-8854-9788.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND FACTUAL SUMMARY .......................................... 1

II.    ARGUMENT ............................................................................................... 4

    A.    Legal Standard .................................................................................... 4

    B.    Plaintiffs Adequately Plead Falsity.................................................... 5

        1.    Defendants Materially Misled Investors About Beyond Meat's QSR Partnerships........................................................ 5

        2.    Defendants Misled Investors About the Investments Beyond Meat Was Making to Further Its QSR Partnerships.................................................................................. 8

        3.    Defendants' Misstatements and Omissions to Investors Were Material .............................................................. 9

        4.    Defendants' Misstatements and Omissions Are Not Immunized by the PSLRA's Safe Harbor .............................. 12

    C.    Plaintiffs Sufficiently Allege Defendants' Scienter ........................... 15

        1.    Plaintiffs' Allegations Create a Strong Inference of Ethan Brown's Scienter ............................................................ 16

        2.    Brown's Lack of Insider Trading Does Not Undermine Plaintiffs' Strong Inference of Scienter .................................. 20

        3.    Plaintiffs Allege a Strong Inference of Nelson's and Hardin's Scienter .................................................................... 22

        4.    Plaintiffs Allege a Strong Inference of Beyond Meat's Corporate Scienter ............................................................... 24

    D.    Plaintiffs Sufficiently Allege Loss Causation.................................... 25

    E.    Plaintiffs Sufficiently Allege Violations of §20(a)............................. 29

    F.    Plaintiffs Sufficiently Allege Violations of §20A ............................. 30

III.    CONCLUSION ........................................................................................ 31

4856-8854-9788.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................4

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004).........................................................................21

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018).............................................23

*Basile v. Valeant Pharm. Int'l, Inc.*,
2015 WL 7352005 (C.D. Cal. Nov. 9, 2015)................................................30

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ................................................18

*Beatbox Music Pty, Ltd. v. Labrador Ent., Inc.*,
2021 WL 831017 (C.D. Cal. Jan. 12, 2021).................................................19

*Berson v. Applied Signal Technology*,
527 F.3d 982 (9th Cir. 2008)..........................................................................6

*Buttonwood Tree Value Partners, LP v. Sweeney*,
2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) .......................................21, 24

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ..........................................................13

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989)........................................................................11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*
*v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)........................................................................16

*City of Miami Gen. Emps. & Sanitation Emps. Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...................................................16, 28

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021) ..........................................................6

**Page**

*Dawod v. Garland*,
2023 WL 8168832 (C.D. Cal. Oct. 12, 2023) ......................................................31

*E. Ohman Jor Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ...............................................................................15

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D. S.C. 2016) ....................................................................29

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .......................................................................15, 25

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................30

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...............................................................................21

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ........................................................21

*FTC v. Trudeau*,
579 F.3d 754 (7th Cir. 2009) ...............................................................................10

*Glazer Cap. Mgmt., L.P. v. Forescout Technologies, Inc.*,
63 F.4th 747 (9th Cir. 2023) ..........................................................................11, 15

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ......................................................22

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................................*passim*

*In re Amgen Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ......................................................15

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .................................16, 18, 20, 21

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ...............................................................................13

4856-8854-9788.v1

**Page**

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...................................... 10, 11, 12

*In re Banc of Cal. Sec. Litig.*,
    2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ........................................ 10, 24, 25

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ................................................ 11, 19

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ....................................................................... 25

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
    2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ................................................ 10

*In re Celera Corp. Sec. Litig.*,
    2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) .................................................. 14

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) .................................................. 11

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ............................................................ 12

*In re Diamond Foods, Inc., Sec. Litig.*,
    2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ........................................... 16, 19

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ................................................................... 26, 27

*In re Fibrogen, Inc.*,
    2022 WL 2793032 (N.D. Cal. July 15, 2022) ................................................. 11

*In re Impinj, Inc. Sec. Litig.*,
    414 F. Supp. 3d 1327 (W.D. Wash. 2019) ..................................................... 27

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................... 24

*In re Merit Med. Sys., Inc. Sec. Litig.*,
    2021 WL 1258590, (C.D. Cal. Mar. 16, 2021),
    *adopted by* 2021 WL 1753612 (C.D. Cal. May 3, 2021) ................................. 13

4856-8854-9788.v1

**Page**

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) ....................................................... 7

*In re Omnivision Technologies, Inc.*,
2005 WL 1867717 (N.D. Cal. July 29, 2005) ....................................................23

*In re Quality Sys., Inc., Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ....................................................................11, 12

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) .......................................................27, 28

*In re Under Armour Sec. Litig.*,
2020 WL 363411 (D. Md. Jan. 22, 2020) .........................................................20

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) .................................................24

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021) ..............................................................29

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .......................................................................5, 15

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) ........................................................18

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ............................................................................24

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ...............................................................................22

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022) ...............................................11, 12, 13

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020)................................................*passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..............................................................................4

4856-8854-9788.v1

**Page**

*Kui Zhu v Taronis Technologies Inc.*,
2020 WL 1703680 (D. Ariz. Apr. 8, 2020) ..........................................................26

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ....................................25, 30, 31

*Loritz v. Exide Technologies*,
2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ......................................................18

*Maiman v. Talbott*,
2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ....................................................21

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ..............................................................................21

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ................................................................................5

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ...............................................................26, 27, 28

*Mulligan v. Impax Laboratories, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................11

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ..............................................................................21

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ..............................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Fund*,
575 U.S. 175 (2015) ..............................................................................................5

*Pierrelouis v. Gogo, Inc.*,
2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) .....................................................21

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..............................................................................29

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .......................................................................16, 18

4856-8854-9788.v1

**Page**

*Roberti v. OSI Sys., Inc.*,
 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ................................. 14, 15, 16, 20

*Schlagal v. Learning Tree Int'l*,
 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) .................................................. 23

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
 485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..................................................... 30, 31

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
 2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ............................................ 21, 22

*Sudunagunta v. NantKwest, Inc.*,
 2017 WL 8810760 (C.D. Cal. Sept. 20, 2017) ........................................... 20, 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007) ................................................................................. 4, 15, 20

*Thomas v. Magnachip Semiconductor Corp.*,
 167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................... 22

*Todd v. STAAR Surgical Co.*,
 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................... *passim*

*Turocy v. El Pollo Loco Holdings, Inc.*,
 2018 WL 3343493 (C.D. Cal. July 3, 2018) .............................................. 30, 31

*Weston v. DocuSign, Inc.*,
 __ F. Supp. 3d __, 2023 WL 3000583
 (N.D. Cal. Apr. 18, 2023) ................................................................... 14, 27, 28

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
 426 F. Supp. 3d 864 (D. Kan. 2019) ................................................................ 19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
 §78j(b) .......................................................................................................... 29
 §78t-1 ..................................................................................... 30, 31§78u-4
 §78t(a) ...................................................................................................... 29, 30

Federal Rules of Civil Procedure
 Rule 9(b) .......................................................................................................... 7

4856-8854-9788.v1

**Page**

17 C.F.R.
§240.10b-5 ................................................................................................................. 15

4856-8854-9788.v1

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DEFINITION |
|---|---|
| ¶___ and ¶¶___ | Citations to paragraphs in the Complaint |
| Beyond Meat or the Company | Beyond Meat, Inc. |
| Brown | Defendant Ethan Walden Brown |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CMO | Chief Marketing Officer |
| COO | Chief Operating Officer |
| CSO | Chief Supply Chain Officer |
| Class Period | May 5, 2020 through October 13, 2022, inclusive |
| Complaint | Plaintiffs' Consolidated Class Action Complaint for the Violation of Federal Securities Laws (ECF 34) |
| COGS | Cost of Goods Sold |
| Defendants | Beyond Meat, Inc., Ethan Walden Brown, Philip E. Hardin, and Mark J. Nelson |
| Del Taco | Del Taco LLC |
| Flatley | McDonald's Corporation's Chief Marketing Officer Morgan Flatley |
| Hardin | Defendant Philip E. Hardin |
| Individual Defendants | Defendants Brown, Hardin, and Nelson |
| KFC | KFC Corporation |
| McDonald's | McDonald's Corporation |
| Motion or Mot. | Defendants' Notice of Motion to Dismiss Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF 42) and Memorandum of Law in Support of Defendants' Motion to Dismiss Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF 42-1) |
| Nelson | Defendant Mark J. Nelson |

- 1 -

4856-8854-9788.v1

| ABBREVIATION | DEFINITION |
|---|---|
| Pepsi | PepsiCo, Inc. |
| Pizza Hut | Pizza Hut, LLC |
| Plaintiffs | Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("SHEPP") and additional named plaintiff Mario A. Colato ("Colato") |
| PSLRA | Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. §78u-4 |
| Ramsey | Doug W. Ramsey |
| RJN | Defendants' Request for Judicial Notice and Incorporation by Reference in Support of Defendants' Motion to Dismiss Consolidated Class Action Complaint for Violation of the Federal Securities (ECF 43) |
| QSR | Quick-service restaurant |
| *WSJ* | *The Wall Street Journal* |

- 2 -

4856-8854-9788.v1

## I.    INTRODUCTION AND FACTUAL SUMMARY

This securities fraud case arises out of Defendants' material misrepresentations and omissions concerning Beyond Meat's inability to scale production of its products for its large QSR and other foodservice partners, and the investments and progress the Company was making to support these partnerships. Beyond Meat produces plant-based meat substitutes. ¶16. By bringing the Company's products to a much wider audience, these partnerships, which included foodservice giants like McDonald's, KFC, and Taco Bell, were critical to Beyond Meat's business strategy to accelerate sales growth. ¶¶22, 25-26. It was also key to Beyond Meat's ability to reduce costs in its production model to reach the important goal of price parity with animal protein (which was 2 to 4 times less than plant-based substitutes), and to meet the price-per-pound demands of its partners. *Id.*

Beyond Meat began publicly announcing these partnerships in late 2019, and as the Class Period commenced, Defendants announced successful plant-based product tests and launches, as well as expanded testing, with these industry titans. Defendants told investors that Beyond Meat was getting "good results," tests were "very positive" and are "going well," that launches were "terrific" and generating "really good results," and that the Company was the "preferred supplier" of plant-based protein for some of these large partnerships. ¶¶40, 42-43, 47, 61, 67. These statements, and the prospect of Beyond Meat having permanent menu offerings on the U.S. menus of these iconic brands, particularly McDonald's, elated analysts who saw this as a significant contributor to Beyond Meat's sales growth. ¶¶28-29, 41, 48, 102.

Along with these statements heralding overwhelmingly positive test results and launches, Defendants also repeatedly spoke about investments in the Company's production processes to meet partners supply demand and reduce costs to reach price parity, which signaled to analysts that Defendants were "highly confident in an expansion with [McDonald's] or another QSR." ¶102. During the Class Period, Defendants publicly assured investors that Beyond Meat's investments were

- 1 -

"continuing to drive the integration of our production process to strip out [] costs," and that the purchase of a manufacturing plant in DeVault, Pennsylvania was intended to "reduce production costs . . . as we'll be able to do important product scaling work in-house." ¶¶44, 58. Defendants also stated that "we're going to bring a lot of cost out of our production model . . . [a]nd you're starting to see us do that," "we're putting in an integrated process [at DeVault] so we can go end-to-end there," that Beyond Meat was "continuing to optimize commercial production," and that Defendants were seeing "a steady improvement in the COGS structure." ¶¶70, 77, 84.

But while Beyond Meat praised the tests and launches with these fast-food behemoths, and the progress of the investments being made in their pursuit, Defendants concealed that the Company was failing in its attempts to successfully scale production to meet the demand of these partners. ¶¶19-24, 30-36, 49. By May 2020, Beyond Meat faced significant challenges in scaling up production to meet the stringent quality requirements set by its partners, including what was required for permanent placement on their menus. ¶49.

For example, by the start of the Class Period, Defendants knew the Company was unable to scale-up production to supply McDonald's with plant-based McPlant patties for a full U.S. nationwide expansion. ¶49(b). McDonald's had strict requirements for the faux meat patties for the McPlant burger (then known as the "PLT"), including consistency, taste, weight, height, shape, and texture. *Id.* But when Beyond Meat started using a continuous mass production process to produce larger volumes of the McPlant patty, the product changed composition because the ingredients were exposed to different levels of liquid, heat, and chemistry changes. ¶49(b)(i). As a result, the product specifically formulated for McDonald's was inconsistent in taste, moisture content, size, and texture. *Id.* Also, Beyond Meat lacked a consistent supply chain for the McPlant patty ingredients and used co-manufacturers to produce the McPlant patties, which also contributed to inconsistencies in the taste and appearance of the patties. ¶49(b)(ii). In fact, after the

- 2 -

McDonald's Canada trials, McDonald's discovered foreign material in product supplied by Beyond Meat that was identified as wood fragments that came from a co-manufacturer's wood pallet. *Id.*

Beyond Meat experienced similar challenges with KFC and its Beyond Chicken Tenders product for its other foodservice customers. ¶49(c)-(d). Following KFC's initial test of Beyond Meat's plant-based chicken product in Atlanta in 2019, Beyond Meat could not scale up production of the plant-based chicken products for KFC to sell as permanent menu items because Beyond Meat was unable to adapt the original test lab recipes for mass production and manufacturing inefficiencies increased the price-per-pound. ¶49(c). Beyond Meat's manufacturing inefficiencies and inability to scale production also caused delayed launches of its Chicken Tenders. ¶49(d). As Defendants eventually admitted, and *Bloomberg* reported, production of the Chicken Tender product alone caused gross margins to decline 5% because of higher co-manufacturer costs and lower output levels. *Id.*, ¶120.

Scaling efforts and production problems worsened as the Class Period progressed. For example, by early 2021, Beyond Meat experienced production setbacks and launch delays of Beyond Pepperoni, a product the Company was manufacturing for Pizza Hut. ¶103(b). The launch of Beyond Jerky – in partnership with Pepsi – suffered from a similar botched launch. *Id.* As Defendants later admitted, the Company could not scale production of the product because it lacked the necessary manufacturing processes, and as a result the production costs were so high that gross margins were decimated. ¶129.

Moreover, Defendants hid from investors the fact that the Company's aggressive investment plan to scale production for these critical partners and bring costs out of the Company's production model, was also failing. ¶¶19, 34-35, 49(e), 59. Defendants entered into the foodservice partnerships without first determining the capital required, or calculating the costs and expenses associated with, manufacturing at scale, causing Defendants to spend millions of dollars on unusable machinery that

- 3 -

sat idle during the Class Period.  ¶¶19, 49(e)(ii).  Defendants were also overbuilding a co-manufacturer network instead of producing products in-house, which tripled the cost of production.  ¶59(c).  The DeVault plant, which was to be the Company's "in-house" production scaling facility, sat partially idle during the Class Period as Defendants used the more expensive co-manufactures for production.  ¶¶59(b)-(d). These problems significantly impacted the Company's ability to scale production, caused product launch delays, and increased expenses and inventory write-offs.

Beyond Meat's inability to meet the demands of its large foodservice partners, and failing investments, came to light in a series of partial disclosures that revealed: revenue decreases due to QSR-related launch delays; gross margin declines due to higher production costs; increasing operating expenses for commercialization; QSR partner test cancellations and dissatisfaction; and Beyond Meat's manufacturing inefficiencies and inability to scale production.  ¶¶183-227.  As result of these partial disclosures, the Company's stock price plummeted from a Class Period high of $194.95, down to $13.35 by the end of the Class Period, ***a stunning 93% drop***.  ¶4.

## II.    ARGUMENT

### A.    Legal Standard

The Court must "accept all factual allegations in the complaint as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007) ("*Tellabs*").[1]  A complaint need only contain sufficient factual matter that states a claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

---

[1]  Plaintiffs do not object to the Court taking judicial notice of the documents referenced in Defendants' RJN and attached to ECF 42-4, and only contend that the Court should not consider these extrinsic materials for the truth of the matters stated therein. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

[2]  Unless otherwise noted, all emphasis is added and citations are omitted.

- 4 -

4856-8854-9788.v1

**B.     Plaintiffs Adequately Plead Falsity**

To adequately plead falsity, "'the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). In other words, "[t]o give rise to an actionable claim for securities fraud," a defendant's statement or omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *5 (C.D. Cal. Apr. 12, 2016) (Fitzgerald, J.). Additionally, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

As demonstrated below, Plaintiffs sufficiently allege that Defendants materially misled Beyond Meat investors.

**1.     Defendants Materially Misled Investors About Beyond Meat's QSR Partnerships**

During the Class Period, Defendants repeatedly assured investors about the success of Beyond Meat's product tests with its QSR partners and the strength of these relationships, leading investors to believe that nationwide U.S. launches with these partners and permanent placement on their menus were imminent. *See* ¶¶39-46, 48, 52, 56-57, 61-63, 67, 69, 75, 78-81, 85, 91, 94-100, 102, 120, 124-127. For instance, beginning in May 2020, Brown repeatedly highlighted Beyond Meat's partnership with McDonald's, assuring the market that the McDonald's tests "got good results in the beginning and got good results at the end," "there's no issue with McDonald's," and that "we had a very positive test with [McDonald's]." ¶¶40, 42. Brown also publicly emphasized that "[w]e feel very good about our relationship with

- 5 -

McDonald's," that the relationship was "really strong," and "we have developed [a] very long-term relationship with [McDonald's]." ¶¶39, 56-57.

Defendants made similar misstatements about the purported success of its other large QSR partnership with YUM! Brands (*i.e.*, Pizza Hut, Taco Bell, and KFC), stating "the tests are going well, went well," and "it was a terrific launch." ¶43. Then, in February 2021, Defendants told investors that these purportedly successful product tests and launches culminated into coveted partnership agreements with both McDonald's and YUM! Brands, with Beyond Meat being the "preferred global supplier" for two of the largest QSRs in the U.S., which further solidified investors' belief that nationwide U.S. launches with these partners were forthcoming. *See* ¶¶60-70. Brown misrepresented to investors that these two agreements "are prime examples of what we've been scaling and preparing for." ¶64.

These statements about the success of Beyond Meat's partnerships with these large QSRs were materially misleading at the time they were made because Beyond Meat could not scale production of its QSR product formulations to meet the strict quality requirements of its partners. While small-batch production for QSR products had been moderately successful, by the start of the Class Period, Beyond Meat struggled with mass producing the product needed to successfully meet the demands of its partners, both in quality and quantity. *See* ¶¶30-35, 49, 59, 71, 104-108.

Nothing required Brown to make these statements. But once he and the other Individual Defendants chose to tout this positive information to the market, "they were bound to do so in a manner that wouldn't mislead investors,"[3] which includes "'disclosing adverse information that cuts against the positive information.'" *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *12 (C.D. Cal. Jan. 17, 2020) ("*Stamps*") (Fitzgerald, J.); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1181 (N.D. Cal. 2021). Defendants violated this duty when

---

[3] *Berson v. Applied Signal Technology*, 527 F.3d 982, 987 (9th Cir. 2008).

- 6 -

they failed to disclose to investors that belying the outward misleading impression they created that Beyond Meat's partnerships with its biggest QSR partners were strong, and that the associated testing and product launches were going well, was the behind-the-scenes reality that the Company was beset with significant manufacturing issues and inefficiencies along with serious quality control problems. *See, e.g.*, ¶¶30-35, 49, 59, 71, 103; *see also STAAR Surgical*, 2016 WL 6699284, at *6 ("In sum, the SAC's allegations that the reality facing STAAR was bleaker than the picture the Company painted for its investors are sufficient to satisfy the PSLRA and Rule 9(b).").

These well-pleaded allegations supporting falsity are corroborated by the detailed reporting that emerged from "reputable" news sources such as *Bloomberg* and *WSJ. In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *7 (W.D. Pa. May 18, 2023). For example, *Bloomberg* reported during the Class Period that: (1) "Taco Bell cancelled a test with Beyond Meat for a carne asada product due to ongoing quality concerns"; (2) "the delays in product roll out and execution challenges Beyond Meat was facing" with respect to its chicken launch; and (3) "three Del Taco stores had dropped Beyond Meat's version of ground beef" and that "some of the Company's other foodservice customers were also dissatisfied with Beyond Meat's product and were either limiting or had already discontinued Beyond Meat menu items." ¶¶33, 104, 118. After the Class Period, the *WSJ*, citing current and former employees, reported that:

> Innovations made in small quantities by hand in Beyond's research laboratories often would spur Mr. Brown and other top executives to make commitments to customers before the company knew how to produce the food at large scale in factories, the employees said.

¶163; *see also* ¶164.

These allegations, contrary to Defendants' claims (*see* Mot. at 17), when viewed holistically, plausibly paint a picture that Beyond Meat's QSR partners were satisfied with the products that the Company was producing during the Class Period.

- 7 -

4856-8854-9788.v1

The fact that McDonald's announced the McPlant without naming Beyond Meat, and then later pulled the U.S. trial of the product, buttresses the Complaint's allegations that Beyond Meat had significant problems scaling up and manufacturing these types of food items to the satisfaction of their extremely important QSR customers and that these issues were negatively impacting the relationships Beyond Meat had with these companies. *See* ¶¶189, 223. The allegations related to the doomed launch of Beyond Meat's jerky product with Pepsi, although not a QSR, are just another example how the Company was having serious issues creating a scaled up version of a product for a large customer. *See, e.g.*, ¶103(b). Thus, by failing to disclose the multitude of problems and inefficiencies surrounding the manufacturing and quality control of their QSR-related products, Defendants' statements and omissions to investors touting the strength of Beyond Meat's QSR relationships were materially misleading. *See Stamps*, 2020 WL 281716, at *12 ("Because Defendants touted its strong relationship with USPS and USPS's approval of Stamps' business model, Stamps had a duty to disclose adverse information that cut against this positive information . . . .").

 **2.** **Defendants Misled Investors About the Investments Beyond Meat Was Making to Further Its QSR Partnerships**

As Defendants were publicly lauding the success of Beyond Meat's QSR partnerships, they also repeatedly discussed the significant investments Beyond Meat made to commercialize and scale production for its QSR partners. These statements were important to investors for two reasons. First, they gave the market additional confidence that Beyond Meat's QSR partnerships would expand, particularly with McDonald's in the U.S., which would be a key driver for the Company's 2022 revenue growth. *See* ¶102. Second, they conveyed that the investments would bring the costs out of Beyond Meat's production model, which was critical for the Company to reach price parity with animal protein and meet the price-per-pound demands of its partners. ¶¶22, 58. For example, during the Class Period, Defendants publicly assured investors that, among other things, Beyond Meat's investments were

- 8 -

4856-8854-9788.v1

"continuing to drive the integration of our production process to strip out [] costs." ¶44; *see also* §I at 2, *supra*, citing ¶¶58, 70, 77, 84. Brown also reiterated to investors that Beyond Meat was not just making the investments on a "hope and a prayer," but rather because the Company had put together "some of the most powerful partnerships in the world, whether it's a Pepsi deal we announced, whether it's YUM!, whether it's McDonald's." ¶68.

These statements were materially misleading because at the time they were made, Defendants' substantial investment plan to scale production for its strategic QSR partners, and bring costs out of the Company's production model, was failing because Beyond Meat's tone-at-the-top of "growth at all" costs was hindering the Company's ability to execute on its investment plans. ¶4. Under Brown's directive, the Company rushed to develop and scale new products for Beyond Meat's strategic and QSR partners, spent millions of dollars on unusable machinery, overbuilt a co-manufacturer network, and experienced manufacturing inefficiencies at the Company's manufacturing plant that were hindering scaling efforts. As Defendants publicly admitted in May 2022, Beyond Meat had not been able to create production processes to scale production for its large partnerships, and, in fact, was forced to scale back on those partnerships less than a month after the end of the Class Period. ¶¶23-24. By concealing from investors the pervasive manufacturing problems (including expensive inefficiencies), Defendants "'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *STAAR Surgical*, 2016 WL 6699284, at *5.

### 3. Defendants' Misstatements and Omissions to Investors Were Material

It is essentially Black-letter law that "[t]he inquiry into materiality is 'fact-specific,'" and "'requires delicate assessments'" that "'are peculiarly ones for the trier of fact.'" *In re Alphabet*, *Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021). Therefore, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy

- 9 -

4856-8854-9788.v1

of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.'" *Id.* Defendants do not contest that subject matters such as Beyond Meat's partnerships with its large QSR (and QSR-like) customers, as well as testing and launches of products for those foodservice giants, were important to investors. The status and financial ramifications of Beyond Meat's partnerships (including product launches and testing) with QSRs like McDonald's, Taco Bell, and KFC were repeatedly discussed in Company-led conference calls, analyst reports, and publications by respected business-focused media outlets like *Bloomberg* and the *WSJ* who covered Beyond Meat. *See* §II(B)(1) at 5-6, *supra*; *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("Courts have found that when a company makes repeated representations on the same topic, even where those representation would otherwise be puffery, the repetition itself communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'") (alteration in original). Moreover, when the truth about Beyond Meat's inability to scale production and failed investments was revealed through a series of partial disclosures, the Company's stock price reacted negatively (*see, e.g.*, ¶¶183-227), which also reinforces the materiality of Defendants' statements to investors. *See Alphabet*, 1 F.4th at 705; *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *4 (C.D. Cal. Sept. 6, 2017).

Defendants simply contend that because they used words like "great" and "very strong" to describe Beyond Meat's overall relationships – as well as product testing and launches – with their QSR partnerships, these types of misrepresentations cannot be actionable because they are vague statements of corporate optimism, *i.e.*, puffery. *See* Mot. at 22. This is false. "'In determining whether a statement is puffery, the context matters.'" *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013) (quoting *FTC v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009)). "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when

- 10 -

4856-8854-9788.v1

used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *see also Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("Accordingly, the Court may not assess the statements listed in the FAC in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery' . . . ."); *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872-73 (W.D. Wash. 2022) (denying puffery defense based on defendants' "myopic" characterization of alleged misstatements). "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc., Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). This is especially true when "many of the challenged statements were made during earnings conference calls" and "in response to specific questions asked by financial analysts." *Glazer Cap. Mgmt., L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023).

In *Stamps* – a decision Defendants do not try to distinguish anywhere in their Motion – this Court held that when analyzed in context, statements that USPS was "'very happy'" with the company and that it had a "'great partnership with USPS,'" were actionable misrepresentations. 2020 WL 281716, at *11. Other courts have held that statements with descriptors such as "'very good,'" "'very pleased,'" "'good progress,'" and representations that a relationship "was positive" and or program was "'very successful,'" were all, when analyzed in context, actionable.[4] Here, Defendants' repeated Class-Period statements as to the Company's QSR partnerships, made mostly by Brown, were crucially important to analysts and investors to assess Beyond Meat's current and future financial viability, as evident by analyst follow-up

---

[4] *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *8 (N.D. Cal. July 15, 2022); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018); *Avon*, 2019 WL 6115349, at *16.

- 11 -

4856-8854-9788.v1

questions during the calls and the substance of their reports published thereafter. *See, e.g.*, ¶79 (during a May 2021 Annual Shareholders Meeting, Brown assured investors about Beyond Meat's relationship with McDonald's, stating: "[t]he relationship with them is – remains really strong, as I've said for years"); *see also* ¶¶39-41, 45, 48, 52, 57, 63, 75, 81, 102; *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (statements to analysts describing company's business relationships as "terrific," "strong," "very strong," and "unique and important," were upheld as actionable).

Defendants' repeated misrepresentations to analysts and investors about Beyond Meat's most important corporate partnerships, creating the misleading impression that they were going "great" and "very good," are thus actionable. *See Quality Sys.*, 865 F.3d at 1143; *Avon*, 2019 WL 6115349, at *16.[5]

### 4. Defendants' Misstatements and Omissions Are Not Immunized by the PSLRA's Safe Harbor

A defendant cannot escape liability under the PSLRA merely "by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings." *Quality Sys.*, 865 F.3d at 1141; *see also Zillow*, 644 F. Supp. 3d at 869 ("A future-tense phrase does not automatically immunize a statement from containing separable, present- or backward-looking aspects, and simply appending 'magic words' does not itself obviate any potential to mislead investors.").

The statements Defendants contend are forward-looking are in fact representations of present and/or historical facts.   For example, contrary to

---

[5]   Defendants essentially argue that the same statements they claim are puffery are also nonactionable opinions. *See* Mot. at 22-23.  Because these statements were made with scienter (*see* §II.C., *infra*), and because they are based on material facts concealed from and misrepresented to investors, they are not shielded from liability. *See STAAR Surgical*, 2016 WL 6699284, at *9 ("Simply inserting the word 'believe' in front of a statement of fact does not, therefore, immunize Defendants from liability."); *id.* at *10 (omission of material fact can make a "'literally accurate'" opinion misleading).

4856-8854-9788.v1

Defendants' claim, nothing in ¶57 is a forward-looking statement. *See* Mot. at 23. During this November 2020 quarterly earnings call with analysts and investors, Brown clearly used the past-tense when he said "***we have developed***" a "very long-term relationship" with McDonald's and "***[w]e worked*** very hard on developing the burger that was in the PLT, and it will be in the McPlant." ¶57. It is hard to see how either of these sentiments about what Beyond Meat "developed" and "worked" on are forward-looking. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017) (defendant's "emphasis on the past tense indicates that [he] was referring to prior events," and therefore the statements were not forward-looking); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 467-68 (S.D. Tex. 2016) (past tense verbs like "was" and "were" make alleged misstatements not forward-looking). The same is true for the bolded sentence in ¶115 that Defendants claim is forward-looking, except instead of being a statement about past facts, it is about present ones. *See* Mot. at 23. In an article published by *The Street*, a Beyond Meat spokesperson was quoted as saying that the Company's partnership with Taco Bell "***is*** strong and continuing" – a clear, albeit misleading, reference to the then-present state of the relationship between Beyond Meat and a QSR partner. ¶115. Other statements cited in Defendants' Motion claimed to be forward-looking (*see* Mot. at 23-24) are similarly representations about either present or historical facts (or both). *See, e.g.*, ¶65 ("***Over the last year . . . .***"); ¶77 ("***continuing*** to optimize" and "***we are adding*** new lines"); ¶78 ("***gives*** us the opportunity ***to continue*** to move at a pace"); ¶84 ("you ***see*** a steady improvement" and "as we ***implement***"); ¶100 ("the investment levels ***you're seeing***" and "***have been*** significant"); ¶101 ("***continuing*** to drive down cost of our materials" and "***we're*** making really good progress"); ¶123 ("***we are*** confident"); ¶133 ("***We have*** multiple initiatives ***underway. . . .***"); *see also In re Merit Med. Sys., Inc. Sec. Litig.*, 2021 WL 1258590, at *8 (C.D. Cal. Mar. 16, 2021), *adopted by* 2021 WL 1753612 (C.D. Cal. May 3, 2021); *Zillow*, 644 F. Supp. 3d at 869 n.8.

- 13 -

4856-8854-9788.v1

Moreover, as this Court made clear on multiple occasions, "'to the extent Plaintiffs . . . challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply.'" *STAAR Surgical*, 2016 WL 6699284, at \*10 (emphasis in original); *see also Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*9 (C.D. Cal. Feb. 27, 2015) (Fitzgerald, J.) (same). Here, for example, the Complaint alleges that Defendants *omitted, i.e., failed to disclose*, material information about the problems plaguing Beyond Meat *at the present time* with respect to the manufacturing and quality control of products it was testing for launches with its large QSR partners like McDonald's, Taco Bell, and KFC. *See, e.g.*, ¶¶4, 49(e), 185; *see also In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at \*2 (N.D. Cal. Sept. 3, 2013) (statement was not forward-looking because "it was an omission of a historical fact"). Therefore, because Defendants' representations were misleading by virtue of omitting material information, the alleged misstatements Defendants complain about are not shielded by the PSLRA's safe harbor.

Finally, Defendants' arguments for why their purportedly cautionary language immunizes material misrepresentations where the omitted undisclosed information (or "risk") already materialized, but remained undisclosed to investors, fails as well. *See Weston v. DocuSign, Inc.*, __ F. Supp. 3d __, 2023 WL 3000583, at \*17 (N.D. Cal. Apr. 18, 2023) ("However, '[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors.'") (alteration in original) (quoting *Alphabet*, 1 F.4th at 703). For example, Defendants never warned investors about presently-occurring, undisclosed facts such as Beyond Meat's failure "to cost-efficiently scale up the original recipes and meet the specifications promised to its partners." ¶49(a). Defendants never warned investors that "Beyond Meat's partners were not only dissatisfied with the quality and sensory aspects of the products, but also with the high cost-per-pound because of the Company's inability to

- 14 -

scale production cost-effectively." *Id.*   There was also no warning that QSR representatives may discover "foreign material in product supplied by Beyond Meat" such "as wood fragments that came from a co-manufacturer's wood pallet." ¶49(b)(ii).   These examples demonstrate why any purported cautionary language about future risks that already materialized is insufficient to bring them under the protection of the PSLRA's safe harbor provision. *See Forescout*, 63 F.4th at 781.

### C.   Plaintiffs Sufficiently Allege Defendants' Scienter

A complaint pleads scienter where it alleges defendants "'made false or misleading statements either intentionally or with deliberate recklessness.'" *STAAR Surgical*, 2016 WL 6699284, at *12; *see also VeriFone Holdings*, 704 F.3d at 708 ("Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5."). Courts must "accept all factual allegations . . . as true" and consider "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  Thus, "[e]ven if no single allegation, standing alone, is 'sufficient to give rise to a strong inference of scienter,' a holistic review of all the allegations may 'combine to give rise to a strong inference of scienter.'" *E. Ohman Jor Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (quoting *Forescout*, 63 F.4th at 766); *see also Stamps*, 2020 WL 281716, at *17; *OSI*, 2015 WL 1985562, at *11.  The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"   *Tellabs*, 551 U.S. at 324.   Thus, "if two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032-33 (9th Cir. 2016).  "'In other words, the tie goes to the Plaintiff.'" *In re Amgen Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

- 15 -

4856-8854-9788.v1

### 1. Plaintiffs' Allegations Create a Strong Inference of Ethan Brown's Scienter

"[W]hen allegations pertain to a company's core operations, the Ninth Circuit permits an inference of scienter." *OSI*, 2015 WL 1985562, at \*12 (citing *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014)).[6]  This is especially appropriate "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 576; *see also STAAR Surgical*, 2016 WL 6699284, at \*13.  Moreover, a court "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." *Alphabet*, 1 F.4th at 706; *see also City of Miami Gen. Emps. & Sanitation Emps. Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1045 (N.D. Cal. 2018) (when paired with allegations regarding CEO's own public statements, allegations regarding his "'hands on' management style, support a compelling inference that [the CEO] knew about the inventory shortages and customer complaints which followed").  Finally, a C-suite level defendant's own public statements to the market can help create a cogent and compelling inference of that executive's scienter.  *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*9 (N.D. Cal. Nov. 4, 2020) ("Indeed, it strains credulity that Cook would not have known about the trade tensions and their potential impact on Apple's business, particularly where Cook opined on those tensions on the November 1 call."); *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at \*11 (N.D. Cal. Nov. 30, 2012) (rejecting defendant CEO's argument that he was "ignorant" of the underlying allegations given his "role in the walnut business at Diamond and his own statements").  Given the vital role QSR partnerships played in Beyond Meat's hope for future financial success, in addition to the repeated public statements made by the Company's CEO and founder Brown to analysts, investors,

---

[6]   The decision in *Reese* was later abrogated on grounds unrelated to its discussion of scienter. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

4856-8854-9788.v1

and the financial media on Beyond Meat's product launches with corporate entities McDonald's and YUM! Brands, the Court has ample reason to find that the "core operations" inference of scienter applies in this case and bolsters a strong inference of Brown's scienter.[7]

Here, Defendants do not dispute (nor could they) that creating and maintaining successful partnerships with behemoths like McDonald's and the YUM! Brands – *i.e.*, Beyond Meat's QSR "whales"[8] and "industry titans"[9] – was integral to the Company's financial health and overall survival. *See, e.g.*, ¶¶25-26, 41, 78, 102. Throughout the Class Period, Beyond Meat's partnerships and product launches with massive QSRs like McDonald's was a constant talking point for Brown when touting the Company's financial prospects on conference calls with analysts and investors, and in interviews with members of the business and financial media. *See* ¶¶27-28. How could it not be, as Brown made it abundantly clear to the market that the relationship with McDonald's "has been great for a long time," and that McDonald's was "such an important" customer and "partner" to Beyond Meat. ¶75; *see also* ¶¶56-57, 79. In fact, acutely aware that analysts and investors were paying close attention to the progress and status of the partnership and McPlant rollout with McDonald's, Brown sarcastically stated on a quarterly conference call that he "was very worried that we'd have one analyst call where McDonald's wasn't mentioned." *Id.* As Beyond Meat's "external . . . gatekeeper of information," one who took on an "active role" in communicating with investors, Brown's repeated public statements not only demonstrated the crucial role QSRs like McDonald's, Taco Bell, and KFC played in Beyond Meat's prospects at future financial growth and profitability, but also made

---

[7]    Because Plaintiffs sufficiently plead Brown's scienter, the Court can impute his fraudulent state of mind to Beyond Meat. *See Alphabet*, 1 F.4th at 706; *see also Stamps*, 2020 WL 281716, at *17.

[8]    ¶¶20, 161.

[9]    ¶18.

- 17 -

clear to the market that he was informed about what was occurring on the Company's operational and testing side. *Reese*, 747 F.3d at 576; *see also* ¶¶40, 42-43, 45, 98, 124-125, 127 (Brown discussing testing involving McDonald's, KFC, Taco Bell, and Pizza Hut with analysts and investors); ¶¶70, 76-77, 97, 100 (discussing the Company's investments and spending in manufacturing with respect to its QSR partnerships); ¶96 (discussing how Beyond Meat supposedly "overcame numerous technical challenges" with respect to its Beyond Pepperoni product line); ¶99 (telling analysts and investors that he has not heard of any "operational challenges within the back of the house" with respect to the rollout of the McPlant"). Brown was also directly involved in working with Beyond Meat's large QSR partners, so much so that his April 2022 interview with *Fast Company* (*see* ¶27) was done alongside McDonald's CMO, Flatley.[10] *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *11 (C.D. Cal. July 1, 2008) (finding a strong inference of scienter based in part on allegations that defendant is the kind of CEO who "talks to . . . and jumps on a plane to go out and meet with customers").

Brown's own public statements reinforce the cogent and compelling inference that as the Company's CEO, he knew, or at the very least should have known, about the scaling-up and manufacturing problems and inefficiencies Defendants concealed from Beyond Meat investors. *See Loritz v. Exide Technologies*, 2014 WL 4058752, at *12 (C.D. Cal. Aug. 7, 2014) (holding that defendants' "statements show that management was aware of, and involved in environmental compliance issues at Vernon, making it even less likely that Defendants were not aware of Vernon's contamination issues"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1210 (W.D. Wash. 2009) ("[CEO's] own statements about risk management show his detailed knowledge about the processes."); *see also Apple*,

_____

[10] The Fast Company interview with Brown and Flatley referenced at ¶27 can be found at https://www.fastcompany.com/90746979/watch-our-full-interview-with-mcdonalds-and-beyond-meat-the-mcplant-is-here-to-stay (last checked on February 6, 2024).

- 18 -

4856-8854-9788.v1

2020 WL 6482014, at *9; *Diamond Foods*, 2012 WL 6000923, at *11. Similarly, Brown's post-Class Period admission that Beyond Meat needed to change its "growth above everything else" mindset (which included cutting its co-manufacturers from eight to three),[11] only serves to further strengthen the allegations that the Company's founder and CEO knew, or was reckless in not knowing, that investors were being misled about Beyond Meat's capabilities to scale-up and manufacture products on a sufficiently large scale to meet the needs of their enormously important QSR customers. *See BioMarin*, 2022 WL 164299, at *13 (holding that post-class period admission by company executive "contributes to an inference of scienter"); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 874 (D. Kan. 2019) (same).

Finally, contrary to Defendants' argument, the Complaint does not simply allege that the Court can infer Brown's scienter because he visited Beyond Meat's plant in Missouri to give tours to potential customers and co-manufacturers. Mot. at 27. What Defendants' Motion (unsurprisingly) fails to mention, is that the Complaint alleges Brown visited the Company's facility in Pennsylvania to discuss Beyond Meat's retail sausage line to be sold in grocery stores, and instructed employees to add more water to the product "even though Brown was told that the product would not look the way the Company wanted it to because more water would change the texture and create an overall drooping appearance." ¶150; *see also Diamond Foods*, 2012 WL 6000923, at *11 (CEO's scienter strengthened by allegations of his "hands-on approach to management" and his own statements). Defendants also never address (and therefore have waived any argument on reply)[12] the Complaint's allegations based on an article by *WSJ*, referencing and relying on statements given by current

---

[11]  *See* ¶¶24, 159, 166.

[12]  *See Beatbox Music Pty, Ltd. v. Labrador Ent., Inc.*, 2021 WL 831017, at *3 (C.D. Cal. Jan. 12, 2021) (Fitzgerald, J.) ("'Issues raised for the first time in the reply brief are waived.'").

- 19 -

4856-8854-9788.v1

and former employees. *See* ¶¶160-165. According to *WSJ*, "Brown's drive to roll out new products on rushed timelines led to missed deadlines, disappointed customers and wasted packaging and ingredients" and "[i]nnovations made in small quantities by hand in Beyond's research laboratories often would spur Mr. Brown and other top executives to make commitments to customers before the company knew how to produce the food at large scale in factories." ¶¶160, 163. Viewed holistically, Brown's public statements, his visits and discussions with employees at the Beyond Meat facilities about the Company's products, along with statements from current and former employees in the November 2022 *WSJ* article, coalesce with the Complaint's other allegations to strengthen the inference of Brown's scienter. *See Stamps*, 2020 WL 281716, at *17; *OSI*, 2015 WL 1985562, at *11; *see also In re Under Armour Sec. Litig.*, 2020 WL 363411, at *5, *8 (D. Md. Jan. 22, 2020) (finding that a *WSJ* article quoting "former executives" helped "generate[] a 'cogent and compelling' inference of scienter").

### 2. Brown's Lack of Insider Trading Does Not Undermine Plaintiffs' Strong Inference of Scienter

Defendants argue that because Brown decided not to follow his fellow executives and dump millions of dollars' worth of Beyond Meat shares, this fact (and purported lack of motive) undermines the Complaint's allegations of his scienter. Mot. at 26-27. Defendants are incorrect for several reasons. First and foremost, "the absence of a motive allegation is not fatal" to a plaintiff's scienter allegations. *Tellabs*, 551 U.S. at 325; *see also Apple*, 2020 WL 6482014, at *12-*13. Second, the fact that "Brown held a significant amount of Beyond Meat's stock throughout the entire alleged Class Period" also does not defeat the Complaint's scienter allegations. Mot. at 26. As Defendants are assuredly aware, the Ninth Circuit is replete with decisions (including one from this very Court) holding that "'[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period.'" *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *12

- 20 -

4856-8854-9788.v1

(C.D. Cal. Sept. 20, 2017) (Fitzgerald, J.); *see also Alphabet*, 1 F.4th at 707 ("Although such allegations may support an inference of scienter, they are not a *sine qua non* for raising such an inference.").[13]

Finally, Defendants claim that if Brown had "full knowledge that Beyond Meat was 'unable to deliver,'" then holding his stock throughout the entire Class Period "'does not make a whole lot of sense.'" Mot. at 26-27 (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)); *but see Apple*, 2020 WL 6482014, at *13 ("[T]he Court does not interpret *Nguyen* to require a specific theory of defendants' motives at the pleading stage."). Defendants' argument, however, ignores the fact that "the securities laws forbid foolish frauds along with clever ones." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent."); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *11 (S.D.N.Y. Sept. 28, 2023) ("*GE*") (same). It is certainly plausible based on the Complaint's ***pre-discovery*** allegations that Brown "'may have thought that there was a chance that the [situation] regarding the [issues] would right itself' and thus misrepresented facts as a 'gamble' that 'bad news . . . will be overtaken by good news.'" *Apple*, 2020 WL 6482014, at *13 n.12 (second and third alteration in original) (quoting *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Makor*")).[14] Here, Brown, along with his co-Defendants, "may have hoped that the situation" with Beyond Meat's QSR partners would improve, but that "hope that does not justify misleading investors." *Apple*, 2020 WL 6482014, at *13 n.12; *see also Makor*, 513 F.3d at 710 ("It is like

---

[13] *See also Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016); *Maiman v. Talbott*, 2010 WL 11421950, at *6 (C.D. Cal. Aug. 9, 2010).

[14] *Cf. Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *9 (N.D. Ill. Apr. 26, 2021) ("[T]he Court need not "'identify the precise moment at which the culpable inference overtook the innocent one" at this early stage.'").

- 21 -

4856-8854-9788.v1

embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing."); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *20 (N.D. Cal. Feb. 23, 2023); *GE*, 2023 WL 6314939, at *11 (citing *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016)).  Moreover, it would not be surprising in the least that Brown, who founded Beyond Meat and was, for all intents and purposes, its public face when it came to interacting with analysts, investors, and the media, knew that dumping his shares at the same time he was outwardly trying to keep market optimism (and, thus, the Company's stock price) from plummeting, would only cause the reverse effect and invite unwelcomed investor panic, distrust, and potentially, regulatory scrutiny.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) ("Indeed, there are several explanations for why an individual defendant would not sell stock even if she knew about false financial statements, such as a desire to avoid drawing the market's attention to the problem."); *GE*, 2023 WL 6314939, at *11 ("There are plausible reasons why an executive might not sell stock despite knowing that its value is inflated, from a desire to demonstrate belief in the company's future to a desire to avoid criminal liability by trading on material non-public information.").

Thus, the Court should reject Defendants' contention that Brown's failure to sell stock during the Class Period demonstrates a lack of motive and, in turn, an absence of scienter.  *See NantKwest*, 2017 WL 8810760, at *12.

### 3.  Plaintiffs Allege a Strong Inference of Nelson's and Hardin's Scienter

Nelson served as Beyond Meat's CFO from the beginning of the Class Period in May 2020 (*i.e.*, a year after the Company went public) to May 2021.  *See* ¶¶13, 169.  During that year, Nelson publicly touted Beyond Meat's QSR partnerships, investments in production capacity, as well as the Company's cost reduction efforts to analysts and investors.  *See, e.g.*, ¶¶47, 66, 154-155.  He also sold nearly 467,000 shares (*i.e., 98.5% of his holdings*) for over $60 million in proceeds before leaving

- 22 -

Beyond Meat in May 2021 (more than double percentage wise – and nearly four times profit wise – what he sold in the year prior). *See* ¶¶177-179; *see also Schlagal v. Learning Tree Int'l*, 1998 WL 1144581, at *16 (C.D. Cal. Dec. 23, 1998). Defendants do not claim that any of these Class Period sales by Nelson and Hardin were made pursuant to a 10b5-1 trading plan. *See Azar v. Yelp*, *Inc.*, 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) (holding that class period sales totaling approximately 20% of an insider defendant's holdings "does . . . provide some supporting evidence" of scienter, "at least in the absence of rebuttal by the 10b5-1 plan"). The Complaint sufficiently alleges a strong inference of Nelson's scienter based on: (1) the substantive nature of the public statements he, as the Company's CFO, made to analysts and investors evincing that he knew (or, at the very least, should have known) about the undisclosed manufacturing, processing and scaling-up problems Beyond Meat was having related to their QSR partnerships and product launches; and (2) the sale of nearly all of his Company stock for more than $60 million.

Just like with Brown, Nelson publicly spoke to the market about topics related to Beyond Meat's QSR partnerships such as "investments in additional production capacity, research and development efforts, marketing capabilities, international expansion and [the Company's] corporate infrastructure." ¶¶66, 154. Similar to Nelson, Hardin – who took over Beyond Meat's CFO position after Nelson stepped down, only to leave the Company after just over a year – also made public statements to analysts and investors about Beyond Meat's manufacturing processes and product launches relating to the Company's large corporate partners as well as Beyond Meat's efforts at cost reduction. *See, e.g.*, ¶¶129-130, 133, 156-157. These kinds of statements can add to a strong inference of scienter for a C-suite executive who speaks on behalf of a company. *See, e.g.*, §III(C)(1) at 16-18, *supra*. The fact that Nelson dumped nearly all of his Beyond Meat shares during the first half of the Class Period (more than double percentage wise what he sold in the year prior) also buttresses a strong inference of his scienter. *See In re Omnivision Technologies, Inc.*, 2005 WL

- 23 -

4856-8854-9788.v1

1867717, at *4 (N.D. Cal. July 29, 2005) (finding scienter supported by suspicious stock sales, the court noted that "[i]n particular, two of the Individual Defendants more than doubled the relative proportion of their shares they sold during the class period").[15]

### 4. Plaintiffs Allege a Strong Inference of Beyond Meat's Corporate Scienter

Even if the Court were to find that the Complaint sufficiently pleaded a strong inference of scienter for only one of the Individual Defendants – all of which were C-suite level executives – that alone would be enough to impute scienter to Beyond Meat. *See Stamps*, 2020 WL 281716, at *17 ("Moreover, since the Complaint adequately pleads scienter as to the individual executives and directors, this scienter can be imputed to Stamps as a corporation."); *Banc*, 2017 WL 3972456, at *7 ("In short, whether Plaintiffs have alleged sufficient facts to show Defendant Banc acted with scienter turns on whether Plaintiffs have alleged sufficient facts to show [Banc's former CEO] Sugarman acted with scienter."). Additionally, Beyond Meat's scienter is further reinforced by "independent investigative effort[s]" from news agencies such as *Bloomberg* and *WSJ*, wherein current and former Beyond Meat employees detailed the Company's various problems and inefficiencies with manufacturing, product launches, and testing related to major QSR customers during the Class Period. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *see also* ¶¶107, 112, 118, 164. Additionally, seven C-suite level executive departures during the Class Period (four of which were after the J.P. Morgan report about

---

[15] Defendants erroneously claim that "Plaintiffs admit that Nelson retained a sizable position in Beyond Meat even after the alleged sales . . . ." Mot. at 29. Given that Nelson sold 98.5% of his holdings between the beginning of the Class Period and the time he left Beyond Meat (which Defendants do not dispute), Plaintiffs in no way "admit" that the 1.5% remaining shares he did not sell are contextually "sizable." Regardless, the fact that he did not sell 100% of his holdings does not undermine his scienter. *See Buttonwood*, 2012 WL 13026910, at *2; *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *21 (S.D. Ohio Sept. 29, 2023) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994)).

- 24 -

4856-8854-9788.v1

McDonald's cancelling the U.S. trial of the McPlant partnership with Beyond Meat) further reinforces a strong inference of the Company's scienter. *See* ¶¶168-173.

Defendants claim that former COO Ramsey – a former Tyson executive who was Beyond Meat's president of its Global McDonald's business (*see* ¶171) – was simply fired because he was arrested for battery and any assertion that his termination adds to the Complaint's scienter theory is "absurd[]." Mot. at 32. However, Defendants' bluster is contradicted by the fact that both Ramsey and former CSO Bernie Adcock were hired at the same time in December 2021 (*see* ¶173), and their terminations were both announced on the same date, *i.e.*, September 20, 2022 – approximately two months after the J.P. Morgan report. *See* ¶¶171-172. It is clear that Ramsey's arrest could be just as much as pretext for his firing from Beyond Meat as it was about the deterioration (and ultimate demise) of the partnership between Beyond Meat and McDonald's with respect to the McPlant's run on U.S. menus during the Class Period. *See ESG*, 828 F.3d at 1032-33 ("[I]f two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter."). Thus, "the Court need not decide if the timing of [the executive departures] is enough to support a strong inference of scienter," rather it need only find that it "'add[s] one more piece to the scienter puzzle.'" *Banc*, 2017 WL 3972456, at *8; *see also Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *14 (N.D. Cal. Mar. 31, 2023) (same).

### D. Plaintiffs Sufficiently Allege Loss Causation

Defendants incorrectly argue that in order to adequately plead the element of loss causation, a plaintiff needs to allege that a corrective disclosure mirrored a prior misrepresentation. *But see In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.3 (9th Cir. 2020) ("[A] corrective disclosure need not be a mirror image of the prior misstatement."); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 385 (6th Cir. 2016) ("We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a

- 25 -

4856-8854-9788.v1

defendant's acknowledgement that it misled investors.").[16]  As this Court previously noted, "'[l]oss causation is a "context-dependent" inquiry as there are an "infinite variety" of ways for a tort to cause a loss'" and "'[r]evelation of fraud in the marketplace is simply one of the "infinite variety" of causation theories a plaintiff might allege to satisfy proximate cause.'"  *Stamps*, 2020 WL 281716, at *17 (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018)); *see also Kui Zhu v Taronis Technologies Inc.*, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) ("Plaintiffs theory of a 'slow leak' revelation is nuanced, but this Circuit has recognized that there are an infinite number of ways to allege loss causation.") (citing *First Solar*, 881 F.3d at 754).  Therefore, "'[d]isclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'"  *First Solar*, 881 F.3d at 754.  A plaintiff need only to allege "a 'causal connection' between the fraud and the loss by tracing the loss back to 'the very facts about which the defendant lied.'"  *Id.* at 753; *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 954 (9th Cir. 2023).

Here, Defendants created a misleading public façade that Beyond Meat was both capable of, and actually executing on, scaling up product production to meet the needs of its large QSR partners.  *See, e.g.*, ¶¶4, 25, 28, 38-48, 56-58, 61-70, 73, 75-85, 93-102.  But in truth, Beyond Meat was suffering from significant internal problems, most critically, meeting the stringent quality demands of its QSR partners, as well as manufacturing and production inefficiencies - all of which contributed to product launch delays, gross margin declines, increased operating expenses, test cancellations, and discontinuations.  *See, e.g.*, ¶¶30, 32, 35-36, 49, 59, 71, 103.  Even though Defendants never publicly admitted that its large QSR partnerships were on much

---

[16]  *See, e.g.*, Mot. at 34 ("Indeed, none [of the corrective disclosures] even mentions that Beyond Meat was unable to scale its manufacturing or meet its partners' specifications . . . .").

- 26 -

shakier ground than Defendants made investors believe, the Complaint's allegations sufficiently demonstrate that the partial corrective disclosures related to their alleged misleading statements (*see, e.g.*, ¶¶187-191, 205-212, 223-224), which satisfies the loss causation pleading standards. *See Facebook*, 87 F.4th at 954; *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 952 (N.D. Cal. 2022) ("Plaintiff need not allege facts consistent with a revelation-of-the-fraud theory to plausibly allege loss causation, where, as here, it has plausibly alleged loss causation under a cognizable alternative theory.").

Contrary to Defendants' assertion, the "announcement of lower-than-expected financial results [can] constitute loss causation." *See* Mot. at 35 (challenging ¶¶187, 192, 197, 200, 213, 217). Quoting the Ninth Circuit's decision in *First Solar* (a binding decision not cited in Defendants' Motion), this Court specifically noted in *Stamps* that "'[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.'" *Stamps*, 2020 WL 281716, at *17 (quoting *First Solar*, 881 F.3d at 754); *see also DocuSign*, 2023 WL 3000583, at *23 (upholding loss causation allegations under *First Solar* and noting that "[t]he heart of DocuSign's argument is that all the plaintiffs have alleged is that the company missed its billings guidance, which is not actionable"). In *Stamps*, this Court upheld plaintiffs' loss causation allegations because they demonstrated that "both earnings reduction were clearly related to the allegedly fraudulent conduct." 2020 WL 281716, at *17; *see also In re Impinj, Inc. Sec. Litig.*, 414 F. Supp. 3d 1327, 1338 (W.D. Wash. 2019) ("Plaintiffs further allege that the decline in demand resulted in a drop in revenues which, when finally revealed to the market, caused the share price to tumble and plaintiffs to suffer loss. The steps in the causal chain are all plausible and foreseeable.").

Here, the Complaint pleads with particularity why "Beyond Meat's decreased foodservice revenues due to launch delays, decreased gross margin, increased

- 27 -

4856-8854-9788.v1

expenses, foodservice inventory write-offs," and other negative financial results that came in the form of partial corrective disclosures (*see, e.g.*, ¶¶187-190, 192-195, 197-203, 213-215, 217-221) were directly related to the material information Defendants concealed from and misrepresented to investors throughout the Class Period. *See* ¶¶20-24, 30-36, 158-167; *see also DocuSign*, 2023 WL 3000583, at \*23 ("The FAC alleges that DocuSign's stock dropped after the company revealed billings misses on December 2, 2021; March 10, 2022; and June 9, 2022. This plausibly shows loss causation under [*First Solar*]."); *Splunk*, 592 F. Supp. 3d at 952 ("Plaintiff's allegations are sufficient to plead loss causation under the earnings miss disclosure theory discussed in *First Solar*.").

The November 17, 2021, December 9, 2021, and February 3, 2022 *Bloomberg* articles that were followed by stock price declines of nearly 4%, 8%, and more than 9%, respectively, are also sufficiently alleged partial corrective disclosures. *See* ¶¶205-212. All three articles partially revealed facts that relate directly to the Complaint's allegations that Defendants hid from investors that, during the Class Period, Beyond Meat experienced serious difficulties scaling up production of certain products to meet the taste and quality standards set by its QSR customers – and that these problems were leading to the delays and/or cancellation of specific product launches. *See, e.g.*, ¶¶104-107, 111, 118. That these partial disclosures about Beyond Meat's manufacturing, quality control, and product launch woes in connection with the Company's QSR customers did not "correct any of the specific challenged statements" as Defendants claim they must (*see* Mot. at 36), is not dispositive of whether the Complaint's loss causation allegations are sufficiently pleaded. As stated above, "a 'corrective disclosure need not be a "mirror image" disclosure – a direct admission that a previous statement is untrue; ***it must simply "relate to the same subject matter as the alleged misrepresentation***.""" *RH*, 302 F. Supp. 3d at 1046; *see also Stamps*, 2020 WL 281716, at \*17 (upholding loss causation allegations despite

- 28 -

defendant's argument that "that neither announcement disclosed the conduct that Plaintiff contends is fraudulent").

The July 27, 2022 J.P. Morgan report that McDonald's discontinued its U.S. test of the McPlant burger made with Beyond Meat – followed by a more than 3% stock price decline (*see* ¶¶137-138, 223-224) – is also plausibly related both to Plaintiffs' allegations about the undisclosed problems the Company was having meeting the production, quality, and scaling demands of its large QSR partners and the November 9, 2020 partial corrective disclosure *via* the public announcement of the McPlant by McDonald's which omitted any reference to Beyond Meat (either specifically by name or even generally). *See Stamps*, 2020 WL 281716, at *18 ("While Defendants may argue that there are other reasons the stock price fell, such factual dispute is better suited for at a later stage in the proceedings.").

Finally, for similar reasons that certain announcements regarding Beyond Meat's deteriorating financial health and overall performance were partial disclosures of the fraud concealed from investors during the Class Period, so to was the announcement on October 14, 2022 that the Company was laying off nearly 20% of its "total global workforce" which was "intended to reduce operating expenses, sharpen the Company's focus on a set of key growth priorities, and target cash flow positive operations within the second half of 2023." ¶141; *see also* ¶¶225-226; *cf. Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 675 (D. S.C. 2016) ("resignation announcements can be corrective disclosures" for loss causation purposes) (citing *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 318 (5th Cir. 2014)); *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 674 (N.D. Cal. 2021) (citing *Amedisys*, 769 F.3d at 323).

### E.    Plaintiffs Sufficiently Allege Violations of §20(a)

For the reasons stated above, the Complaint more than adequately pleads that the Individual Defendants violated §10(b), and, therefore, the Court should also

- 29 -

4856-8854-9788.v1

uphold Plaintiffs' §20(a) claims.  *See* ¶¶251-254; *STAAR Surgical*, 2016 WL 6699284, at *14.

### F.     Plaintiffs Sufficiently Allege Violations of §20A

Defendants' contemporaneity challenges to Plaintiffs' §20A insider trading claim against Nelson fail.  Mot. at 37-39.  As Defendants admit, "the Ninth Circuit has not defined the 'exact contours' of contemporaneous trading." *Id.* at 37.  Therefore, "'[t]here is no law binding on this Court as to what constitutes "contemporaneous" trading.'" *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *9 (C.D. Cal. July 3, 2018).   Accordingly, courts in this Circuit regularly hold that "contemporaneity" for §20A's purposes can encompass multiple days within an insider defendant's trades.  *See Basile v. Valeant Pharm. Int'l, Inc.*, 2015 WL 7352005, at *5 (C.D. Cal. Nov. 9, 2015) (citing cases upholding eight and nine-day gaps as sufficiently contemporaneous); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 606 (N.D. Cal. 2019) (nine-day trading period contemporaneous); *VMware*, 2023 WL 2763541, at *19 (four days sufficient).  Here, Colato purchased Beyond Meat shares at inflated prices within three to eight days of Nelson's May 7 & 8, 2020 insider stock sales, which is sufficiently contemporaneous.  *See* ¶¶259-260.  The §20A claims against Nelson based on SHEPP's purchases should also be upheld.  Defendants rely on *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020), a non-binding decision, to argue that SHEPP's §20A claims must be dismissed because it: (1) purchased Beyond Meat shares between November 10 & 12, 2020, at prices below what Nelson sold his shares for on November 17 & 18, 2020; and (2) purchased these shares before Nelson sold his.  *See* Mot. at 39.  However, neither Defendants nor the court in *SEB* cite any mandatory authority dictating that a plaintiff cannot allege a viable §20A claim if the stock purchase at issue predates the insider defendant's sale.  *See SEB*, 485 F. Supp. 3d at 1136; *but see El Pollo Loco*, 2018 WL 3343493, at *2, *17, *21 (certifying §20A class that began on May 15, 2015, even though insider defendants did not sell their

- 30 -

4856-8854-9788.v1

stock until May 19, 2015).  Also, *SEB* is factually distinguishable.  The court in *SEB* held that a plaintiff's purchase of a company's shares at a price below an insider defendant's sale "cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with defendant at an unfair advantage."  *SEB*, 485 F. Supp. 3d at 1136.  Here, however, the Complaint sufficiently alleges that SHEPP (along with the entire putative class of Beyond Meat shareholders) was at an informational disadvantage when it made its purchases of Company stock between November 10-12, 2020 because when Beyond Meat reported its Q3 2020 results, Defendants, including Nelson, knowingly omitted material information about the Company's inability to scale production for its large QSR partners as well as its undisclosed production and manufacturing problems.  *See* ¶¶50-59; *cf. El Pollo Loco*, 2018 WL 3343493, at *8 ("'Section 20A was added to the [Exchange] Act in 1988 to "provide greater deterrence, detection and punishment of violations of insider trading."'") (alteration in original).

Accordingly, the §20A claims against Nelson should be upheld.  *See VMware*, 2023 WL 2763541, at *18-*19 (upholding §20A allegations and rejecting defendant's reliance on *SEB*).

**III.    CONCLUSION**

Based on the foregoing, Defendants' Motion should be denied in its entirety.  Especially given that Defendants themselves do not request, and therefore waive any argument that the Court dismiss the Complaint with prejudice (*see* Mot. at 39), should the Court decide to dismiss the Complaint in whole or in part, Plaintiffs request leave to amend.  *See Dawod v. Garland*, 2023 WL 8168832, at *5 (C.D. Cal. Oct. 12, 2023) (Fitzgerald, J.).

DATED:  February 6, 2024              ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      SPENCER A. BURKHOLZ
                                      LAURIE L. LARGENT
                                      MATTHEW I. ALPERT
                                      JOSEPH J. TULL

- 31 -

_____

MATTHEW I. ALPERT

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
malpert@rgrdlaw.com
itull@rgrdlaw.com

Lead Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 10,490 words, which complies with the word limit set by court order dated December 6, 2023.

_____

MATTHEW I. ALPERT

- 32 -

4856-8854-9788.v1

# Mailing Information for a Case 2:23-cv-03602-MWF-AGR Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kenneth P. Dolitsky**
  kdolitsky@rgrdlaw.com

- **Scott Russell Foglietta**
  scott.foglietta@blbglaw.com

- **Michele D. Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,

- **Avi Josefson**
  avi@blbglaw.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com,wgravitt@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Joseph J. Tull**
  JTull@rgrdlaw.com

- **Jonathan D. Uslaner**
  jonathanu@blbglaw.com,juslaner@gmail.com

- **Heather A. Waller**
  heather.waller@lw.com

- **Ryan Arber Walsh**
  ryan.walsh@lw.com,ryan--walsh-0031@ecf.pacerpro.com,#ocecf@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)