UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

SASKATCHEWAN HEALTHCARE          )
EMPLOYEES' PENSION PLAN,         )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )   2:23-CV-3602-MWF
               vs.               )
                                 )
BEYOND MEAT, INC., et al.,       )
                                 )
          Defendants.            )
_____

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Monday, April 22, 2024

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:


For the Plaintiffs:


        ROBBINS GELLER RUDMAN & DOWD LLP
        By:  Matthew Alpert, Attorney at Law
            Laurie Largent, Attorney at Law
            Joseph Tull, Attorney at Law
        655 West Broadway, Suite 1900
        San Diego, California 92101




For the Defendants:

        LATHAM & WATKINS LLP
        By:  Michele Johnson, Attorney at Law
            Allie O'Hara, Attorney at Law
        650 Town Center Drive, 20th Floor
        Costa Mesa, California 92626

THE CLERK:  Calling item number 2, case number CV-23-3602-MWF, Saskatchewan Healthcare Employees' Pension Plan vs. Beyond Meat, Inc., et al.

Counsel, please state your appearance for the record.

MR. ALPERT:  Good morning, Your Honor.  For the plaintiffs, my name is Matthew Alpert; with me are my colleagues Laurie Largent and Joseph Tull.

THE COURT:  If I could ask the plaintiffs to sit over here, please.

MS. JOHNSON:  Good morning, Your Honor.  Michele Johnson from Latham & Watkins on behalf of the defendants. And with me is my colleague Allie O'Hara.

THE COURT:  Good morning, counsel.

I don't really have a tentative in this.  It's obviously a very complicated matter.  There is the issue of having to deal with the Aylo defendants on the motion to dismiss -- I'm sorry -- the -- here in regard to the statute.

The -- it really, I just decided it would make more sense to kind of just sketch out some thoughts.

So let me hear first from -- and I don't want to say that you have to approach this as a rigid thing, you can try to weave some of these concerns into your argument.

But let me just start, then, with hearing from the defendants as the moving parties, and then I'll hear from the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

plaintiffs.

MS. JOHNSON:  Thank you, Your Honor.  Again, Michele Johnson on behalf of the defendants.

We appreciate the opportunity to address what the Court is concerned with, and appreciate the tentative questions, I guess I'll call them.

And so let me just give some context, and then I'll dive right into the questions.  This was a nascent industry to break into the $1.5 trillion meat industry with plant based.  And the risk disclosures up front, as Your Honor is aware, said very specifically, We don't know if we'll be able to scale.  We don't know if we will be able to launch, et cetera.  In that context, we have to remember that the class period also overlapped with COVID.

And I think that goes to one of the questions that I thought maybe I would start with, which is, what about the *First Solar* rule that plaintiff should be able to prove lost causation by a showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that the fraud had caused the miss?

The earnings miss was right in the middle of COVID, and the company withdrew guidance and said, We don't know what is going on.  We are in the food industry.  We are trying to break into the, you know, QSR industry, and we don't know what is going to happen.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

So I think the key part of *First Solar* is if the market was unaware that the fraud had caused the miss, and I -- the allegations are just not there, that it was fraud that caused that.

Instead, the company retrenched, continued to move forward as aggressively as possible, as the CEO said, and continued to attempt to partner with the restaurants.

So turning to your first question. You say the "statements describing Beyond Meat's relationship with its partners is puffery because it used generic positive terms," but, "in one instance, the analyst specifically asked about McDonald's Canada."

So how could these positive generalized statements be puffery? Isn't it more specific? That allegation came from paragraph 39, which is the May 5th, 2020, conference call, very early, very beginning of the class period.

And the specific question was, from the analyst, was, "We see these -- we see these tests, and a lot of them have an opening date. This is the only one that had an end date. Did it end for some bad reason?" And the CEO said, "No, no bad reason. That was just the test. And our relationship remains very good."

There is no allegation that that was wrong. There is no allegation that he was misstating the test; and instead, we have allegations that in February 2021 McDonald's

signed a three-year partnership.

And that partnership, there is no allegation that it didn't continue for those three years; it did. And there were launches throughout that three years. There were tests all over the place. There were tests, 600 stores in the U.S. And then there were product launches in the U.K., in Germany, in Ireland, in a number of places around the world that are continuing. There is no allegation that they stopped.

And we can see from Exhibit 6, which is in the record, that those continued. They are real products in real places in thousands of stores all over the world.

So to say in May of 2020 that our relationship is positive is borne out by the evidence that came after that date; and therefore, saying it's very positive is either completely true, or the type of puffery that we are arguing about.

THE COURT: Well, you've raised the QSR issue. So turning to that, what -- taking all the allegations as true, and that there was this certain dissatisfaction, again, how -- how does that characterize the -- could be characterized in either as positive or vague or optimistic, or, you know, all of these words that we are accustomed to dealing with. And I think even a very naive consumer would understand that something that has to be world famous in some literal sense is not world famous.

So how would that relate with the Q -- to the QSR?

MS. JOHNSON:  Your Honor, I'll start with the case law, and then answer your question.

In the *Twitter* decision in the Ninth Circuit, the Court said product development is often torturous, and there is no obligation to disclose the problems, the issues, the challenges.

The United States Supreme Court in *Macquarie* just said a couple of weeks ago that that is, in fact, correct. There is no obligation to speak unless you have to -- when you speak, you have to speak truthfully of course.

And then the *Skillz* decision by the Ninth Circuit a week and a half ago similarly said, business is about working out problems.  If there are kinks in the process, you do not have to disclose those.  That is not the point of the disclosure law.

And that is what happened here.  There were problems.  There were issues.  That is what business is about.  And there -- the contamination caused by a copacker is one good example of that.  That is a problem that then was worked out.

But in the record, in the earnings calls and in the earnings releases and in the Ks and the Qs that are in the record, these same QSR partners continued to do tests, continued to launch product, continued to partner.  And the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

question was only ever around how big?  How much?  How fast?  And that is what the company warned against.  Say, we can't tell you when this will happen.  We can't tell you if it can happen.  We can't tell you if we can scale.  But the record that is before Your Honor on a motion to dismiss does say that those partnerships continued.  Those partnerships led to real launches.

And that is why saying that QSR partners were dissatisfied with the quality, dissatisfied with the cost effectiveness.  Let's take that as true.  But what happened?  What happened was what the company said was happening in realtime, and the timing of it was, of course, what the risk factors disclosed.

THE COURT:  You've already mentioned *First Solar*, I want to -- I obviously have another matter on calendar today, and I want to make sure they can be heard, as well.

But before hearing from the plaintiffs, let me ask you about scienter.  How would you summarize the state of the record as scienter in your terms, which is to say that it simply is insufficient?

MS. JOHNSON:  It is simply insufficient.

THE COURT:  I mean, are you pointing to -- is there anything you wanted to elaborate on from the brief?  Are you saying, because there is -- there is just simply the absence?  Are there any facts that you feel are contraindicative which

you wish to highlight?  Is there any case law that you feel is placing the, you know, really making a burden here?  Is there anything else you want to say in regard to scienter?

MS. JOHNSON:  Yes.  Briefly, Your Honor.

The CEO, who made the most of the statements and signed the statements made by the company, didn't sell a single share.  He was properly optimistic about his strategy.  And not until two months after the class period did he say, We are going to change strategies.

That is classic fraud by hindsight.  That is no support for scienter, of knowing that these relationships were not going to play out in the way that the company hoped, still hopes.  There is no suggestion.

And it's contrary to reason to suggest that the CEO knew this was never going to happen, and the allegations in the complaint that they invested millions of dollars in equipment and worked tremendously hard to do those launches.

The CFO, Hardin made no stock sales, and actually joined when the former CEO, Nelson, left in the middle of the class period.  It is beyond ridiculous to think that a new CFO for no reason, for no personal motivation, with no idea jumps into the same fraud in the middle and continues it.  It makes no sense.

The only defendant that is alleged to have sold is Nelson.  And it's right there in the complaint, the sales

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

before the class period for one year, since the IPO to the start of the class period was one year. If you compare those sales with the two-and-a-half-year class period, very long, they are not out of line. The class period sales are not out of line.

And his sales were periodic the whole time, both before and after the class period. And then the sales at the end make sense because he was retiring, and he's out of the company.

So the inference of nonfraudulent impact, meaning they were trying to break into this new market, they updated the market as they heard about things, as they found out about things, and warned is the much more persuasive inference.

THE COURT: Thank you.

Let me hear from the plaintiff.

MR. ALPERT: Good morning, Your Honor. Matthew Alpert for plaintiffs. I will be brief, and I will just try to address a couple of quick things that Ms. Johnson brought up.

No one is saying that defendants have an obligation to disclose kinks that are going on behind the scenes. They only have the obligation once they start speaking to analysts and investors, and that is what happened here.

No one is making Mr. Brown or his colleagues say

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

that they -- that Beyond Meat has great relationships, strong partnerships with Taco Bell or McDonald's.  Mr. Brown is the one that is taking it upon himself, and the company is taking it upon itself to talk about that.  She's absolutely right. There is no obligation when it comes to silence, but that is not what we have here.

As far as the partnerships that were being announced, and in May 2020 that, you know, why would things be going poorly, then they announce a partnership later?

One, that is a global partnership.  And no one disputes here that the main -- that the really important part was the U.S. menus for Beyond Meat.

And in November 2020, as the complaint alleges, McDonald's comes out and says, We are coming out with a McPlant, but conspicuously, there is no mention of Beyond Meat.

And as the complaint goes on, there is kind of a full court press by Beyond Meat and Mr. Brown to say, No, no, just so you know, we have a good relationship, that is not what is going on.  I know analysts are asking these questions.

And then later you see, you know, with the J.P. Morgan report in July of '22, when they ultimately -- you know, the inklings that they are pulling from the U.S. menus, that they were trying the McPlant on in Texas and California,

that they were being pulled off the menu.

And that goes back, well, if the relationships were going well, and if the testing and if the scaling up was going well, if the taste, the size, the consistency was meeting the requirements for entities like these whale, giant companies, like McDonald's and Taco Bell, then they would have wound up on U.S. menus.

And now, I mean, this isn't in the complaint because it's been recent, but Beyond Meat has been focusing on Europe when it comes to QSRs, and Australia and other countries, and not the U.S.  And that is because it wasn't working here, and that is what the complaint alleges.

As far as -- Ms. Johnson said that Beyond Meat said that they didn't know when they could scale.  That is never alleged in the complaint.  That is never brought up in the motion to dismiss.  That is not part of this case.

To focus on scienter -- and again, I want to be brief so the other parties can be heard.  Mr. Brown, to say that Mr. Brown was a hands on CEO does him a disservice.  He goes to the plant.  He talks to the people.  He goes on podcasts.  He does interviews with McDonalds executives.  He is the face.  He is the founder of the company.

And to Ms. Johnson's point about he didn't sell stock, it absolutely makes sense, because if you are trying to tell investors and analysts, Believe in our company,

please keep investing, please believe that we are going to attain profitability and revenue, why would you sell stock?

It's one thing for a CFO and someone who doesn't have the sweat and the blood, equity into the company like Mr. Brown does, but if he starts dumping millions and millions of shares as he's saying, Please believe in the company, and, Oh, by the way, I just happened to sell these shares, so I could buy my child a bicycle.  That is not going to fly with investors and analysts.

As far as addressing the Court's specific questions, it's our contention, Your Honor, that Bloomberg and Wall Street Journal are reputable news outlets.  And they are doing interviews with former employees.  They are doing news, you know, journalism, investigations into things that Beyond Meat is not going to reveal.  Beyond Meat is not going to say, Hey, by the way, we just want to tell you Taco Bell or KFC, they are not going to put these things on their full-time menu.  We are having delays.  We probably shouldn't be sending our pepperoni to the Netherlands to do certain parts of the manufacturing process.

Now, it's up to the journalists to hopefully keep in check companies, publically-traded companies, to what they are saying to analysts and investors in the market as whole.

And so we believe that these are reputable journalists, and not just kind of people on the street that

are just doing anecdotal kind of questions.

As far as the executive departures, Your Honor, our contention is the strongest evidence of scienter really is Mr. Brown, what the company knows.  I mean, he, again, is the focal point.  And the fact that he didn't sell shares doesn't undermine that.

I think the executive departures, Your Honor, and even the layoffs, if what was going on, and what they were telling the market, that the QSR partnerships were going well and going strong, and that the scaling and the product that they were kind of presenting to these QSRs behind the scenes were really meeting their requirements, and the investments this company was making in its manufacturing and its production and the new employees was really paying off, then they wouldn't need to cut people.  And the executives wouldn't need to leave.

And our theory is, in pre-discovery, without discovery in this PSLRA stage, that that is just another piece of the puzzle.  It's not the main piece.  But we think even without it, Mr. Brown's scienter alone bolsters this case and should allow it to go past into discovery.

I think that is all I have, Your Honor.

THE COURT:  Thank you.

And briefly, let me hear from the defendants.

MS. JOHNSON:  Thank you, Your Honor.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Taking them in order.  The McPlant launch.  That was, of course, announced by McDonald's.  They were testing it, and they were going to decide what could be said and how broadly it would go.

And the complaint alleges that a Beyond Meat spokesperson then said, Yeah, it's a partnership with us.  And that is not alleged to be false.  So nothing about that launch was part of the falsity.

Taco Bell is particularly interesting, because the cancellation of one particular test, which is touted as a big problem, was described in a joint statement where both Taco Bell and Beyond Meat said, Our partnership is strong and continuing.

So when you look at the allegations that there were these problems, and that is what led to McPlant not being launched more broadly at McDonald's, and that is what led to some of these slow launches, that is just contradicted by statements that the actual QSR partners were making, and statements that Beyond Meat had made throughout the complaint that are not alleged to be false or misleading.

The reputable journalists, we are certainly not saying they are not reputable.  It just requires a lot more specificity to have those allegations about unnamed people be enough under the PSLRA.  And we would submit that they are not at all sufficient.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

On the selling shares point, if he had sold shares, they would argue that that is scienter.  If he doesn't sell shares, they say, Of course he wouldn't.  But he didn't sell a single one.  And that is indicative of, not the end of the argument, the rest of them certainly should be evaluated, but that is indicative of a complete lack of scienter.

And on the departures, it is based on the record before Your Honor, the departures after a change in strategy.  That completely explains it, much more than the supposition that the departures are because of a two-and-a-half year scheme that was initiated by the defendants.

THE COURT:  Well, using the word "supposition" kind of gets at what is going on here.  I understand that argument.

Well, the point is really is it appropriate now, would it be a Rule 8 argument in the absence of *Twombly* and *Iqbal*?  No.  Would it be -- is it a legitimate argument now with *Twombly* and *Iqbal*?  That is a closer question.

Under the statute, because the PSLRA is very interesting, because on the one hand it makes it obviously easier to have something be done in part by having certain specific things that have to be alleged, and thereby generating the case law, which thereby is grist for the mill of what you are doing right now.

But on the other hand, still if it's ultimately

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

something -- I still have to draw inferences in favor of the opposing party.  And then, of course, summary judgment is yet another standard.

So like I said, I certainly understand the argument you are making, whether it's for me now, whether it's for me at summary judgment, whether it's for the jury one day, that is really what I think has to -- I've got to figure out.

So anything else very briefly before I take this under submission?

MS. JOHNSON:  Just that the Supreme Court under *Tellabs* said that the inferences of nonfraudulent conduct needs to be weighed, and it's not just that they alleged a plausible inference if the nonfraudulent inference is plausible, as well, that is for your court to -- for Your Honor to evaluate on the motion to dismiss.

THE COURT:  All right.  Thank you very much.  The matter is taken under submission.

*****     *****     *****

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


_____


Amy C. Diaz, RPR, CRR                 April 23, 2024

S/  Amy Diaz