UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No. **CV 23-03602-MWF (AGRx)**          Date:  **August 9, 2024**

Title:    Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

|  |  |
|---|---|
| Deputy Clerk: | Court Reporter: |
| Rita Sanchez | Not Reported |
| | |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
| None Present | None Present |

**Proceedings (In Chambers):**          ORDER GRANTING DEFENDANTS'
                                          MOTION TO DISMISS CONSOLIDATED
                                          CLASS ACTION COMPLAINT FOR
                                          VIOLATION OF THE FEDERAL
                                          SECURITIES LAWS [42]

Before the Court is a Motion to Dismiss the Consolidated Class Action Complaint (the "Motion"), filed by Defendants Beyond Meat, Inc. ("Beyond Meat" or the "Company"), Ethan Walden Brown, Mark J. Nelson, and Philip E. Hardin, on December 8, 2023.  (Docket No. 42).  Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("Lead Plaintiff" or "Plaintiff") filed an Opposition on February 6, 2024. (Docket No. 44).  Defendants filed a Reply on March 22, 2024.  (Docket No. 44).

The Court has read and considered the Motion and held a hearing on **April 22**, **2024**.

For the reasons discussed below, the Motion is **GRANTED** *with leave to amend*.  Plaintiffs fail to sufficiently allege a material misrepresentation.  Additionally, Plaintiffs' allegations do not give rise to a "strong inference" of scienter except as to Brown.

## I.    **BACKGROUND**

This is a securities class action brought on behalf of all persons who purchased the common stock of Beyond Meat between May 5, 2020, and October 13, 2022,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 23-03602-MWF (AGRx)          **Date:  August 9, 2024**

**Title:**     Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

inclusive (the "Class Period"), and were allegedly harmed (the "Class").  (Complaint ¶¶ 2, 231).

On October 09, 2023, Lead Plaintiff filed a Consolidated Complaint. (Complaint (Docket No. 34)).  The Court summarizes the allegations in the Complaint as follows:

Beyond Meat is a Los Angeles-based producer of plant-based meat substitutes such as Beyond Burgers, Beyond Sausages, Beyond Meatballs, and Beyond Pepperoni. (*Id.* ¶¶ 3, 16).  The Company sought to build "meat directly from plants" by replicating the look, taste, and texture of animal meat using only vegan, nongenetically modified ingredients.  (*Id.* ¶ 16).  The Company's goal is to create plant-based meat substitutes that are indistinguishable from the products they seek to replicate.  (*Id.*).  Beyond Meat found success creating small, sample-sized prototypes of its product offerings, and received immense support from venture funding and celebrity investors.  (*Id.* ¶ 17). The Company went public in 2019 in the best-performing IPO in nearly two decades, with shares surging more than 163% in the first day of trading.  (*Id.*).

Beyond Meat's Corporate Culture was controlled by Brown, the Company's founder, who maintained a growth-above-all culture and exerted pressure from the top to roll out new products on rushed and unrealistic timelines.  (*Id.* ¶ 19).  Brown served as the Company's Chief Executive Officer ("CEO") at all relevant times.  (*Id.* ¶ 2). Hardin was the Company's Chief Financial Officer ("CFO") Treasurer, and Chief Operating Officer ("COO") from December 2015 to May 2021.  (*Id.*).  Mark J. Nelson served as the Company's CFO from July 2021 to October 2022.  (*Id.*).

Throughout the Class Period, Defendants misled investors, by misrepresenting the success of its product tests with its large-scale quick-service restaurant ("QSRs") partnerships, including prominent food retailers like McDonald's, Kentucky Fried Chicken ("KFC"), Pizza Hut, and Taco Bell, knowing that the Company could not successfully scale production to meet the demand of these partners.  (*Id.* ¶ 4).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)          Date:  August 9, 2024

Title:     Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Moreover, they concealed from investors that the Company's investment plan to scale production was failing.  (*Id*.).  Beyond Meat's choices in manufacturing prohibited any large-scale success with QSRs.  (*Id.* ¶ 34).  In the rush to fulfill unrealistic promises to customers, Defendants, who lacked the experience and technical know-how for scaling, especially at the magnitude required for large QSRs, purchased millions of dollars of manufacturing equipment before they knew the technical requirements for producing the new products at scale.  (*Id.* ¶ 34).  This rush to fulfill caused hundreds of millions of dollars in unnecessary equipment to sit idle at Beyond Meat's warehouses.  (*Id*.).

Beyond Meat also overbuilt its co-manufacturer network. (*Id.* ¶ 35).  Flouting industry practice to pay co-manufacturers when services were rendered and products were manufactured, Beyond Meat paid co-manufacturers on a tolling fee basis.  (*Id.* ¶ 35).  Beyond Meat also terminated most of the senior staff at the former co-manufacturer plant, DeVault, when it bought the plant, replacing them with inexperienced Beyond Meat employees, and causing production to plummet, which Beyond Meat compounded when it outsourced work to the more expensive and inconsistent co-manufacturers.  (*Id*.).

Beyond Meat never came close to a permanent menu launch in the U.S.  (*Id.* ¶ 30).  Beyond Meat was unable to conform to McDonald's requirement of product consistency at large-scale production.  (*Id*.).  During the Class Period, Defendants also knew they could not successfully scale production for KFC, Taco Bell, and Pizza Hut. (*Id*.).  As a result, their partners were dissatisfied with the quality and sensory aspects of the products, leading to their discontinuation.  (*Id*.).  Due to Beyond Meat's putative lack of commercial probity, Defendants spent millions of dollars on unusable machinery, overbuilt a co-manufacturer network, and experienced manufacturing inefficiencies.  (*Id.* ¶¶ 21, 23).  These manufacturing inefficiencies caused new product launches to be set aside and/or delayed, making the Company miss production deadlines.  (*Id.* ¶ 24).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 23-03602-MWF (AGRx)                Date:  August 9, 2024**
**Title:**      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

As the truth of Defendants' conduct was disclosed in a series of partial disclosures, the Company's stock price plummeted from a Class Period high of $194.95 to $13.35 at the end of the Class Period, a 93% drop.  (*Id.* ¶ 4).

During the Class Period, certain Beyond Meat executives profited by selling hundreds of thousands of shares of their personally held Company stock at artificially inflated prices.  (*Id.* ¶ 5).  For instance, Nelson alone sold over 466,000 shares of Beyond Meat stock during the Class Period for over $60.8 million in proceeds, including selling almost all of his holdings before he departed the Company in May 2021.  (*Id.*).  Other top-level Beyond Meat executives received over $75 million in stock sale proceeds during the Class Period.  (*Id.*).

Based on the above allegations, Plaintiffs assert three claims for relief for violations of: (1) § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5; (2) § 20(a) of the Exchange Act; and (3) §20A of the Exchange Act.

Plaintiffs challenge the following emphasized statements:

A.    **Challenged Statements Regarding QSR Partnerships**

1.  **May 5, 2020 - 1Q 2020 Earnings Conference Call**

*Statement 1.*  In response to an analyst question of why the McDonald's Canada test ended in April 2020, Brown stated, "***for no negative reason at all. . . . [W]e feel very good about our relationship with McDonald's and what's going to be happening both there and potentially elsewhere.***"  (*Id.* ¶ 39).

*Statement 2.*  "***I can assure you, there's no issue with McDonald's***" and "***there's been no change in information since we began this test and got good results in the beginning and got good results at the end.***"  (*Id.* ¶ 40).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)          Date:  August 9, 2024
Title:       Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
              al.

### 2.  June 10, 2020 - William Blair Growth Stock Conference

*Statement 1.*  Brown was asked for an update on the McDonald's Canada test
and a potential launch.  In response, Brown reiterated that "***we had a very positive test
with them . . . I remain very optimistic about our business in food service.***"  On the
call Brown also assured investors that none of the Company's QSR partners were
"***scrapping any plans to launch.***"  (*Id.* ¶ 42).

*Statement 2.*  Brown touted recent tests with Pizza Hut, Taco Bell, and KFC,
claiming "***it was a terrific launch***" and "***the tests are going well, went well.***"  (*Id.*
¶ 43).

### 3.  August 4, 2020 - Q2 2020 Earnings Conference Call

*Statement 1.*  "In addition, and particularly noteworthy as it relates to continued
advancement of our poultry platform, we recently initiated a limited-time promotion of
Beyond Fried Chicken with KFC in Southern California. . . . The product sold out in
half that time in Los Angeles, with San Diego not far behind.  This test followed
successful consumer responses in Atlanta, where Beyond Fried Chicken debuted at a
single location in August of 2019 and sold out in less than 5 hours; and an expanded
market test in February 2020 in the Nashville and Charlotte markets, which also
received a very positive consumer response.  ***We are fortunate to partner with such an
iconic brand as KFC and couldn't be more pleased with these initial positive
results.***"  (*Id.* ¶ 46).

*Statement 2.*  Brown assured investors that Beyond Meat's larger foodservice
partners were doing well, stating that "***we're continuing to see, when we do these
launches, really good results.***"  (*Id.* ¶ 47).

### 4.  November 9, 2020 - 3Q 2020 Earnings Conference Call

*Statement 1.*  "***Our relationship with McDonald's is good. It's really strong.
Our work there on behalf of what they're doing continues***" and "***I feel, as I said in***

---

**CIVIL MINUTES—GENERAL**                                          **5**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 23-03602-MWF (AGRx)              **Date:  August 9, 2024**

Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
al.

**the past, good about that relationship and good about what we're contributing to the
McPlant platform.**" (*Id.* ¶ 56).

**Statement 2.** "I will say this, **everything I've said is true that we have
developed very long-term relationship with [McDonalds].  We worked very hard on
developing the burger that was in the PLT, and it will be in the McPlant.** But it's
really up to them to say the extent of that where it's going to be, how it's going to be
there.  But everything that I've been doing and our research team has been doing is
marching towards a particular outcome with them, and *I feel good about that*." (*Id.*
¶ 57).

### 5.  February 25, 2021 - 4Q 2020 Earnings Press Release

**Statement 1.** "Beyond Meat, Inc. (NASDAQ: BYND) today announced the
establishment of a three-year global strategic agreement with McDonald's Corporation.
*As part of the agreement, Beyond Meat® will be McDonald's preferred supplier for
the patty in the McPlant®, a new plant-based burger being tested in select
McDonald's markets globally.  In addition, Beyond Meat and McDonald's will
explore co-developing other plant-based menu items – like plant-based options for
chicken, pork and egg – as part of McDonald's broader McPlant platform.*" (*Id.*
¶ 61).

**Statement 2.** "To this end, I'm pleased to share with you today 2 significant
global partnerships, one with McDonald's, and the other with Yum! Brands, the parent
company of Kentucky Fried Chicken, Pizza Hut and Taco Bell, both of **which are
prime examples of what we've been scaling and preparing for.**" (*Id.* ¶ 64).

**Statement 3.** "I think that – Yum has obviously been aggressive as well in all
the right ways.  *And so the use of the word preferred there is intentional on the
McDonald's side.* There's some ins and outs into how we relate across the global
chain.  But the – *what we try to express in that release, I think, is pretty descriptive in
the sense that we'll be the preferred global supplier for the McPlant plant-based
burger patty*.  There are some products that are already in the market throughout the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
            al.

chain that would be held aside, and so outside of this agreement.  ***But we also are
working with them in a collaborative sense looking at these other areas of poultry,
pork and egg.  So think about it as a collaborative relationship to really put the best
products on the market in the plant-based space with McDonald's.***  Going over to
Yum!, very similar in the sense that there's some ins and outs about how each brand
participates.  ***But overall, think about us as a preferred supplier in that regard.***  So
***we've got some great work we've done with Pizza Hut***.  Obviously, ***we've done some
really good things with KFC.  You heard earlier this year about Taco Bell.  These
are partners that we're going to be deeply innovating with and bringing the very best
of our innovation.  We have this brand new campus that we're building.***  The work
we're doing with these and other CT partners are very, very – intensively the design of
that facility.  And Yum! and McDonald's have a special place they're in." (*Id.* ¶ 67).

      ***Statement 4.***  "Yes. So I mean, I think there is a very much more robust
structure that we're in now.  We've worked with both of these companies for a very
long time, and it's been a pleasure to work with them.  They've got some outstanding
folks there, and this is a formalization of that in a more organized structure.  ***And so
when you think about being named the preferred supplier in both of these
environments and the sheer number of products on our menu and volume across the
world, it's very different from being referred to as participating in a test in Canada
or some of the Nordic countries.  So it is very different in kind in my view.***" (*Id.*
¶ 69).

## 6.  May 6, 2021 - Q1 2021 Earnings Conference Call

      "First of all, I'm superstitious, since I was very worried that we'd have one
analyst call where McDonald's wasn't mentioned.  So thank you for mentioning
McDonald's.  So it's – they're going to – really, it's like – ***it's such an important
customer to us***.  It's an important partner to us.  ***Our relationship with them has been
great for a long time.  We had to just keep reassuring people that was the case.  I'm
glad that they finally allowed us to talk about that publicly.***" (*Id.* ¶ 75).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| **Case No.** CV 23-03602-MWF (AGRx) | **Date:** August 9, 2024 |
| Title: | Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al. |

### 7. May 19, 2021 - Annual Shareholders Meeting

Brown again assured investors about Beyond Meat's relationship with McDonald's, stating: ***"The relationship with them is – remains really strong, as I've said for years."*** (*Id.* ¶ 79).

### 8. November 10, 2021 - 3Q 2021 Earnings Conference Call

***Statement 1.*** Brown also touted to investors that "Pizza Hut launched a limited rollout of our latest product innovation Beyond Pepperoni at roughly 70 locations across 5 U.S. markets" and that "***we overcame numerous technical challenges*** to ensure that Beyond Pepperoni is nearly indistinguishable from Pizza Hut's iconic original pepperoni." (*Id.* ¶ 96).

***Statement 2.*** "Yes. ***I haven't heard that, that there's any operational challenges*** within the back of the house. And certainly, what I've seen from the stores that I have toured, they seem to be doing really well. ***It's a great product***. I don't know if anyone in phone has had an opportunity to have it, but it just – if you want some reassurance about where we're headed, go get a McPlant. Absolutely delicious. And yes, we're excited about it." (*Id.* ¶ 99).

### 9. December 10, 2021 - Article Published by The Street

"'Evaluating multiple iterations when scaling a product is standard practice in our industry. ***The bottom line is that our partnership with Taco Bell is strong and continuing***, and we look forward to further announcements with them,' a Beyond spokesperson said, in a statement Beyond Meat's head of communications said was a joint statement from both companies." (*Id.* ¶ 115).

### 10. February 24, 2022 - Q4 2021 Earnings Conference Call

***Statement 1.*** "***[W]e are obviously working toward more permanent menu placement with all of our QSR partners***." (*Id.* ¶ 126).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

**Case No.**  CV 23-03602-MWF (AGRx)                    **Date:  August 9, 2024**
**Title:**        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
                al.

    *Statement 2.*  "[I]f you look at our track record, ***we've done well with
continuing to maintain the relationships with our QSRs, continue to go from test to
trials and then from trials to LTOs and then from there to full launches***.  And so –
but there's nothing in particular we can do other than just perform well in each stage."
(*Id.* ¶ 127).

### 11.  May 11, 2022 - Q1 2022 Earnings Conference Call

    Brown also encouraged investors by stating that the Company was expecting an
"***uptick in net revenues***" in Q2 2022 from "***new product launches and expected QSR
launches and trial both in the U.S. and abroad.***"  (*Id.* ¶ 135).

### B.      <u>Challenged Statements Regarding Beyond Meat's Scaling and
Production Efforts</u>

### 1.  June 10, 2020 - William Blair Growth Stock Conference

    Brown also discussed with analysts the Company's ongoing efforts to manage
the production costs associated with product innovation and assured the market that
Beyond Meat was "***continuing to drive the integration of our production processes to
strip out some costs, as well as we're continuing to see a maturation of the supply
chain.***"  (*Id.* ¶ 42).

### 2.  November 9, 2020 - 3Q 2020 Earnings Conference Call

    *Statement 1.*  During the conference call Nelson blamed the $1.1 million
inventory reserve and write-off on COVID-19, stating "Included in the cost of goods
sold during the quarter was $1.8 million of expenses ***directly related to COVID-19***,
including $1.1 million in inventory write-offs and reserves associated with Foodservice
products deemed to be unsalable."  (*Id.* ¶ 54).

    *Statement 2.*  Brown blamed COVID-19 for any delay in full-scale QSR and
partner product launches, stating: "***there's [] testing going on, but I think folks are***

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

*waiting for a resumption of full economic activity before they start to really add things into the menu. So that's happening in the U.S., and it's happening in the EU as well. And we get that. There's just complexity to the menus already.*"  (*Id.* ¶ 55).

        **Statement 3.**  First, we recently completed the acquisition of one of our former co-manufacturing facilities in Pennsylvania.  *The capability to produce a certain portion of our finished goods completely in-house is a key part of our longer-term strategy to reach price parity with that of animal protein.  We intend to use our new Pennsylvania facility to not only reduce production costs but to pilot processes and products, including our newly designed continuous production lines and perform initial scale-up trials of new products.*  With the addition of this wholly-owned production capacity, *we're also welcoming some 180 employees to the Beyond Meat family.*  I should note that we will continue to align ourselves with best-in-class copacking partners here and abroad and expect the acquisition of our new Pennsylvania facility to only strengthen these relationships, *as we'll be able to do important product scaling work in-house* before transferring certain downstream activities to these partners.  (*Id.* ¶ 58).

### 3.  February 25, 2021 - 4Q 2020 Earnings Press Release

        **Statement 1.**  "*Over the last year, you've seen us make significant investments in operations capabilities and infrastructure.*  These investments were and are continuing to be made to prepare for the growth ahead."  (*Id.* ¶ 65).

        **Statement 2.**  "I think the one thing that I'll continue to caution folks on is we're investing right now.  And all the investments you saw us do last year and the fourth quarter that resulted in numbers that maybe you didn't like on the EPS side, et cetera, *they're for a reason. . . . We're commercializing a lot.  We're building new facilities. We're adding operational staff.  There's a lot of cost that goes into growing a business that today has a certain amount of revenue, but is being grown and established for tomorrow's revenue, right?  And we're not doing those in a hope and a prayer.  We're doing this as we put together some of the most powerful*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

*partnerships in the world, whether it's a Pepsi deal we announced, whether it's Yum!, whether it's McDonald's."*  (*Id.* ¶ 68).

    **Statement 3.**  Brown discussed the Company's strategy for reducing costs to produce Beyond Meat's products confirmed that the acquisition of the Pennsylvania manufacturing plant was a step in that direction, stating "*we're going to bring a lot of cost out of our production model.  And you're starting to see us do that, whether it's in the facility we just purchased in Pennsylvania, where we're putting in an integrated process so we can go end-to-end there*."  (*Id.* ¶ 70).

### 4.  May 6, 2021 - Q1 2021 Earnings Conference Call

    **Statement 1.**  "*Specific investments and activities include: the establishment of more localized production within close proximity of our highest priority markets; more integrated end-to-end production processes across a greater proportion of our manufacturing network; scale-driven efficiencies in procurement and fixed cost absorption; . . . continued improvements in throughput across our manufacturing network; [and] certain product and process innovations and reformulations*"  (*Id.* ¶ 76).

    **Statement 2.**  Brown also told investors that scaling production for its foodservice customers was critical to the Company's cost management efforts and that Defendants were "*continuing to optimize commercial production at the Pennsylvania plant we acquired last year in support of strategic QSR customers in our retail business, we are adding new lines in our Columbia, Missouri facility.*"  (*Id.* ¶ 77).

    **Statement 3.**  "*So what this does is it gives us the opportunity to continue to move at a pace that matches the opportunity.  And so if you look at the relationships we just signed with McDonald's and with Yum! Brands, if you look at a lot of the names that we've been active with even before COVID and particularly before COVID in the QSR space, none of those have gone away as relationships.  And so I wanted to be in a position where I had the personnel, the facilities and the research and development to be the best partner they can possibly have, even as we continue*

---

**CIVIL MINUTES—GENERAL                                          11**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

*to grow in our retail space.  So that was the reason we had a large part for gaining the capital."* (*Id.* ¶ 78).

## 5.  August 5, 2021 - Q2 2021 Earnings Conference Call

"So I think it is a combination of these efficiencies we're going to be driving through increased throughput and all the other cost-down programs that we're pursuing. . . . And then what I just said about the U.S. retail to be layered on top of that in terms of different form factors.  *And so you see a steady improvement in the COGS structure as we implement this cost-down program on our existing product lines*, the ability to offer those to consumers at a lower price, and then you layer on the strategic launches with our partners and then the new innovation coming across those 3 platforms, and that's how you bridge that."  (*Id.* ¶ 84).

## 6.  November 10, 2021 - 3Q 2021 Earnings Conference Call

*Statement 1.*  "*What I will say is that the investment levels you're seeing this year, not just specific to McDonald's, but specific to our entire  Foodservice platform have been significant because of what we expect in 2022.  And in fact, some of the addition that I mentioned to our management team is also going to be revealing in terms of what we're looking for in 2022*."  (*Id.* ¶ 100).

*Statement 2.*  When asked whether he was "committed to [price parity] at kind of all costs", Brown declined to directly answer, but assured investors that Beyond Meat was "*continuing to drive down cost of our materials*", that the Company "*[would] be able to offer cost reductions over time*", and that "*we're making really good progress.*"  (*Id.* ¶ 101).

## 7.  November 17, 2021 - Bloomberg Article

A Beyond Meat spokesperson was quoted in the *Bloomberg* article, stating, "[w]e elected not to use an additional co-packer who had availability because they did not meet our high safety standards for production. . . . *This is not a question of*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

*internal problems with formulations or resulting production problems; rather, it is about ensuring we only deliver the best product expected by our customers.*' (*Id.* ¶ 110).

### 8.  February 24, 2022 - Q4 2021 Earnings Conference Call

Brown told investors that "*We expect these higher costs to persist for at least the first half of this year with significant improvement by year-end*," but he assured the market that "*though we expect continued near-term headwinds from some of these considerations, we are confident that none are structural in nature.*" (*Id.* ¶ 123).

### 9.  May 11, 2022 - Q1 2022 Earnings Conference Call

*Statement 1.*  "*As we mentioned on the last call, as we look toward the remainder of the year, we expect this will get better.  We have multiple initiatives underway with one of the largest improvements already secured, as we recently signed a contract to consolidate operations with a third-party manufacturer that can produce Jerky with more automated equipment, lowering fees and reducing the need for multiple processing locations, thereby reducing costly shuttle transportation.  We expect this capacity to come online in mid-Q3 of 2022.*" (*Id.* ¶ 133).

*Statement 2.*  Brown told investors "*we navigated significant cost challenges in the first quarter of 2022, the majority of which relate to scaling for strategic product launches and are temporary in nature.*" (*Id.* ¶ 134).

## II.  REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

Along with their Motion, Defendants filed a Request for Judicial Notice and Consideration of Documents Incorporated by Reference ("RJN") on December 8, 2023.  (Docket No. 43).  Plaintiffs did not oppose Defendants' RJN.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

**Case No.**  CV 23-03602-MWF (AGRx)              **Date:  August 9, 2024**

**Title:**      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

In the RJN, Defendants ask that the Court consider documents attached as Exhibits one through thirteen to the Declaration of Heather Waller (Docket No. 42-4). (RJN at 2).  The documents fall into the following three categories:  (1) NASDAQ prices (Ex. 1); (2) transcript of earning calls (Exs. 2–8); and (3) SEC filings (Exs. 7–13).  (RJN at 6).

Defendants request that the Court consider Exhibits two through eight under the incorporation by reference doctrine, and request that the Court take judicial notice of Exhibits one through thirteen under the Federal Rule of Evidence 201.  (RJN at 3, 5).

Under Rule 12(d) of the Federal Rules of Civil Procedure, if the Court considers matters outside the pleadings in ruling on a motion to dismiss that motion must be converted into one for summary judgment.  Fed. R. Civ. P. 12(d).  As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  An exception to this general rule exists for (1) materials that are attached to or necessarily relied upon in the complaint, and (2) matters of public record.  *Id.* at 688-89; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in assessing securities fraud claims, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

The Court determines that Exhibits two through six are incorporated by reference.  The Court also takes judicial notice of the remaining documents for the limited purpose that Defendants specify in their RJN because they are of matters of public record and are not subject to reasonable dispute.

Accordingly, the RJN is **GRANTED**.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:    Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

## III.  **LEGAL STANDARD**

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . .'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In ruling on the Motion under Rule 12(b)(6), the Court follows *Twombly*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their Ninth Circuit progeny.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Court must disregard allegations that are legal conclusions, even when disguised as facts.  *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014).  "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'"  *Eclectic Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief.  *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)          Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Allegations of fraud must also meet a higher pleading standard.  *See* Fed. R. Civ. P. 9(b) (requiring the pleading party to "state with particularity the circumstances constituting fraud or mistake").  It is well-established that "[a]t the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act []."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  "Thus, a plaintiff must plead falsity with particularity:  a plaintiff must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1164 (9th Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(1)).  The PSLRA further requires plaintiffs to plead scienter with particularity:  "a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)).

## IV.  DISCUSSION

### A.  Section 10(b) and Rule 10b-5 (Claim 1)

To plead a claim under § 10(b) of the Exchange Act, 15 U.S.C. §§ 78a *et seq.*, and its corresponding SEC regulation, Rule 10b-5, Plaintiffs "must allege, (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020) (citation and internal quotation marks omitted).

Defendants argue that Plaintiffs' § 10(b) and Rule 10b-5 claim fails for three reasons:  (1) Plaintiffs fail to plead an actionable misrepresentation or omission; (2) Plaintiffs fail to adequately plead scienter; and (3) Plaintiffs fail to plead loss causation.  The Court addresses the first two arguments as they are dispositive.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

Case No.  CV 23-03602-MWF (AGRx)                Date:  August 9, 2024

Title:       Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

## 1.  Material Misrepresentation or Omission:  Falsity

"[T]o properly allege falsity, a securities fraud complaint must . . . specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)) (internal quotation marks omitted).  This requirement "prevents a plaintiff from skirting dismissal by filing a complaint with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (emphasis in original).  "In the Ninth Circuit, plaintiffs may establish falsity in three ways: 'if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1175 (N.D. Cal. 2021) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017)).

As an initial matter, the Court determines the Complaint fails to comply with Rule 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1).  Plaintiffs' Complaint comprises almost forty challenged statements, but many of those statements are composed of several sentences and are "followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading," *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266 (N.D. Cal. 2019) (citation and internal quotation marks omitted).  (*See e.g.*, Complaint ¶¶ 39, 49).  This type of "puzzle pleading" alone is a sufficient basis to grant the Motion.  *see, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001) (dismissing a complaint where the Court found it "exceedingly difficult to discern precisely which statements are alleged to be misleading").

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 23-03602-MWF (AGRx)              **Date:  August 9, 2024**
**Title:**     Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
          al.

### a.  Challenged Statements Regarding QSR Partnerships

Plaintiffs challenge twenty statements regarding Beyond Meat's relationships
with QSRs that are allegedly false or misleading.  (*See* Complaint ¶¶ 39–40, 42–43,
46–47, 56–57, 61, 64, 67, 69, 75, 79, 96, 99, 115, 126–27, 135).  Plaintiffs argue that
the statements falsely suggested that "nationwide U.S. launches with these partners and
permanent placement on their menus were imminent," and created the impression that
"Beyond Meat's partnerships with its biggest QSR partners were strong and that the
associated testing and product launches were going well."  (Opposition at 5, 7 (citing
Complaint ¶¶ 30–35, 39–46, 48–49, 52, 56–57, 59, 61–63, 67, 69, 71, 75, 78–81, 85,
91, 94–100, 102–03, 120, 124–127)).

However, Plaintiffs fail to provide contemporaneous factual allegations to
demonstrate how the statements were false when made.

For example, Brown made a statement at the 1Q 2020 Earnings Conference Call
that there was "no negative reason at all" for why the McDonald's Canada test ended
in April 2020.  Plaintiffs claim Brown's statement is materially false and/or misleading
because "Defendants knew the Company was unable to scale-up production to supply
McDonald's with patties for its McPlant burger for a full U.S. nationwide expansion."
(Complaint ¶¶ 39, 49).  The alleged fact that Beyond Meat was unable to scale-up
production for a nationwide expansion does not mean that scalability was the reason
the Canada test ended.  In other words, Plaintiffs' claim lacks the requisite link with
the actual content of the statement to show how it is false.  *SEB Inv. Mgmt. AB v. Align
Tech., Inc.*, 485 F. Supp. 3d 1113, 1129 (N.D. Cal. 2020); see also *Brody v.
Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (explaining that it is not
enough to allege that "a statement . . . is incomplete or does not include all relevant
facts."  And noting that Rule 10b-5 "prohibit[s] *only* misleading and untrue statements,
not statements that are incomplete").

Because the factual allegations in the Complaint are almost entirely "untethered
to the actual statements made by Defendants," the Court is left to guess "how these
factual allegations render the Defendants' representations misleading."  *SEB Inv.*

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)                Date:  August 9, 2024
Title:    Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
          al.

*Mgmt. AB*, 485 F. Supp. 3d at 1129; *see also Brody*, 280 F.3d at 1006 (A statement
must "affirmatively create an impression of a state of affairs that differs in a material
way from the one that actually exists." (citation omitted)).  Therefore, Plaintiffs fail to
state with particularity, under Rule 9(b), facts "giving rise to a reasonable inference
that the challenged statements were false or misleading *when made.*"  *Pirani v. Netflix,
Inc.*, No. 22-CV-02672-JST, 2024 WL 69069, at *9 (N.D. Cal. Jan. 5, 2024) (emphasis
in original).

> **b.  Challenged Statements Regarding Beyond Meat's Scaling
>      and Production Efforts**

    Plaintiffs challenge seventeen statements discussing Beyond Meat's scaling and
production efforts.  (*See* Complaint ¶¶ 44, 54–55, 58, 65, 68, 70, 76–78, 84, 100–01,
110, 123, 133, 134).  Plaintiffs contend that the statements were misleading because at
the time they were made, Defendants' "substantial investment plan to scale production
for its strategic QSR partners, and bring costs out of the Company's production model,
was failing." (Opposition at 9).  These allegations fare no better and fail for the same
reasoning as the challenged statements regarding Beyond Meat's relationships with
QSRs.

> **2.  Material Misrepresentation or Omission: Puffery, Non-Actionable
>      Opinion, and the PSLRA Safe Harbor**

    Defendants contend that a substantial portion of the challenged statements are
not actionable because the statements are either puffery, opinion, or shielded by the
PSLRA's safe-harbor provision.  (Motion at 21–25).

> **a.  Standards**

> *i.  Puffery*

    "Statements of mere corporate puffery, vague statements of optimism like
'good,' 'well-regarded,' or other feel good monikers, are not actionable" under the

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

Case No.  CV 23-03602-MWF (AGRx)            Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
            al.

PSLRA "because professional investors, and most amateur investors as well, know
how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v.
Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotation marks
omitted).  A statement is considered "corporate puffery" when it "is so exaggerated or
vague that no reasonable investor would rely upon it when considering the total mix of
information available." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d at 834
(internal quotation marks omitted).

### *ii.   Opinion*

    Likewise, opinions can be non-actionable statements.  "An opinion is a belief, a
view, or a sentiment which the mind forms of persons or things." *In re
QuantumScape*, 580 F. Supp. 3d 714, 738 (N.D. Cal. 2022) (quoting *Omnicare, Inc. v.
Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)).
Because a PSLRA violation "require[s] falsity with respect to a material fact, there are
substantial limits in applying" PSLRA liability "to a pure statement of honest opinion."
*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188–89 (9th Cir. 2021) (cleaned up).

### *iii.   PSLRA Safe Harbor*

    Lastly, the PSLRA protects certain "forward-looking" statements from liability.
*See* 15 U.S.C. § 78u-5(c).  The safe-harbor provision is "designed to protect companies
and their officials when they merely fall short of their optimistic projections." *Id.* at
1189 (citation and quotations omitted).

    A forward-looking statement is statutorily defined as:

    (A) a statement containing a projection of revenues, income (including income
    loss), earnings (including earnings loss) per share, capital expenditures,
    dividends, capital structure, or other financial items;

    (B) a statement of the plans and objectives of management for future operations,
    including plans or objectives relating to the products or services of the issuer;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)          Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
al.

(C) a statement of future economic performance, including any such statement
contained in a discussion and analysis of financial condition by the management
or in the results of operations included pursuant to the rules and regulations of
the Commission;

(D) any statement of the assumptions underlying or relating to any statement
described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent
that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be
specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

Whether a statement is forward-looking and protected by the PSLRA's safe
harbor "turns on particular language" and therefore requires an individualized analysis
of each statement.  *QuantumScape*, 580 F. Supp. 3d at 736.  This is because "some
statements about the future may combine non-actionable forward-looking statements
with separable — and actionable — non-forward-looking statements." *Wochos*, 985
F.3d at 1190 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir.
2017)).  When there are "mixed" statements, "only the forward-looking aspects could
be immunized from liability, because the safe harbor is not 'designed to protect
[issuers] when they make a materially false or misleading statement about current or
past facts, and combine that statement with a forward-looking statement.'"  *Id.*
(quoting *Quality Sys.*, 865 F.3d at 1141–42).

### b.  Breakdown of Non-Actionable Statements

Plaintiffs' "shotgun approach to identifying a false or misleading statement,"
*Waswick v. Torrid Holdings, Inc.*, No. CV 22-08375-JLS (ASx), 2023 WL 9197563, at
*4 (C.D. Cal. Dec. 1, 2023) (citation and internal quotation marks omitted), makes it

---

CIVIL MINUTES—GENERAL                                          21

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)                Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
            al.

difficult for the Court to evaluate which statements are non-actionable.  Nevertheless,
the Court determines the non-actionable portions of the relevant challenged statements.

For ease of reference, the Court's findings are broken down by challenged
statement.  The non-actionable portions of the statement are further grouped by the
type of statement — i.e., puffery, opinion, and PSLRA safe harbor.  If a statement is
not listed or a portion is not grouped, it is actionable.

- Statement 1:  "***for no negative reason at all. . . . [W]e feel very good about
  our relationship with McDonald's and what's going to be happening both
  there and potentially elsewhere.***"  (Complaint ¶ 39)

    o  Puffery/Opinion:  "[W]e feel very good about our relationship with
       McDonald's"

    o  PSLRA Safe Harbor:  "what's going to be happening both there and
       potentially elsewhere"

- Statement 2:  "***I can assure you, there's no issue with McDonald's*** " and
  "***there's been no change in information since we began this test and got
  good results in the beginning and got good results at the end.***"  (*Id.* ¶ 40)

    o  Opinion:  "got good results in the beginning and got good results at the
       end"

- Statement 3:  Brown was asked for an update on the McDonald's Canada test
  and a potential launch.  In response, Brown reiterated that "***we had a very
  positive test with them . . . I remain very optimistic about our business in
  food service.***"  On the call Brown also assured investors that none of the
  Company's QSR partners were "***scrapping any plans to launch.***"  (*Id.* ¶ 42)

    o  Opinion:  "we had a very positive test with them . . . I remain very
       optimistic about our business in food service."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)                    Date:  August 9, 2024
Title:        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

- Statement 4:  Brown touted recent tests with Pizza Hut, Taco Bell, and KFC, claiming "***it was a terrific launch***" and "***the tests are going well, went well.***" (*Id.* ¶ 43).

    o  The entire challenged statement is considered a puffery and opinion statement.

- Statement 6:  "In addition, and particularly noteworthy as it relates to continued advancement of our poultry platform, we recently initiated a limited-time promotion of Beyond Fried Chicken with KFC in Southern California. . . . The product sold out in half that time in Los Angeles, with San Diego not far behind.  This test followed successful consumer responses in Atlanta, where Beyond Fried Chicken debuted at a single location in August of 2019 and sold out in less than 5 hours; and an expanded market test in February 2020 in the Nashville and Charlotte markets, which also received a very positive consumer response.  ***We are fortunate to partner with such an iconic brand as KFC and couldn't be more pleased with these initial positive results.***"  (*Id.* ¶ 46).

    o  The entire challenged statement is considered a puffery and opinion statement.

- Statement 7:  Brown assured investors that Beyond Meat's larger foodservice partners were doing well, stating that "***we're continuing to see, when we do these launches, really good results.***"  (*Id.* ¶ 47).

    o  The entire challenged statement is considered a puffery and opinion statement.

- Statement 11:  "***Our relationship with McDonald's is good. It's really strong. Our work there on behalf of what they're doing continues***" and "***I feel, as I said in the past, good about that relationship and good about what we're contributing to the McPlant platform.***"  (*Id.* ¶ 56).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)                    Date:  August 9, 2024
Title:        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
              al.

- o  Puffery:  "Our relationship with McDonald's is good"; "It's really
     strong"

- o  Opinion:  "Our relationship with McDonald's is good"; "I feel, as I
     said in the past, good about that relationship and good about what
     we're contributing to the McPlant platform"

- Statement 12:  "I will say this, ***everything I've said is true that we have
  developed very long-term relationship with [McDonalds].  We worked very
  hard on developing the burger that was in the PLT, and it will be in the
  McPlant.***  But it's really up to them to say the extent of that where it's going
  to be, how it's going to be there.  But everything that I've been doing and our
  research team has been doing is marching towards a particular outcome with
  them, and ***I feel good about that.***"  (*Id.* ¶ 57).

  - o  Puffery:  "I feel good about that"

  - o  Opinion:  "We worked very hard on developing the burger that was in
       the PLT"; "I feel good about that"

  - o  PSLRA Safe Harbor:  "it will be in the McPlant"

- Statement 15:  "I think that – Yum has obviously been aggressive as well in
  all the right ways.  ***And so the use of the word preferred there is intentional
  on the McDonald's side.***  There's some ins and outs into how we relate
  across the global chain.  But the – ***what we try to express in that release, I
  think, is pretty descriptive in the sense that we'll be the preferred global
  supplier for the McPlant plant-based burger patty***.  There are some products
  that are already in the market throughout the chain that would be held aside,
  and so outside of this agreement.  ***But we also are working with them in a
  collaborative sense looking at these other areas of poultry, pork and egg.
  So think about it as a collaborative relationship to really put the best
  products on the market in the plant-based space with McDonald's.***  Going

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)                    Date:  August 9, 2024
Title:        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

over to Yum!, very similar in the sense that there's some ins and outs about how each brand participates.  ***But overall, think about us as a preferred supplier in that regard.*** So ***we've got some great work we've done with Pizza Hut***. Obviously, ***we've done some really good things with KFC.  You heard earlier this year about Taco Bell.  These are partners that we're going to be deeply innovating with and bringing the very best of our innovation.  We have this brand new campus that we're building.*** The work we're doing with these and other CT partners are very, very – intensively the design of that facility.  And Yum! and McDonald's have a special place they're in."  (*Id.* ¶ 67).

   o Puffery:  "we've got some great work we've done with Pizza Hut"; "we've done some really good things with KFC"; "These are partners that we're going to be deeply innovating with and bringing the very best of our innovation."

   o Opinion:  "we've got some great work we've done with Pizza Hut"; "we've done some really good things with KFC"

   o PSLRA Safe Harbor:  "These are partners that we're going to be deeply innovating with and bringing the very best of our innovation."

• Statement 16:  "Yes. So I mean, I think there is a very much more robust structure that we're in now.  We've worked with both of these companies for a very long time, and it's been a pleasure to work with them.  They've got some outstanding folks there, and this is a formalization of that in a more organized structure.  ***And so when you think about being named the preferred supplier in both of these environments and the sheer number of products on our menu and volume across the world, it's very different from being referred to as participating in a test in Canada or some of the Nordic countries.  So it is very different in kind in my view.***"  (*Id.* ¶ 69).

   o Opinion: "So it is very different in kind in my view."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

- Statement 17:  Brown discussed the Company's strategy for reducing costs to produce Beyond Meat's products confirmed that the acquisition of the Pennsylvania manufacturing plant was a step in that direction, stating "***we're going to bring a lot of cost out of our production model.  And you're starting to see us do that, whether it's in the facility we just purchased in Pennsylvania, where we're putting in an integrated process so we can go end-to-end there***."  (*Id.* ¶ 70).

   o PSLRA Safe Harbor:  "we're going to bring a lot of cost out of our production model."

- Statement 19:  "I think the one thing that I'll continue to caution folks on is we're investing right now.  And all the investments you saw us do last year and the fourth quarter that resulted in numbers that maybe you didn't like on the EPS side, et cetera, ***they're for a reason. . . . We're commercializing a lot.  We're building new facilities.  We're adding operational staff.  There's a lot of cost that goes into growing a business that today has a certain amount of revenue, but is being grown and established for tomorrow's revenue, right?  And we're not doing those in a hope and a prayer.  We're doing this as we put together some of the most powerful partnerships in the world, whether it's a Pepsi deal we announced, whether it's Yum!, whether it's McDonald's.***"  (*Id.* ¶ 68).

   o Puffery:  "We're commercializing a lot."

- Statement 20:  "First of all, I'm superstitious, since I was very worried that we'd have one analyst call where McDonald's wasn't mentioned.  So thank you for mentioning McDonald's.  So it's – they're going to – really, it's like – ***it's such an important customer to us***.  It's an important partner to us.  ***Our relationship with them has been great for a long time.  We had to just keep reassuring people that was the case.  I'm glad that they finally allowed us to talk about that publicly.***"  (*Id.* ¶ 75).

CIVIL MINUTES—GENERAL                                                  26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:       Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
             al.

- o   Puffery/Opinion:  "Our relationship with them has been great for a
      long time.  We had to just keep reassuring people that was the case.
      I'm glad that they finally allowed us to talk about that publicly."

- o   Opinion:  "it's such an important customer to us"

- Statement 24:  Brown again assured investors about Beyond Meat's
  relationship with McDonald's, stating: ***"The relationship with them is –
  remains really strong, as I've said for years."***  (*Id.* ¶ 79).

  - o   The entire challenged statement is considered a puffery and opinion
        statement.

- Statement 27:  When asked whether he was "committed to [price parity] at
  kind of all costs", Brown declined to directly answer, but assured investors
  that Beyond Meat was "***continuing to drive down cost of our materials***", that
  the Company "***[would] be able to offer cost reductions over time***", and that
  "***we're making really good progress***."  (*Id.* ¶ 101).

  - o   Puffery/Opinion:  "we're making really good progress."

- Statement 29:  "Yes.  ***I haven't heard that, that there's any operational
  challenges*** within the back of the house.  And certainly, what I've seen from
  the stores that I have toured, they seem to be doing really well.  ***It's a great
  product***.  I don't know if anyone in phone has had an opportunity to have it,
  but it just – if you want some reassurance about where we're headed, go get a
  McPlant.  Absolutely delicious. And yes, we're excited about it."  (*Id.* ¶ 99).

  - o   Puffery/Opinion:  "It's a great product."

- Statement 31:  "'Evaluating multiple iterations when scaling a product is
  standard practice in our industry.  ***The bottom line is that our partnership
  with Taco Bell is strong and continuing***, and we look forward to further

CIVIL MINUTES—GENERAL                                                    27

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)               Date:  August 9, 2024
Title:        Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

announcements with them,' a Beyond spokesperson said, in a statement Beyond Meat's head of communications said was a joint statement from both companies."  (*Id.* ¶ 115).

- o Puffery:  "strong"

- Statement 34:  Brown told investors that "*We expect these higher costs to persist for at least the first half of this year with significant improvement by year-end*," but he assured the market that "*though we expect continued near-term headwinds from some of these considerations, we are confident that none are structural in nature.*"  (*Id.* ¶ 123).

  - o The entire challenged statement is considered a statement shielded by the PSLRA safe harbor provision.

- Statement 35:  "*As we mentioned on the last call, as we look toward the remainder of the year, we expect this will get better.  We have multiple initiatives underway with one of the largest improvements already secured, as we recently signed a contract to consolidate operations with a third-party manufacturer that can produce Jerky with more automated equipment, lowering fees and reducing the need for multiple processing locations, thereby reducing costly shuttle transportation.  We expect this capacity to come online in mid-Q3 of 2022.*"  (*Id.* ¶ 133).

  - o Opinion:  "As we mentioned on the last call, as we look toward the remainder of the year, we expect this will get better.  "

  - o PSLRA Safe Harbor:  "As we mentioned on the last call, as we look toward the remainder of the year, we expect this will get better."; "We expect this capacity to come online in mid-Q3 of 2022."

- Statement 37:  Brown also encouraged investors by stating that the Company was expecting an "*uptick in net revenues*" in Q2 2022 from "*new product*

CIVIL MINUTES—GENERAL                                                            28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)            Date:  August 9, 2024
Title:     Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
           al.

> ***launches and expected QSR launches and trial both in the U.S. and
> abroad.***"  (*Id.* ¶ 135).

> o   The entire challenged statement is considered a statement shielded by
>     the PSLRA safe harbor provision.

### 3.  Scienter

In order to survive a motion to dismiss, the Complaint must create a strong
inference of scienter.  *See* 15 U.S.C. § 78u–4(b)(2) (The complaint must "state with
particularity facts giving rise to a strong inference that the defendant acted with the
required state of mind.").  "To [create] a 'strong inference' of scienter under the
PSLRA, a complaint must allege that the defendant made false or misleading
statements with an intent to deceive, manipulate, or defraud, or with deliberate
recklessness."  *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir.
2021) (citation and internal quotation marks omitted).  Deliberate recklessness is not
"*mere* recklessness."  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir.
2016) (citation omitted) (emphasis in original).  Instead, it is "an *extreme* departure
from the standards of ordinary care . . . which presents a danger of misleading buyers
or sellers that is either known to the defendant or is so *obvious* that the actor must have
been aware of it."  *Id.* (citation omitted) (emphasis in original).

The "strong inference" standard "present[s] no small hurdle for [a] securities
fraud plaintiff."  *Id.* (citation omitted).  A reviewing court must "engage in a
comparative evaluation [and] . . . consider, not only inferences urged by the plaintiff
. . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*,
551 U.S. at 314.  A complaint will survive a motion to dismiss "only if a reasonable
person would deem the inference of scienter cogent and at least as compelling as any
opposing inference one could draw from the facts alleged."  *Id.* at 324.

Because Plaintiffs have not alleged a material misrepresentation or omission,
they are not able to allege that Beyond Meat or any of its officers had knowledge of
falsity or acted with deliberate recklessness as to any of the challenged statements.

---

**CIVIL MINUTES—GENERAL**                                                    29

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:     Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Even if Plaintiffs had satisfied the first element, the Court concludes that Plaintiffs have failed to plead adequate facts to allege that Defendants either intentionally or with deliberate recklessness misrepresented Beyond Meat's relationship with QSRs or its scaling and production efforts.

### a.  Brown

Defendants argue that Plaintiffs cannot rely on the core operations doctrine to establish scienter as to Brown.  (Motion at 27).

Courts that have found a strong inference of scienter under the core operations doctrine have done so when the action involves "specific admissions from top executives that they are involved in every detail of the company," or "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) (citations omitted).  As to the first scenario, the Complaint lacks an admission from Brown that he was involved in every detail of the company.  *See Id.* at 786 (noting that "without accompanying particularized allegations," the inference applies only in "rare circumstances").

Plaintiffs accordingly focus on the second scenario and argue that the QSR partnerships played a vital role in Beyond Meat's "financial health and overall survival."  (Opposition at 17).  Plaintiffs further argue that Brown served as an external gatekeeper of information relating to the QSR partnerships and thus his "constant" communications demonstrate scienter.  (*Id.* at 17–18).  Plaintiffs' argument is not ironclad because most of the challenged statements that Brown made regarding the importance of the QSR partnerships were non-actionable opinion or puffery statements.  (*See e.g.*, Complaint ¶ 75 (McDonald's is "such an important customer" to Beyond Meat)).  Additionally, Plaintiffs fail to explain how such statements demonstrate that he was specifically informed of the particularities surrounding Beyond Meat's "operational and testing side," (Opposition at 18).  Nonetheless, granting inferences to Plaintiffs, the Court views scienter as being sufficiently pled through reliance on the doctrine.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Without the core operations doctrine, the Complaint fails to allege particularized facts to give rise to a strong inference of scienter under Rule 9(b).  "To meet this pleading requirement, the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (citation omitted).  The Complaint notably lacks facts alleging "what defendants knew *and when*." *In re Enovix Corp. Sec. Litig.*, No. 23-cv-00071-SI, 2024 WL 349269, at *15 (N.D. Cal. Jan. 30, 2024) (emphasis in original).  It is not clear at what point Brown allegedly had knowledge or acted with deliberate recklessness regarding testing and scalability.

**b.  Nelson and Hardin**

Plaintiffs' point to the fact that Nelson allegedly sold 98.5% of his holdings in Beyond Meat during the Class Period to argue scienter.  (Opposition at 22).

"[S]tock sales by corporate insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Dearborn Heights*, 856 F.3d at 621 (citation and quotation marks omitted).  To make this determination, courts consider three factors:  "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id*.

Here, Plaintiffs only provide Nelson's total sales for the entire Class Period and his total sales for the year prior to the Class Period.  (Complaint ¶ 177, 179).  Therefore, the Complaint fails to allege "the precise amount of shares sold [and] the timing of these sales." *Id*.  Plaintiffs then erroneously compare Nelson's total sales for the 29-month Class Period with his total sales for the preceding 12-month period in order to argue that his sales are inconsistent with his prior trading history.  Accordingly, Nelson's sales during the Class Period cannot contribute to an inference of scienter.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)              Date:  August 9, 2024
Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et
            al.

The Complaint also fails to allege particularized facts to give rise to a strong
inference of scienter under Rule 9(b) for the same reasoning as allegations of scienter
for Brown.  The Court notes that only one of the challenged statements were made by
Nelson and Hardin respectively.  (*See* Complaint ¶¶ 54, 133).  Therefore, in order to
allege scienter with particularity, Plaintiffs' factual allegations need to be geared
toward establishing scienter when those statements were made.

### c.  Corporate Scienter

"[E]ven assuming corporate scienter is a viable theory in [the Ninth Circuit],
Plaintiffs fail to adequately allege scienter under that doctrine because the statements
that Plaintiffs cite to were not 'so dramatically false' that at least some corporate
official must have known of their falsity."  *Loc. 353, I.B.E.W. Pension Fund v.
Zendesk, Inc.*, No. 21-15785, 2022 WL 614235, at *2 (9th Cir. Mar. 2, 2022).  And at
the hearing, Plaintiffs' even argued that Brown is their strongest evidence of scienter.

Moreover, Plaintiffs reliance on executive departures and reports from news
agencies to further their scienter argument is unavailing.  (*See* Opposition at 24–25).

"[A]n employee's resignation supports an inference of scienter only when 'the
resignation at issue was uncharacteristic when compared to the defendant's typical
hiring and termination patterns or was accompanied by suspicious circumstances.'"
*Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981, 1002 (9th Cir. 2009)).  Otherwise, "the inference that the defendant
corporation forced certain employees to resign because of its knowledge of the
employee's role in the fraudulent representations will never be as cogent or as
compelling as the inference that the employees resigned or were terminated for
unrelated personal or business reasons."  *Zucco*, 552 F.3d at 1002.  Plaintiffs fail to
allege how the executive departures compare to Beyond Meat's typical hiring and
termination patterns and how the departures are related to the J.P. Morgan report such
that the report should constitute a suspicious circumstance.  (*See* Complaint ¶ 172).

---

**CIVIL MINUTES—GENERAL**                                              32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 23-03602-MWF (AGRx)          **Date:  August 9, 2024**
**Title:**      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

Additionally, "newspaper articles should be credited only to the extent that other factual allegations would be — if they are sufficiently particular and detailed to indicate their reliability.  Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000).  Plaintiffs do not provide full news articles and instead summarizes their contents.  (*See* Complaint ¶¶ 107, 112, 118, 164).  These summaries, however, fail to provide the underlying factual support required by Rule 9(b).

If the articles are merely being used to establish scienter through temporal proximity, that alone is insufficient to create a strong inference of scienter.  *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (explaining that "temporal proximity of an allegedly fraudulent statement or omission and a later disclosure" is insufficient on its own to establish scienter and can only "bolster" an inference based on other allegations).

### 4.  Loss Causation

"The Court need only address loss causation if a plaintiff has otherwise pleaded actionable misstatements or omissions."  *In re Intel Corp. Sec. Litig.*, No. 5:20-CV-05194-EJD, 2023 WL 2767779, at *26 (N.D. Cal. Mar. 31, 2023), *aff'd*, No. 23-15695, 2024 WL 1693340 (9th Cir. Apr. 19, 2024) (internal citation omitted).

Plaintiffs fail to sufficiently plead the material misrepresentation and scienter elements.  Accordingly, the Motion is **GRANTED** as to Plaintiffs' 10(b) claim.

### B.     Section 20(a) and 20A Claims (Claims 2 and 3)

The parties agree that Plaintiffs' § 20(a) claim is derivative of its §10(b) claim. (Motion at 36; Opposition at 30); *see also Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").  Because Plaintiffs failed stated a § 10(b) or Rule

---

**CIVIL MINUTES—GENERAL**                                              33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 23-03602-MWF (AGRx)            Date:  August 9, 2024

Title:      Saskatchewan Healthcare Employees' Pension Plan v. Beyond Meat, Inc. et al.

10b-5 violation, there is no alleged primary violation that could support a § 20(a) claim.

As with Plaintiffs' § 20(a) claim, Plaintiffs have failed to plead a "predicate violation" of the securities laws to support their Section 20A claim. *See Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ("To satisfy § 20A, a plaintiff must plead . . . a predicate violation of the securities laws.").

Accordingly, the Motion is **GRANTED** as to Plaintiffs' Section 20(a) and 20A claims.

V.    **CONCLUSION**

Because there is a possibility Plaintiffs may allege additional facts in support of its claims, the Court will grant Plaintiffs leave to amend the Complaint to address the issues discussed in this Order and any other potential deficiencies raised in the Motion.

Accordingly, the Motion is **GRANTED** *with leave to amend*.

Plaintiffs may file a First Amended Complaint ("FAC") by no later than **September 6, 2024**.  Defendants shall respond to the FAC, if filed, by no later than **September 30, 2024**.  Failure to file a FAC will be construed as a decision to stand on the facts alleged in the Complaint.

IT IS SO ORDERED.