ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ (147029)
LAURIE L. LARGENT (153493)
MATTHEW I. ALPERT (238024)
JOSEPH J. TULL (339956)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
malpert@rgrdlaw.com
jtull@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SASKATCHEWAN HEALTHCARE EMPLOYEES' PENSION PLAN, and MARIO COLATO,<br><br>Plaintiffs,<br><br>vs.<br><br>BEYOND MEAT, INC., et al.,<br><br>Defendants. | Case No. 2:23-CV-03602-MWF(AGRx)<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


Page

I. SUMMARY OF ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. THE PARTIES ..... 5

A. Plaintiffs ..... 5

B. Defendants ..... 6

IV. FACTUAL ALLEGATIONS ..... 6

A. Beyond Meat's Business ..... 6

B. Beyond Shifts Focus to New and Customized Products as Sales for Core Refrigerated Products Decline ..... 7

C. Defendants Had No Plan in Place for Commercializing and Scaling New and Customized Products ..... 7

D. Defendants Knew Beyond Meat Could Not Commercialize and Scale New and Customized Products ..... 8

1. Defendants Knew Beyond's Existing Production Processes Were Not Equipped for New and Customized Products ..... 8

a. Products for Yum!'s Pizza Hut Brand ..... 9

b. Products for PepsiCo Partnership ..... 9

c. New Frozen Chicken Product ..... 10

d. Manufacturing Inefficiencies at Beyond's Main Production Plants Increased New Product Costs ..... 11

2. Beyond Struggled with Formulation Issues Around Customized Products for QSRs ..... 12

a. McDonald's ..... 12

b. Yum!'s KFC Brand ..... 12

E. Company Founder and CEO Brown Was Directly Involved in New and Customized Product Commercialization ..... 13

F. Media Articles Also Corroborate Beyond's Internal Problems ..... 15

1. November 17, 2021 *Bloomberg* Article ..... 15

2. December 10, 2021 *Bloomberg* Article ..... 16

Page

3. July 21, 2022 *Bloomberg* Article ... 16

4. November 21, 2022 *WSJ* Article ... 17

V. DEFENDANTS' MATERIALLY MISLEADING STATEMENTS ... 17

A. February 25, 2021 Press Release and Earnings Call ... 17

B. May 6, 2021 Earnings Call ... 20

C. August 5, 2021 Earnings Call ... 22

VI. THE TRUTH BEGINS TO EMERGE IN SEVERAL PARTIAL DISCLOSURES WHILE DEFENDANTS CONTINUED TO MISLEAD INVESTORS ... 23

A. October 22, 2021 Press Release ... 23

B. November 10, 2021 Press Release and Earnings Call ... 23

C. November 17, 2021 *Bloomberg* Article ... 25

D. December 9, 2021 Partial Disclosure ... 28

E. February 3, 2022 Partial Disclosure ... 29

F. February 24, 2022 Earnings Call ... 29

G. May 11, 2022 Partial Disclosure ... 31

H. July 27, 2022 Partial Disclosure ... 32

I. October 14, 2022 Corrective Disclosure ... 33

VII. POST CLASS PERIOD EVENTS ... 34

VIII. ADDITIONAL FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ... 36

A. Company Founder and CEO Brown Was Hands-On at the Company's Factories and Plants ... 36

B. Brown Knew of Facts Critical to Beyond Meat's Core Operations ... 37

C. Corporate Scienter ... 38

IX. LOSS CAUSATION ... 39

A. October 22, 2021 ... 39

B. November 11, 2021 ... 40

C. November 17, 2021 ... 41

**Page**

D. December 10, 2021 .... 42
E. February 3, 2022 .... 42
F. February 25, 2022 .... 43
G. May 12, 2022 .... 44
H. July 28, 2022 .... 45
I. October 14, 2022 .... 46
X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .... 47
XI. CLASS ACTION ALLEGATIONS .... 48
COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Both Defendants .... 50
COUNT II For Violation of §20(a) of the Exchange Act Against Both Defendants .... 52
XII. PRAYER FOR RELIEF .... 53
XIII. JURY DEMAND .... 53

1. Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("SHEPP") and additional named plaintiff Mario A. Colato ("Colato") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined in ¶¶18-20, *infra*), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements made by Defendants; U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Beyond Meat, Inc. ("Beyond Meat," "Beyond," or the "Company"); analysts' reports and advisories about the Company; interviews with former employees of the Company; and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF ACTION

2. This is a securities class action on behalf of all purchasers of the securities of Beyond Meat between February 25, 2021 and October 13, 2022, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants Beyond Meat and Ethan Walden Brown ("Brown") the Company's founder and Chief Executive Officer ("CEO") (collectively, "Defendants").

3. Beyond Meat is a Los Angeles-based producer of plant-based meat substitutes. Before the onset of COVID-19, Beyond Meat's core products were refrigerated beef and sausage products, which carried high margins because Beyond's production processes were set up to produce them cost efficiently. When the pandemic hit in 2020, sales of Beyond's core refrigerated products temporarily skyrocketed due to an increase in at-home food consumption and a spike in beef

prices, which drove more consumers to try plant-based meat options. For example, Beyond tripled its U.S. supermarket sales in the second quarter of 2020 in the midst of the pandemic.

4. As stay-at-home orders lifted and consumers shifted back to cheaper conventional meat, the sales of these core products began to decline. At the same time, the plant-based burger market was becoming saturated and Beyond began facing intense competition from rivals like Impossible Foods, in addition to big agribusiness and natural food makers wanting to cash in on the plant-based protein craze. Beyond's competitors were entering the grocery stores at significantly lower price points, which forced Defendants to reduce prices of Beyond's core products to match.

5. By late 2020, the slowdown of Beyond Meat's core refrigerated product sales made Defendants ramp up their efforts to launch new products and develop customized products for large quick-service-restaurant chains ("QSRs") and new foodservice partnerships. Desperate to grow sales, Defendants invested heavily in production capacity and rushed to commercialize new products and secure these large partnerships. By January 2021, Brown announced a joint venture with foodservice giant PepsiCo to commercialize new plant-based protein snacks and beverages. Then, a month later on February 25, 2021, the beginning of the Class Period, during a conference call with analysts and investors, Brown announced two enormous global supply agreements with quick-service-restaurant titans McDonald's and Yum! Brands ("Yum!") to commercialize new products.

6. During the Class Period, Brown publicly told investors that Beyond Meat was prepared to meet the demands of these large partnerships and ready to commercialize new products. For example, Brown assured investors that the McDonald's and Yum! agreements "***are prime examples of what we've been scaling and preparing for***," and that the Company was "***continuing to optimize commercial production . . . in support of strategic QSR customers***." Defendants also assured investors that the millions of dollars they were spending in expanding Beyond's

production capacity were aligned with their plans for the new and customized products and scaling, and not just grounded in "***hopeful thinking***," or on a "***hope and a prayer***." Rather, Defendants told the market that these investments gave Beyond the "***opportunity to continue to move at a pace that matches the opportunity***." As investors were cautious about these massive investments, Defendants reinforced that they were "***starting to see***" production costs decrease as a result of the investments made to launch new products, and that the Company was making "***continued improvements in [product] throughput***" and "***[product] reformulations***."

7. However, unbeknownst to investors, Defendants were rushing these new and customized products to market without any cost-efficient plan or technical know-how to commercialize or scale them. Defendants were spending millions of dollars on useless machinery that they ended up offloading shortly after the Class Period.

8. Also, while Beyond's existing production processes worked for manufacturing its core products, Defendants knew at the start of the Class Period that these processes were not equipped to commercialize or customize new products. These new offerings required more complex and specialized processes that Beyond's existing facilities were not equipped to handle. Beyond was forced to rely on multi-location production and use more expensive outside co-manufactures, both of which significantly increased product costs. The need to coordinate between different sites and external manufacturers added logistical challenges and drove up transportation, warehouse, and handling costs. Additionally, Beyond struggled with formulation issues around the new and customized products, leading to escalating production trial costs, new product launch delays, and customer dissatisfaction.

9. Furthermore, Defendants concealed from the market that because of these internal production problems, the Company's product sales mix was deteriorating during the Class Period as high-dollar, high-margin sales of its core refrigerated products were being replaced by lower-dollar, lower-margin new products and customized products for its large partners.

10. Through a series of partial disclosures, the truth about Beyond Meat's internal problems began to publicly emerge in late 2021. On October 22, 2021, the Company issued a pre-earnings announcement slashing revenues and announcing operational challenges. Then, on November 11, 2021, Beyond Meat reported the lowest gross margin in the Company's history (since going public), due to higher expenses associated with scaling production and new product commercialization. Then, six days later, on November 17, 2021, *Bloomberg* published an article, based on the accounts of several former Beyond Meat employees, that disclosed a number of ongoing internal problems with new product launches and scaling issues. Defendants, however, publicly refuted any such problems, adamantly claiming that the *Bloomberg* allegations were "***not a question of internal problems with formulations or resulting production problems***" but instead "***it is about ensuring we only deliver the best product expected by our customers***."

11. Based on Defendants' public denials, the market remained optimistic about Beyond Meat's outlook. Analysts following Beyond projected significant revenue increases for fiscal years ("FY") 2022 and 2023 in anticipation of its partnership deals and new product launches. For example, on December 13, 2021, Piper Sandler issued a company note raising FY 2021 revenue estimates of $565 million to $601 million in FY 2022, in anticipation of new product launches. Defendants, however, continued to conceal Beyond Meat's internal problems from the market.

12. On February 24, 2022, Defendants were forced to disclose to the market that the Company's scaling and new product commercialization efforts had decimated gross margins and on May 12, 2022, when the Company's gross margins took another hit because of similar problems, Defendants publicly admitted that Beyond Meat had no dedicated processes in place to scale production. Beyond's stock price further declined in late July 2022, when it was reported that McDonald's was discontinuing the McPlant burger. On October 14, 2022, Beyond's stock price declined again when

the Company announced massive layoffs, executive departures, and a reduction in guidance.

13. These concealed facts decimated Beyond Meat's Class Period stock price. As the truth of Defendants' conduct was disclosed, the Company's stock price plummeted from a Class Period high of $157.49 to $13.35 at the end of the Class Period, a stunning drop of nearly 92%. As a result of Defendants' wrongful acts, and the resulting decline in the market value of Beyond Meat's stock, Plaintiffs and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

15. Venue is proper in this District pursuant to §27 of the Exchange Act, as Beyond Meat's principle executive offices are located at 888 North Douglas Street, Suite 100, El Segundo, California 90245, and a substantial portion of the acts and transactions giving rise to the violations of law complained of occurred in this District.

## III. THE PARTIES

### A. Plaintiffs

16. SHEPP was appointed lead plaintiff in this matter on July 26, 2023. ECF 27. SHEPP is a defined benefit pension plan with approximately 70,000 members and more than $10 billion in assets under management. SHEPP is the largest defined benefit pension plan in the Saskatchewan province of Canada. SHEPP, as set forth in its previously filed certification (ECF 23-2), purchased or acquired Beyond Meat common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

17. Plaintiff Colato is an individual residing in Los Angeles, California. Colato, as set forth in his previously filed certification (ECF 34-1), purchased or

acquired Beyond Meat common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

**B. Defendants**

18. Defendant Beyond Meat, headquartered in El Segundo, California, is a producer of plant-based meat substitutes. The Company's common stock trades on the Nasdaq stock exchange ("NASDAQ"), which is an efficient market, under the ticker symbol "BYND."

19. Brown founded Beyond Meat in 2009 and has served as the President and CEO of Beyond Meat from 2009 to the present.

20. Brown, because of his position within Beyond Meat, possessed the power and authority to control the contents of Beyond Meat's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Brown was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information, Brown knew that the adverse facts specified herein had not been disclosed, and were being concealed from the public, and that the positive representations which were being made were then materially misleading.

## IV. FACTUAL ALLEGATIONS

**A. Beyond Meat's Business**

21. Beyond Meat is a producer of plant-based meat substitutes. The Company sells its products through two channels: retail, which includes mainstream grocery stores, and big box chains; and foodservice, which includes full-service restaurants and quick-service restaurants.

22. The Company went public in 2019. At the time of the IPO, the Company's core product offerings included its refrigerated plant-based beef and sausage products sold through its retail and foodservice channels.

### B. Beyond Shifts Focus to New and Customized Products as Sales for Core Refrigerated Products Decline

23. Following a surge, then drop, in sales due to the pandemic, Beyond Meat was in search of continued growth to justify its stock price, and desperate to offset declining sales of its most established, and profitable, core line of business – refrigerated beef and sausage products. The need to transition its business away from its core products led Beyond to rapidly focus on new product development, including new frozen products, and customized products for its large foodservice partnerships.

24. Beyond's core refrigerated beef and sausage products had a proven, reliable, and cost-efficient manufacturing model, allowing them to carry high margins and command higher prices from consumers in grocery stores and foodservice partners. In contrast, Beyond's new products and customized offerings for QSRs and other partners were the exact opposite – rushed to market, and burdened with inefficient production processes that increased production costs. These new products generated lower revenue per pound. Consequently, the higher manufacturing costs and lower revenue resulted in a significantly lower margin profile for the new and customized products compared to the Company's core offerings.

### C. Defendants Had No Plan in Place for Commercializing and Scaling New and Customized Products

25. Before and during the Class Period, Beyond Meat's corporate culture was dominated by Brown, the Company's founder, who maintained a growth-above-all else culture. As Defendants were rushing to rollout new products and enter into partnerships to create customized products, unbeknownst to investors, Defendants had not established the technical requirements or capital-efficient means to commercialize and scale production of these new and customized products. For instance, Beyond Meat executives, including Brown, were entering into partnership agreements with McDonald's and Yum!, based on sales presentations where the Company's executives presented small-batch product prototypes. At the time these sales presentations were made, Defendants did not have any defined processes to scale-up production of the

products they were presenting, and had not tested the products to ensure manufacturability at the scale that would be required to meet demand of these large QSR partners.

26. Because of the rush to produce new and customized products, lack of defined production processes, and capital needs, Defendants were spending millions of dollars on unusable machinery, and experiencing manufacturing inefficiencies at the Company's DeVault, Pennsylvania plant that were stymieing product commercialization and scaling efforts. Shortly after the Class Period, Defendants were forced to unload this unusable equipment in order to reduce costs.

### D. Defendants Knew Beyond Meat Could Not Commercialize and Scale New and Customized Products

#### 1. Defendants Knew Beyond's Existing Production Processes Were Not Equipped for New and Customized Products

27. By the beginning of the Class Period, Defendants also knew that Beyond's existing production processes for its core products were not capable of cost-effectively bringing new products to market.

28. Beyond was relying on disjointed production methods, spread across multiple facilities, which significantly drove up costs at every stage – from processing and transportation to warehousing. This fragmented approach resulted in longer production times, delayed product launches, and increased production costs. The inherent inconsistencies in this scattered production process further led to lower product throughput[1] and quality control issues, resulting in wasted materials and made the new products even more expensive to produce.

29. Additionally, the Company had to shift a significant portion of its production volume to more expensive co-manufacturers, rather than using its lower-cost internal production capabilities, which was also inflating the overall expenses

[1] "Throughput" in food manufacturing industry describes how many quality units a production process can produce.

associated with bringing new products to market. The cost for co-manufactures to produce Beyond Meat's new product was in some cases more than triple the cost for in-house production. For example, it was $0.30 per pound at Beyond's DeVault plant versus a range of $0.80 to $1.36 per pound for the co-manufacturers. Further, by using so many co-manufacturers, Beyond Meat lost control of the manufacturing process, and co-manufacturers used inconsistent ingredients.

30. Unbeknownst to investors, these problems were causing the Company's sales mix to deteriorate as high-dollar, high-margin sales of its core refrigerated products were being replaced by lower-dollar, lower-margin new frozen products and customized products for its large partners.

**a. Products for Yum!'s Pizza Hut Brand**

31. An example of the expensive and inefficient processes the Defendants were using to create new products was seen in the months leading up to a small-scale test of a plant-based pepperoni product for Yum! (Pizza Hut) in August 2021. Beyond Meat's production process for the Pizza Hut pepperoni was particularly complex and costly. The process involved making salami-like links called "chubs," at Beyond's plant in Pennsylvania. These chubs were then flown to a manufacturing plant in Europe for slicing, and finally shipped back to the United States for the Pizza Hut test.

32. This multi-location production process dramatically increased transportation and warehousing costs and drove up the cost of the product. When presented with the high price of the Beyond Pepperoni, Pizza Hut balked at the price, and raised concerns about the Company's ability to produce the product on a commercial scale.

**b. Products for PepsiCo Partnership**

33. During the Class Period, the launch of Beyond Jerky as part of the Company's partnership with PepsiCo suffered from similar problems. As Defendants later publicly admitted, the Company could not scale production of the product because it lacked the necessary processes. The Beyond Jerky had to be made in

facilities across several states. As a result, this eroded the Company's gross margins on the product and consumed almost all of Beyond Meat's internal manufacturing lines, meaning the Company had to use high cost co-manufacturers for its other products.

**c. New Frozen Chicken Product**

34. The Company's production of its new frozen chicken product was plagued by inefficiencies and high costs from the start. In the year or more leading up to its July 2021 launch, several factors contributed to these issues. First, the manufacturing process was fragmented. The base chicken product was produced at the Company's Missouri plant, but it then had to be shipped to the DeVault plant (a co-manufacturer at the time) for further processing – marinating, breading, and frying. This extra step added significant transportation and production costs, which decreased the product's margin profile.

35. Compounding these issues, Beyond used an inefficient tumbler freezing process, which caused the chicken products to break apart. This led to considerable product waste and drove up the cost per pound. The fragmentation and waste not only inflated production costs but also made it difficult for the Company to meet demand, as the damaged product could not be sold.

36. As Defendants rushed this product to market, Beyond encountered even more costly problems. The rushed timeline led to delays in the actual launch, and just before the first scheduled release date, Defendants were forced to rely on co-manufacturers due to production difficulties. These setbacks further increased production costs and limited the number of restaurants and retail channels where the product could initially be launched. All of these inefficiencies ended up limiting the number of restaurants where the product was launched and increased production costs.

**d. Manufacturing Inefficiencies at Beyond's Main Production Plants Increased New Product Costs**

37. By the beginning of the Class Period, Beyond was experiencing significant manufacturing inefficiencies at its DeVault, Pennsylvania plant, which increased new product costs. Beyond acquired the DeVault plant in September 2020 specifically to commercialize new products. However, the Company made a critical misstep after the acquisition by terminating most of the senior staff who had extensive experience in plant operations. These seasoned professionals were replaced with the Company's own employees, who lacked the necessary expertise in running a manufacturing plant. This lack of experience directly led to a substantial increase in downtime for the production lines dedicated to new products.

38. Prior to Beyond's takeover, the DeVault plant churned out over one million pounds of chicken product per week. However, post-acquisition, production plummeted, to 200,000 per week. This decline was exacerbated by ongoing formulation issues that caused the chicken production lines to experience a scrap rate of nearly 50%. The combination of inexperienced staff and operational challenges severely hampered the plant's efficiency and product throughput.

39. Compounding these issues, the DeVault plant also suffered from severe inventory management problems that further inflated Beyond's new production costs. Most of the Company's products required cold storage, but in an attempt to expand manufacturing capacity, the Company eliminated all cold storage space at the DeVault plant to make room for additional equipment. As a result, Defendants had to rent off-premises freezer trucks and third-party freezer space to store the products. This makeshift storage arrangement led to frequent misplacement and loss of products, prompting DeVault to abandon its inventory management processes altogether. Consequently, Beyond accumulated a massive amount of expired inventory, which had to be discarded or written off, further compounding its operational inefficiencies and financial losses.

### 2. Beyond Struggled with Formulation Issues Around Customized Products for QSRs

40. Before and during the Class Period, Beyond Meat experienced significant internal problems around new product formulation, which doomed the launch of customized products for its QSR partners.

#### a. McDonald's

41. McDonald's had strict requirements for the plant-based meat patties for the McPlant burger, including consistency, taste, weight, height, shape, and texture. These requirements differed from the Beyond Burger that Beyond Meat sold at retail to other foodservice customers. But Beyond Meat was unable to meet McDonald's specifications at scale.

42. One of McDonald's key requirements was product consistency. Beyond Meat began using the continuous production process it utilized for large scale production of its own core products to produce the McPlant patty at scale with the initial recipes Beyond employed for the trials. The problem, however, was that because the ingredients were exposed to different levels of liquid, heat, and chemistry changes, the product changed composition. This change in processing resulted in product inconsistency in taste, moisture content, size, and texture. Additionally, Beyond Meat lacked a reliable supply chain for the McPlant patty ingredients (that McDonald's strictly required), which also contributed to inconsistencies in the taste and appearance of the patties.

43. Defendants used co-manufacturers to produce and manufacture the McPlant patties for McDonald's, which also impacted production uniformity and resulted in Beyond Meat not being able to meet McDonald's strict product specifications.

#### b. Yum!'s KFC Brand

44. After an initial test in 2019, Beyond Meat could not scale production for its chicken product for KFC. Beyond's scaled-up batches did not conform to KFC's

product specifications and it also drove up production costs with last-minute re-formulation attempts which also caused high amounts of product waste. Additionally, manufacturing inefficiencies increased the price-per-pound of the product. KFC was deterred by the higher price per pound, which impacted the partnership. In the end, Beyond Meat was unable to meet KFC's needs.

45. Beyond Meat could not adapt the original test lab recipes – that Defendants promised KFC – to mass scale production. The scaled up batches Defendants produced did not match up to the taste, size, texture, or moisture content of the original recipes. As a result, Beyond Meat was incapable of meeting KFC's U.S. product specifications for nationwide sales.

**E. Company Founder and CEO Brown Was Directly Involved in New and Customized Product Commercialization**

46. Media reports based on information obtained from then-current and former Beyond employees described Brown as hands-on to the point where he dominated the Company and was personally involved in Beyond's product development as the Company experienced the issues described in ¶¶23-44.

47. On November 17, 2021, *Bloomberg* published an article titled *Beyond Meat's Delayed Chicken Launch Extends Post-IPO Woes*.[2] This article was based on "conversations with five former employees," and represented that "every description of internal business, conversations and culture at Beyond Meat in this story has been corroborated by at least three of these people, who were directly involved in the matters discussed." This article reported that "[i]nsiders and onlookers alike lay substantial blame [for Beyond Meat's delayed chicken launch] at the feet of founder and Chief Executive Officer Ethan Brown."

48. This *Bloomberg* article also reported that "Brown discusses products with customers before scaling has been figured out, according to four people with

[2] A copy of the November 17, 2021 *Bloomberg* article is attached as Exhibit B, hereto.

knowledge of the matter." The article added that "multiple former employees who worked directly with Brown say that while he is a far-sighted leader with significant accomplishments, he lacks the experience to run the day-to-day operations of a fast-growing public company. . . . Brown doesn't want to hear differing opinions, they said."

49. Similarly, on November 21, 2022, *The Wall Street Journal* ("*WSJ*") published an article faulting Brown for many of Beyond Meat's shortcomings during the Class Period.[3] For instance, the article cited "current and former employees" to state that "Mr. Brown also has struggled to stick to priorities and manage Beyond's growth – switching gears frequently in ways that has left teams confused and frustrated." The article added that:

> Mr. Brown's drive to roll out new products on rushed timelines led to missed deadlines, disappointed customers and wasted packaging and ingredients, according to internal company documents and emails and current and former employees. A new offering backfired when veggie sausages slumped in their packaging on store shelves.

50. This article also quoted Beyond Meat's former vice president of research and development as stating: "'Pushing back on Ethan [Brown] was very hard,' . . . 'He didn't want to hear things that were contrary.'" According to the *WSJ* article, "Mr. Brown wanted to make progress as fast as possible and worry about details later, a common characteristic of startup founders."

51. The article also discussed "a gulf [which] emerged between the team responsible for developing new products and the group that figures out how to produce them at large volumes, according to current and former employees." It further stated that:

---

[3] A copy of the November 21, 2022 *WSJ* article is attached hereto as Exhibit C.

> Innovations made in small quantities by hand in Beyond's research laboratories often would spur Mr. Brown and other top executives to make commitments to customers before the company knew how to produce the food at large scale in factories, the employees said.

52. The *WSJ* article also reported that "Mr. Brown's drive to get products to market and strike deals with restaurant chains regularly trumped a focus on short-term profitability, according to current and former employees."

### F. Media Articles Also Corroborate Beyond's Internal Problems

53. *Bloomberg* and *WSJ* articles also corroborate the allegations herein.

#### 1. November 17, 2021 *Bloomberg* Article

54. For example, the November 17, 2021 *Bloomberg* article, "*Beyond Meat's Delayed Chicken Launch Extends Post-IPO Woes*," explained that Beyond Meat's launch of chicken tenders for KFC was delayed as "the result of significant internal problems around formulation – from confusion and misalignment to belated decision-making – leading to corresponding production delays, according to multiple former employees with knowledge of the matter." The article also noted:

> Questions arose about whether the chicken product should be raw, like the company's beef and sausage offerings, or precooked, like similar chicken and alt-chicken products. Late in the process, the Beyond team landed on a cooked tender, more like competitors in alt- and real meat.

55. *Bloomberg* further reported that this "late decision had a domino effect. . . . For Beyond, which relies heavily on co-manufacturers, that means pushing back delivery dates to customers." According to *Bloomberg*, the "chicken wasn't an isolated issue for the company – commercialization is an ongoing challenge for Beyond, according to five former employees."

**2. December 10, 2021 *Bloomberg* Article**

56. Another *Bloomberg* article published on December 10, 2021, titled "*Taco Bell Abandoned Plan to Test Beyond Meat's Carne Asada*" also corroborates that Defendants were experiencing problems with scaling up formulations for large QSR customers.[4] For example, *Bloomberg* reported in this article that "Taco Bell canceled a planned test of a product from Beyond Meat Inc. after the fast-food chain was dissatisfied with samples in October, according to people with direct knowledge of the matter." *Bloomberg* added that "[t]wo Beyond Meat employees from the team that made the product, which was designed to mimic grilled meat known as carne asada, were terminated, according to the people, who asked not to be named discussing private information."

**3. July 21, 2022 *Bloomberg* Article**

57. *Bloomberg* published another article on July 21, 2022, based on "conversations with 19 current and former employees of Beyond Meat and a review of internal documents, photos and communications" titled "*Why Taco Bell, Pizza Hut Aren't Offering Beyond Meat Products Right Now*" that further corroborates the allegations.[5] For example, this article noted that:

> Beyond has a history of showing products to customers without a capital-efficient approach or the technical know-how to commercialize them, said the current and former employees, who asked not to be named discussing private company information.

58. *Bloomberg* substantiated that Beyond pepperoni "chubs" were "made in Beyond's Pennsylvania plant, then they were flown to its European manufacturing facility for slicing, then brought back stateside for Pizza Huts." According to seven current and former employees, "[b]oth before and after that test . . . there were

---

[4] A copy of the December 10, 2021 *Bloomberg* article is attached as Exhibit D, hereto

[5] A copy of the July 21, 2022 *Bloomberg* article is attached hereto as Exhibit E.

ongoing disagreements over the order of cooking and slicing." *Bloomberg* also reported that "Pizza Hut balked at the high price of the pepperoni and has expressed doubts about Beyond's ability to produce it at commercial scale, former employees with knowledge of the matter told Bloomberg."

#### 4. November 21, 2022 *WSJ* Article

59. After the Class Period, the *WSJ* published an article on November 21, 2022, titled "*Beyond Meat's Very Real Problems: Slumping Sausages, Mounting Losses*," based on information obtained from then "current and former employees," that further corroborates the allegations. The article also reported that "Beyond at times purchased millions of dollars worth of equipment it didn't need." *WSJ* reported on Beyond Meat's difficulties making chicken tender products, stating that "Beyond ran into difficulties producing the [chicken] tenders and, shortly before the product was due on supermarket shelves, turned to a third-party manufacturer." *WSJ* also reported that with regard to Beyond Jerky, "Beyond struggled to re-create an early lab-crafted version in bulk at plants, according to current and former employees and company emails." *WSJ* confirmed that "the jerky had to be made in facilities across several states, boosting its cost of production and squeezing profit margins."

## V. DEFENDANTS' MATERIALLY MISLEADING STATEMENTS

### A. February 25, 2021 Press Release and Earnings Call

60. The Class Period begins on February 25, 2021, when Beyond Meat announced its Q4 2020 and FY 2020 financial results and held a conference call with investors. In conjunction with the financial results announcement, Beyond Meat also issued a press release officially announcing a "three-year global strategic agreement" partnership with McDonald's and a partnership with Yum!

61. The press release quoted Brown, stating that the agreement would "combine the power of Beyond Meat's rapid and relentless approach to innovation with the strength of McDonald's global brand," and additionally, "Beyond Meat and McDonald's will explore co-developing other plant-based menu items – like plant-

based options for chicken, pork and egg – as part of McDonald's broader McPlant platform."

62. The press release stated that the Yum! partnership was for the co-creation of plant-based protein menu items at three of the largest U.S. QSRs: KFC, Pizza Hut, and Taco Bell.

63. Analysts following Beyond Meat reacted positively to this announcement. For example, in a February 25, 2021 report, Berenberg Capital Markets wrote that "[Beyond] had previously announced various test launches with KFC, Pizza Hut, and Taco Bell of varying scale over the past year and a half, and we view this announcement as the culmination of those test launches." J.P. Morgan added that "we did not actually know for sure until now that Beyond would be supplying anything to MCD, so this news is constructive."

64. *Misleading statement*. During the conference call, Brown told investors that the McDonald's and Yum! agreements "***are prime examples of what we've been scaling and preparing for***."[6]

65. *Misleading statement*. When an analyst asked if Brown could provide "some visibility into the near term a little bit," Brown assured investors about the large investments Beyond Meat was making to support its strategic partners, stating:

> ***[W]e're not doing those in a hope and a prayer***. We're doing this as we put together some of the most powerful partnerships in the world, whether it's a Pepsi deal we announced, whether it's Yum!, whether it's McDonald's.

66. *Misleading statement*. Later in the call, Brown discussed the Company's strategy for reducing costs to produce Beyond Meat's new products and confirmed

[6] Unless otherwise specified, emphasis is placed on the portions of the statements alleged to be materially misleading. Additionally, to the extent there remains statements this Court previously found inactionable, they are only repeated herein for readability and/or to provide context for the alleged misstatements. Additionally, for the Court's convenience, attached hereto is Exhibit A, a summary chart of Defendants' misleading statements.

that by acquiring the Pennsylvania manufacturing plant "we're going to bring a lot of cost out of our production model. ***And you're starting to see us do that, whether it's in the facility we just purchased in Pennsylvania***, where we're putting in an integrated process so we can go end-to-end there."

67. *Why the statements in ¶¶64-66 are misleading*. Based on the alleged facts in ¶¶23-59, Brown's February 25, 2021 conference call statements were misleading when made for the following reasons:

(a) Contrary to Brown's statement that these large partnerships "***are prime examples of what we've been scaling and preparing for***," the true facts, which Defendants knew and/or recklessly disregarded, were that Beyond Meat did not have the production process in place to effectively commercialize and scale new products for its large foodservice customers.

(b) Brown's statement that the Company was not making investments merely on "***a hope and a prayer***" was misleading because the true facts, which Defendants knew and/or recklessly disregarded, were that the infrastructure investments they were making could not support new product commercialization and customized products for Beyond Meat's foodservice partnerships. In reality, the Company lacked the necessary production processes to effectively commercialize and scale new products for its major foodservice clients. Despite the assurances of a strategic approach, the Company's infrastructure and operational capabilities were not adequately prepared to meet the demands of its large-scale partners.

(c) Brown's statement that "***you're starting to see us***" reduce costs through Beyond's DeVault plant acquisition, was misleading when made. The true facts, which Brown knew and/or recklessly disregarded, were that the operational challenges and limitations at the DeVault plant, which was specifically purchased to commercialize and scale new and customized products, were causing production costs to increase. This, in turn, was causing the margin profiles on the new and customized products to erode and causing Beyond's sales mix to deteriorate as high-dollar, high-

margin sales of its core refrigerated products were being replaced by lower-dollar, lower-margin new frozen products and customized products for its large partners.

**B. May 6, 2021 Earnings Call**

68. On May 6, 2021, after the market closed, Beyond Meat announced its Q1 2021 financial results and held a conference call with investors.

69. *Misleading statement*. During the call, Brown detailed the Company's specific ongoing investment spending to support Beyond Meat's strategic QSR customers, stating:

> Specific investments and activities include: the establishment of more localized production within close proximity of our highest priority markets; more integrated end-to-end production processes across a greater proportion of our manufacturing network; scale-driven efficiencies in procurement and fixed cost absorption; . . . ***continued improvements in throughput across our manufacturing network; [and] certain product and process innovations and reformulations*** . . . .

70. *Misleading statement*. Brown also told investors that scaling production for its foodservice customers was critical to the Company's cost management efforts and that Defendants were "***continuing to optimize commercial production at the Pennsylvania plant we acquired last year in support of strategic QSR customers***."

71. *Misleading statement*. On the call, Brown also confirmed that "in early March, we . . . closed $1 billion convertible senior notes offering," which "raised $1.04 billion in net proceeds for Beyond Meat." When asked by an analyst what Beyond Meat would be doing with the $1.1 billion capital raise, Brown told investors that the "relationships . . . with McDonald's and with Yum! Brands" were "the reason we had a large part for gaining the capital." Brown stated:

> ***So what this does is it gives us the opportunity to continue to move at a pace that matches the opportunity***. And so if you look at the relationships we just signed with McDonald's and with Yum! Brands, if

> you look at a lot of the names that we've been active with even before COVID and particularly before COVID in the QSR space, none of those have gone away as relationships. And so I wanted to be in a position where I had the personnel, the facilities and the research and development to be the best partner they can possibly have, even as we continue to grow in our retail space. So that was the reason we had a large part for gaining the capital.

72. *Why the statements in ¶¶69-71 are misleading*. Based on the alleged facts in ¶¶23-59, Brown's May 6, 2021 conference call statements were misleading when made for the following reasons:

(a) The true facts, which Brown knew and/or recklessly disregarded, were that Beyond Meat lacked the production processes to improve "***throughput across our manufacturing network; [and] certain product and process innovations and reformulations***," and was not "***optimiz[ing] commercial production***" for the new and customized products for Beyond's QSR customers. Production throughput was decreasing because Beyond had to use co-manufactures to produce the new and customized products. Also, when internal process were used for these products, the combination of inexperienced staff and operational challenges at the DeVault plant was reducing product throughput. Similarly, Defendants were experiencing significant internal problems around new and customized product formulation that were leading to escalating production trial costs, new product launch delays, up to 50% product waste, and QSR customer dissatisfaction as to product quality. The increased production costs also made the customized plant-based products price prohibitive for Beyond's QSR customers because they were now more expensive than their conventional protein-based menu items.

(b) Brown's statement that Beyond had the "***opportunity to continue to move at a pace that matches the opportunity***" was misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that the

infrastructure investments being made could not support new product commercialization and customized products for Beyond Meat's foodservice partnerships. In reality, the Company lacked the necessary production processes to effectively commercialize and scale new products for its major foodservice clients. Despite the assurances of a strategic approach, the Company's infrastructure and operational capabilities were not adequately prepared to meet the demands of its large-scale partners.

**C. August 5, 2021 Earnings Call**

73. On August 5, 2021, Beyond Meat hosted an earnings call for its Q2 2021 financial results. Brown was specifically asked about when investors could expect the McDonald's partnership to ramp up. He responded that "I think you will see some activity this year that is test in nature and things like that or market analysis and tests and things like that" and "the general uptick will be in 2022 from what we're seeing."

74. *Misleading statement.* On the call, analysts raised concerns about the discrepancy between Beyond Meat's purported increase in manufacturing capacity but lack of sales growth. Brown eased investors' fears by stating that the Company had a plan in place to increase sales growth, stating:

> So I think it is a combination of these efficiencies we're going to be driving through increased throughput and all the other cost-down programs that we're pursuing . . . . And then what I just said about the U.S. retail to be layered on top of that in terms of different form factors. ***And so you see a steady improvement in the COGS structure as we implement this cost-down program on our existing product lines***, the ability to offer those to consumers at a lower price, and then you layer on the strategic launches with our partners and then the new innovation coming across those 3 platforms, and that's how you bridge that.

75. *Why the statement in ¶74 is misleading.* Based on the alleged facts in ¶¶23-59, Brown's August 5, 2021 conference call statement that "***so you see a steady***

***improvement in the COGS structure***" was misleading when made. The true facts, which Brown knew and/or recklessly disregarded, were that the costs to produce new and customized products were significantly higher than Beyond's core products. Beyond's sales mix was deteriorating as high-dollar, high-margin sales of its core refrigerated products were being replaced by lower-dollar, lower-margin new frozen products and customized products for its large partners.

## VI. THE TRUTH BEGINS TO EMERGE IN SEVERAL PARTIAL DISCLOSURES WHILE DEFENDANTS CONTINUED TO MISLEAD INVESTORS

### A. October 22, 2021 Press Release

76. On October 22, 2021, Beyond Meat issued a pre-earnings announcement press release telling investors that the Company was slashing its Q3 2021 net revenue outlook from between $120 million to $140 million to just $106 million, a decline of 12% to 25%, and that expenses were continuing to rise as the Company experienced operational challenges.

77. As a direct result of this partial corrective disclosure, Beyond Meat's stock dropped 11.8%, from a closing price of $108.62 per share on October 21, 2021 to a closing price of $95.80 per share on October 22, 2021, on an unusually high volume of over 14 million shares traded.

78. Analysts reacted negatively due to the October 22, 2021 disclosure. For example, on October 26, 2021 a Credit Suisse analyst issued a report lowering Beyond Meat's target price from $123.00 per share to $96.00 per share, stating that "Beyond's operational challenges this year may hurt the company's credibility with large QSR chains like [McDonald's] to meet volume commitments."

### B. November 10, 2021 Press Release and Earnings Call

79. On November 10, 2021, after the market closed, Beyond Meat announced its Q3 2021 financial results and held a conference call with investors. During the conference call, Defendants reported that gross margin declined to 21.6% from 27.3% the prior-year same quarter because of higher transportation costs, warehousing fees,

and expenses associated with new product commercialize for Beyond Meat's large foodservice customers. In a November 10, 2021 analyst report, Piper Sandler noted that "[Q3 2021] margins were lowest in [the Company's] reported history."

80. As a result of this partial corrective disclosure, Beyond Meat's stock price declined over 13%, on a massive trading volume of 20.7 million shares.

81. However, as discussed below, Defendants continued to mislead investors in the November 10, 2021 press release and conference call that served to buffer the impact of Beyond Meat's disappointing results and maintained the artificial inflation in Beyond Meat's stock price.

82. *Misleading statement*. The November 10, 2021 press release quoted Brown as stating that regarding "scaling products and infrastructure for our strategic quick serve restaurant partners, bringing new product to retail markets, [] investing in innovation, commercialization, and production capabilities here in the U.S., EU, and China, ***we believe we are steadily executing against our vision of being tomorrow's global protein company***."

83. *Why the statement in ¶82 is misleading*. Based on the alleged facts in ¶¶23-59, Brown's statement that Beyond was "***steadily executing against its vision***," was misleading when made. The true facts, which Brown knew and/or recklessly disregarded, were that Beyond Meat lacked the production processes to produce new and customized products for Beyond's QSR customers, which was causing production costs for these products to be significantly higher than the Company's core products. This was causing the margin profiles on these new and customized products to erode. The increasing costs were also made by the customized plant-based products price prohibitive for Beyond's QSR customers because they were now more expensive than their conventional protein-based menu items.

84. *Misleading statement*. During the conference call, Brown also told investors that "Pizza Hut launched a limited rollout of our latest product innovation Beyond Pepperoni at roughly 70 locations across 5 U.S. markets" and that "***we***

***overcame numerous technical challenges*** to ensure that Beyond Pepperoni is nearly indistinguishable from Pizza Hut's iconic original pepperoni."

85. *Why this statement in ¶84 is misleading*. Based on the alleged facts in ¶¶23-59, this statement was misleading when made. In truth, Brown knew, or recklessly disregarded, that Defendants had only "over[come]" the "technical challenges" at the increased cost of using an international, multi-location production process to make customized products for Pizza Hut that increased transportation and warehousing costs and made the product cost-prohibitive to the customer. When presented with the high price of the pepperoni product, Pizza Hut balked at the price, and expressed concerns about Beyond's ability to produce the product at a commercial scale.

86. *Misleading statement*. Brown also assured investors that Beyond Meat's investments for its large foodservice customers "***[were] not founded on hopeful thinking, but rather are the result of planning against key partnerships, market development initiatives and other opportunities***."

87. *Why the statement in ¶86 is misleading*. Based on the alleged facts in ¶¶23-59, this statement was misleading when made. The true facts, which Brown knew and/or recklessly disregarded, were that Defendants were rushing into partnership agreements with large scale QSRs such as McDonald's and Yum!, that the Company called "whales," based on sales presentations where Brown and other Company executives presented small-batch product prototypes. At the time these sales presentations were made, Defendants did not have any defined processes to scale-up production of the products they were presenting, and had not tested the products to ensure manufacturability at the scale that would be required to meet demand of these large QSR partners.

### C. November 17, 2021 *Bloomberg* Article

88. Less than a week later, *Bloomberg* published the November 17, 2021 article titled *Beyond Meat's Delayed Chicken Launch Extends Post-IPO Woes*,

highlighting the delays in product roll out and execution challenges Beyond Meat was facing. Citing five former Beyond Meat employees, *Bloomberg* exposed the Company's ongoing scaling and manufacturing problems and how those problems were tarnishing the Company's relationships with potential partners.

89. Specifically, *Bloomberg* detailed Beyond Meat's struggles in launching a chicken product, noting that despite "the expanded partnership with Yum" announced earlier in 2021, "a national Beyond Fried Chicken rollout still hasn't materialized." The article also reported that "[t]he slow, uneven launch was the result of significant internal problems around formulation – from confusion and misalignment to belated decision-making – leading to corresponding production delays, according to multiple former employees with knowledge of the matter."

90. The article stated that Beyond Meat's belated decision-making had "a domino effect" of delaying product launches because the Company relied heavily on third party co-manufactures. For example, according to *Bloomberg*, former employees reported that during the alt-chicken production process, "[q]uestions arose about whether the chicken product should be raw . . . or pre-cooked . . . . Late in the process, the Beyond team landed on a cooked tender." The article noted that with changes like that, "'[e]ssentially you have to create a whole other production line,'" which means pushing back delivery dates to customers.

91. This *Bloomberg* article also stated that "chicken wasn't an isolated issue for the company – commercialization is an ongoing challenge for Beyond, according to five former employees."

92. *Bloomberg* further reported that "some of those who have worked closely with [Brown] also say that he isn't an effective manager of the day-to-day operations of a public company" and that "Brown discusses products with customers before scaling has been figured out, according to four people with knowledge of the matter."

93. As a direct result of this partial corrective disclosure, the price of Beyond Meat's stock declined 3.6%, from a closing price of $83.48 per share on November 16, 2021, to a closing price of $80.47 per share on November 17, 2021.

94. However, Defendants' denials of any ongoing problems quoted in the *Bloomberg* article served to limit Beyond Meat's stock price decline on November 17, 2021, and as a result Beyond Meat's stock price remained artificially inflated.

95. *Misleading statement*. Specifically, a Beyond Meat spokesperson was quoted in the *Bloomberg* article, stating: "'[w]e elected not to use an additional co-packer who had availability because they did not meet our high safety standards for production . . . . ***This is not a question of internal problems with formulations or resulting production problems; rather, it is about ensuring we only deliver the best product expected by our customers***.'"

96. *Why the statement in ¶95 is misleading*. Based on the alleged facts in ¶¶23-59, this statement was misleading when made for the following reasons:

(a) The true facts, which Defendants knew and/or recklessly disregarded, were that Beyond Meat lacked the production processes to produce new and customized products for Beyond's QSR customers. Defendants were experiencing significant internal problems around new and customized product formulation that were leading to escalating production trial costs, new product launch delays, up to 50% product waste, and QSR customer dissatisfaction. Also, Defendants relied on fragmented and inefficient production processes, as the existing internal production lines – optimized for the Company's core products – were incompatible with the requirements of the new products. This approach significantly escalated costs at every stage, from processing and transportation to warehousing.

(b) These internal problems were making the margin profiles on these new and customized products significantly lower than Beyond's core products. The increasing costs also made the customized plant-based products price prohibitive for

Beyond's QSR customers because they were now more expensive than their conventional protein-based menu items.

**D. December 9, 2021 Partial Disclosure**

97. On December 9, 2021, after the market closed, multiple media sources reported that Taco Bell had cancelled a planned test of Beyond Carne Asada due to ongoing quality concerns. According to those reports, this cancellation was further evidence of ongoing problems Beyond Meat faced in bringing its products to market at scale.

98. For example, on December 10, 2021, *Bloomberg* reported that "Taco Bell canceled a planned test of a product from Beyond Meat Inc. after the fast-food chain was dissatisfied with samples in October, according to people with direct knowledge of the matter." *Bloomberg* added that "[t]wo Beyond Meat employees from the team that made the product, which was designed to mimic . . . carne asada, were terminated."

99. As a direct result of this partial corrective disclosure, the price of Beyond Meat's stock declined nearly 8%, from a closing price of $70.09 per share on December 9, 2021, to a closing price of $64.51 per share on December 10, 2021.

100. However, Beyond Meat quickly responded to this article to reassure investors about the strength of the Company's partnership with Taco Bell, which served to limit Beyond Meat's stock price decline on December 10, 2021, and as a result Beyond Meat's stock price remained artificially inflated.

101. *Barron's* published an article on December 10, 2021, reporting a joint statement from Beyond and Taco Bell that "[w]e can't provide additional details at this time but are very excited about what Taco Bell and Beyond Meat have planned."[7]

102. Beyond Meat's response to the *Bloomberg* article succeeded in comforting investors and the public about the Company's relationship with Taco Bell

[7] A copy of the *Barron's* article is attached hereto as Exhibit F.

and served to buffer the impact of Beyond Meat's disappointing results and maintained the artificial inflation in Beyond Meat's stock price.

103. For instance, *vegconomist* reported on December 16, 2021 that "it appears the speculation can soundly end, and the world can once again anticipate Beyond Meat's next groundbreaking launch."[8]

**E. February 3, 2022 Partial Disclosure**

104. On February 3, 2022, *Bloomberg* published an article reporting that three Del Taco stores had dropped Beyond Meat's version of ground beef. The article also reported that some of the Company's other foodservice customers were also dissatisfied with Beyond Meat's product and were either limiting or had already discontinued Beyond Meat menu items.[9]

105. As a direct result of this partial corrective disclosure, the price of Beyond Meat's stock declined 9.4%, from a closing price of $64.00 per share on February 2, 2022, to a closing price of $58.01 per share on February 3, 2022.

**F. February 24, 2022 Earnings Call**

106. On February 24, 2022, after the market closed, Beyond Meat issued its Q4 2021 and FY 2021 financial results and held a conference call with investors. On the conference call, Defendants reported that the Company's Q4 2021 gross margin declined to 14.1%, compared to 24.9% in Q4 2020, due to increased new product manufacturing.

107. On the conference call, Brown admitted that the higher manufacturing costs were attributable to production of Beyond's new chicken tender product because "we used higher-cost co-manufacturing partners, experienced lower throughput levels and other supply chain inefficiencies." Brown also admitted that the Company had to "shift[] a significant amount of volume to external co-manufacturers . . . away from

---

[8] A copy of the *vegconomist* article is attached hereto as Exhibit G.

[9] A copy of the February 3, 2022 *Bloomberg* article is attached hereto as Exhibit H.

our internal facility in Pennsylvania . . . in order to free up line time for commercialization."

108. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped 9.2%, from a closing price of $49.00 per share on February 24, 2022 to a closing price of $44.49 per share on February 25, 2022, on unusually high volume of over 11.6 million shares traded.

109. During the conference call, Defendants continued to make misleading statements about its strategic partnerships that served to buffer the impact of Beyond Meat's disappointing Q4 2021 results and maintained the artificial inflation in Beyond Meat's stock price.

110. *Misleading statement*. On the conference call, Brown assured investors that the high product costs for Beyond's new products were temporary in nature and that Defendants "***do not expect these higher costs to persist indefinitely***."

111. *Why the statement in ¶110 is misleading*. Based on the facts alleged in ¶¶23-59, this statement was misleading when made . The true facts, which Defendants knew and/or recklessly disregarded, were that Beyond Meat lacked the production processes to produce new and customized products for Beyond's QSR customers. Defendants were experiencing significant internal problems around new and customized product formulation that were leading to escalating production trial costs, new product launch delays, up to 50% product waste, and QSR customer dissatisfaction. Also, Defendants relied on fragmented and inefficient production processes, as the existing internal production lines – optimized for the Company's core products – were incompatible with the requirements of the new products. This approach significantly escalated costs at every stage, from processing and transportation to warehousing. These internal problems were making the margin profiles on these new and customized products significantly lower than Beyond's core products.

112. *Misleading statement*. During the question-and-answer portion of the conference call, Brown answered an analyst's question regarding KFC and McDonald's and "whether these items are going to be on the permanent menu," stating: "***we are obviously working toward more permanent menu placement with all of our QSR partners***."

113. *Misleading statement*. Later in the call, Brown answered a question about advancing strategic partner trials to actual launches stating:

> [I]f you look at our track record, ***we've done well with continuing to maintain the relationships with our QSRs, continue to go from test to trials and then from trials to LTOs and then from there to full launches***. And so – but there's nothing in particular we can do other than just perform well in each stage.

114. *Why the statements in ¶¶112-113 are misleading*. Based on the facts alleged in ¶¶23-59, these statements were misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that Beyond's efforts to obtain permanent placement on the menus of its QSR partners in the U.S. were already doomed. While the Company was doing test trials with McDonald's and Yum! restaurants, these customers were dissatisfied with the customized products because they did not meet their product requirements. Also, increased production costs for the new customized plant-based products made them price prohibitive for Beyond's customers and more expensive than conventional protein-based menu items.

### G. May 11, 2022 Partial Disclosure

115. On May 11, 2022, after the market closed, Beyond Meat announced its Q1 2022 financial results and held a conference call with investors. During the conference call, the Company's Chief Financial Officer ("CFO") reported gross margin of 0.2% for the quarter, a 30% decrease from the prior year same quarter, 30.2%. Beyond Meat's CFO explained that the dramatic decrease in gross margin was due to the "expensive and inefficient" manufacturing process the Company took

to launch Beyond Meat Jerky in partnership with PepsiCo. During the conference, Beyond's CFO further admitted that the launch of Beyond Meat Jerky was "unprecedented" for the Company because of its scale and that the launch was done in an "expensive and inefficient manner" because the Company had not yet established manufacturing processes for scaling. Brown added that Defendants had to "interrupt[] steady-state internal production" of its core products in order to commercialize Beyond Jerky and other customized products for its QSRs.

116. During the call, Beyond's CFO also reported that costs of goods sold increased $1.15 per pound during the quarter and that Beyond Jerky accounted for more than half of the costs, with the remainder being driven by increased manufacturing costs, including higher transportation and warehousing costs.

117. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped 4.2%, from a closing price of $26.17 per share on May 11, 2022 to a closing price of $25.08 per share on May 12, 2022, on a massive trading volume of over 22.4 million shares.

**H. July 27, 2022 Partial Disclosure**

118. On July 27, 2022, after the market closed, an analyst from J.P. Morgan issued a report titled "McPlant Seems McDone in the US for Now." The report stated "[w]e believe that McDonald's . . . had broadly discontinued its US test of the McPlant burger made with Beyond Meat." The analyst noted that J.P. Morgan spoke with McDonald's employees at 25 locations that previously carried the product and "each said that the item is no longer on the menu." The report stated that "clearly this news isn't good for the narrative . . . it's hard to see [Beyond Meat's] stock multiple expanding when one of the more visible customers has backed away."

119. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped over 3%, from a closing price of $32.44 per share on July 27, 2022 to a closing price of $31.43 per share on July 28, 2022.

### I. October 14, 2022 Corrective Disclosure

120. On October 14, 2022, before the market opened, Beyond Meat filed a Form 8-K with the SEC that announced "a plan to reduce the Company's current workforce by approximately 200 employees, representing approximately 19% of the Company's total global workforce" and that the "decision was based on cost-reduction initiatives intended to reduce operating expenses, sharpen the Company's focus on a set of key growth priorities, and target cash flow positive operations within the second half of 2023."

121. The press release attached to the Form 8-K stated that the Company was forced to admit that it had to make "making a strategic shift in pursuit of a more sustainable growth model that emphasizes the achievement of cash flow positive operations." The press release also quoted Brown as stating that "'Beyond Meat is implementing measures to drive more sustainable growth, emphasizing the achievement of cash flow positive operations within the second half of 2023'" and that "'we are significantly reducing expenses and sharpening our focus on a set of key growth priorities.'"

122. The press release also announced that Beyond Meat was reducing its full year revenue outlook for 2022. Specifically, the press release stated:

> Based upon preliminary results, the Company now expects third quarter 2022 net revenues of approximately $82 million, a decrease of approximately 23% versus the prior-year period. Full year 2022 net revenues are expected to be in the range of approximately $400 million to $425 million, representing a decrease of approximately 14% to 9% compared to the full year 2021. This compares to the Company's previous expectation of full year 2022 net revenues in the range of $470 million to $520 million.

123. As a direct result of this corrective disclosure, the price of Beyond Meat's stock declined 9.7%, from a closing price of $14.78 per share on October 13, 2022, to a closing price of $13.35 per share on October 14, 2022.

124. Analysts who followed the Company reacted strongly and negatively to this information. For instance, Barclays reported on October 14, 2022 that while "[a]ccording to management, these actions will help the company become cash flow-positive by 2H23: . . . we are more cautious and expect positive cash flow by 2H24." BTIG reported on October 14, 2022 that "Beyond Meat's announcement this morning of workforce reductions, executive departures, and slashing of forward guidance puts all the bad news out on the table."

125. Piper Sandler also reported on October 14, 2022 that Beyond Meat "[was] now targeting to achieve positive cash flow from operations by 2H23. While this is possible, it depends on many variables in a volatile environment, and timing beyond our visibility horizon. We do not assume it will happen."

## VII. POST CLASS PERIOD EVENTS

126. Due to the severe margin pressures caused by the Company's costly new product strategy, Defendants were compelled to abandon this strategy shortly after the Class Period and re-focus back to the Company's higher-margin, core refrigerated products. On Beyond Meat's November 9, 2022 earnings conference call with investors, Brown announced Beyond Meat was now limiting new product development for its foodservice partners in order to reduce expenses, stating: "[W]e are significantly reducing operating expenses while focusing on a more narrow set of strategic partner[s], retail and foodservice opportunities." Brown also conceded that the Company needed to "change [its] mindset from one where it was growth above everything else to now pushing very quickly the business into a cash flow positive and a profitable position" and that the Company was "pivot[ing] from the growth above all operating model" to stabilize the business.

127. Also on the November 9, 2022 conference call, Beyond provided additional details regarding the impact of its deteriorating product mix. Defendants conceded that Beyond was forced to now focus "on stabilizing and subsequently restoring growth within [its] core portfolio of refrigerated SKUs, which in turn is expected to contribute to meaningful gross margin improvement back into positive territory." Likewise, Brown stated, "in retail, we plan to restore growth to our core product offerings, burgers, beef and dinner sausage in the refrigerated set." Brown added: "the transformative growth is in the refrigerated meat case . . . . I don't think it's going to come from the next spaghetti and . . . frozen [meat]ball. . . . I think this core focus is the right one."

128. Analysts took note of Defendants' product sales mix commentary on the November 9, 2022 conference call. For example, a BMO Capital Markets analyst report noted: "BYND's launch of new costly products including jerky over the last several years created severe margin pressure and will continue to lead to significant headwinds in the near-term." A Bank of America Securities report emphasized Beyond's plan to improve its product mix and "focus on core, higher margin, SKUs including launch of burger 4.0, beef crumble 4.0 and sausage 3.0." A Cowen analyst report emphasized: "According to management burgers, ground beef, and dinner sausage are Beyond Meat's highest margin products and account for roughly 3/4 of total gross revenue. The company plans to prioritize . . . these products . . . ." A J.P. Morgan analyst report noted that Beyond "needs to restore top line growth, particularly with core refrigerated SKUs" with "less of a focus on non-core items."

129. Two days later, on November 10, 2022, Beyond filed its Form 10-Q with the SEC for Q3 2022 and admitted that deteriorating product sales mix had a negative impact on its gross margins, disclosing: "[O]ur . . . gross margin[s] . . . have been . . . adversely impacted . . . by . . . changes in our product [sales] mix including the launch of new products . . . which may carry lower margin profiles relative to existing products, due in part to early cost of production inefficiencies."

130. On February 2, 2023, the *WSJ* published an article titled *Beyond Meat Hires Marketing Executive*, in which the *WSJ* reported that "according to current and former employees," Beyond Meat's efforts to stabilize its business included unloading "excess food-processing and laboratory equipment . . . directly to other companies, including third-party manufacturers Beyond had used to help make its products."[10]

## VIII. ADDITIONAL FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

131. By virtue of the facts set forth below in ¶¶23-59 and the other facts set forth at ¶¶60-125, it may be strongly inferred that Defendants knew and/or recklessly disregarded that their Class Period statements were materially misleading to investors.

### A. Company Founder and CEO Brown Was Hands-On at the Company's Factories and Plants

132. Brown's knowledge of Beyond Meat's issues alleged herein can be inferred by his hands-on approach, as discussed in more detail at ¶¶46-52.

133. Evidence of Brown's knowledge about new product production and scaling issues at Beyond Meat's facilities can also be inferred based on the fact that he visited the facilities himself. For example, Brown visited Beyond Meat's manufacturing plant in Malvern, Pennsylvania to discuss the manufacturing of the Company's retail sausage line to be sold in grocery stores. The Beyond Meat CEO instructed employees at the Malvern plant to add more water to the sausage product – made up of in part by pea protein and flour – even though Brown was told that the product would not look the way the Company wanted it to because more water would change the texture and create an overall drooping appearance. Brown also routinely visited the Company's Missouri plant, at least quarterly, where Brown would provide tours to potential customers and potential co-manufacturers.

134. Brown also directly engaged in the production process when problems arose. For instance, when McDonald's discovered foreign material – later confirmed

---

[10] A copy of the February 2, 2023 *WSJ* article is attached hereto as Exhibit I.

to be wood fragments from a pallet – in the McPlant burger during the trial phase, the Company's executive management team met several times after the incident and cautioned employees at the plant to be particularly careful with McDonald's materials because McDonald's was very thorough in their requirements. Indeed, Brown personally communicated with boots on the ground multiple times a day about the incident.

### B. Brown Knew of Facts Critical to Beyond Meat's Core Operations

135. Brown was the founder and CEO of Beyond Meat. He was responsible for, and remained well informed of, issues critical to the Company's success. Brown identified Beyond Meat's ability to commercialize new products for its large foodservice partners, like McDonald's, as one such critical issue. For instance, Brown spoke with investors about Beyond Meat's strategic partnership with McDonald's so often that he joked during Beyond Meat's May 6, 2021 Q1 2021 earnings conference call that he "was very worried that we'd have one analyst call where McDonald's wasn't mentioned." Brown was also Beyond Meat's spokesperson in conference calls with analysts and investors, as well as in interviews with journalists and podcasters, about the Company's product offerings, QSR partnerships, financial results, and financial outlook.[11] Brown also stressed his hands-on approach to running the Company, telling *Time Magazine* in 2021 that:

> My wish, and my focus on the company is how do we speed the path to market for innovation? We innovate very quickly, we commercialize at

[11] For example, in a December 22, 2020 interview on the podcast *The Verge*, Brown stated, "[s]o QSR[s] are really important to us from the perspective of getting the product to people where they want to consume [it]." The full interview can be found at https://www.theverge.com/22193672/beyond-meat-ceo-interview-ethan-brown-decoder-podcast (last visited on September 5, 2024).

a rate that I need to match that innovation, and that's . . . what I'm working on.[12]

136. In another example, Brown told analysts and investors during the Company's Q3 2021 earnings call that "from the anecdotal information I'm getting just from talking to people at the register" the McPlant burger's "results in Los Angeles, as you'd expect, have been amazing." Also during this call, Brown told analysts and investors about the McDonald's "stores that I have toured" and the "[t]he anecdotal information I have from going to different stores has been very positive."

137. Given his repeated focus on the importance of scaling Beyond Meat's product launches with the Company's large QSRs and foodservice partners, Brown can be presumed to have knowledge of adverse facts impacting these scaling and price reduction efforts. The Company's inability to deliver products to their large QSRs and foodservice partners at manageable price points doomed Defendants' goal of, for instance, a nationwide launch of the McPlant patty. Brown's repeated and specific statements to the investing public regarding his and defendant Beyond Meat's focus on such strategic partnerships demonstrates his knowledge of these adverse facts. Indeed, given the focus the Defendants placed on the status of Beyond Meat's large QSRs and foodservice partnerships and cost reduction efforts, it would be absurd to suggest that Brown was not aware that Beyond Meat was increasingly unable to deliver for its large QSR and foodservice partners throughout the Class Period.

**C. Corporate Scienter**

138. The allegations above also establish a strong inference that Beyond Meat as an entity acted with corporate scienter throughout the Class Period, as Brown, the Company's founder and CEO, had actual knowledge of the misrepresentations of material facts set forth herein (for which he had a duty to disclose), or acted with reckless disregard for the truth because he failed to ascertain and to disclose such

[12] The full July 11, 2021 article can be found at https://time.com/6078353/beyond-meat-ceo-ethan-brown/ (last visited on September 5, 2024).

facts, even though such facts were available to him. Such material misrepresentations were done knowingly and/or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public. By concealing these material facts from investors, Defendants maintained and/or increased Beyond Meat's artificially inflated common stock prices throughout the Class Period.

## IX. LOSS CAUSATION

139. The market for Beyond Meat's common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Beyond Meat's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Beyond Meat common stock relying upon the integrity of the market price for Beyond Meat's common stock and market information relating to Beyond Meat, and have been damaged thereby.

140. When the relevant truth, and/or materialization of the risk, became known, the price of Beyond Meat's common stock declined as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class.

### A. October 22, 2021

141. On October 22, 2021, Beyond Meat issued a pre-earnings announcement press release slashing Q3 2021 net revenue outlook from between $120 million to $140 million to just $106 million, a decline of 12% to 25%. In the press release Beyond Meat also revealed the Company's expenses were continuing to rise and the Company experienced operational challenges during the quarter.

142. As a direct result of this partial corrective disclosure, Beyond Meat's stock dropped 11.8%, from a closing price of $108.62 per share on October 21, 2021 to a closing price of $95.80 per share on October 22, 2021, on an unusually high

volume of over 14 million shares traded. The NASDAQ Composite Total Return Index decreased by only 0.5% and the S&P Food & Beverage Select Industry Total Return Index increased 0.4%. The new Company-specific material information released on October 22, 2021 concerning decreased revenues, increasing expenses, and operational challenges were directly related to the misleading statements previously made by Defendants.

143. Analysts reacted negatively the October 22, 2021 disclosure. For example, on October 26, 2021 a Credit Suisse analyst issued a report lowering Beyond Meat's target price from $123.00 per share to $96.00 per share, stating that "Beyond's operational challenges this year may hurt the company's credibility with large QSR chains like [McDonald's] to meet volume commitments."

**B. November 11, 2021**

144. On November 10, 2021, after the market closed, Defendants reported lower than expected gross margin for the quarter due to inventory write-offs and the Company's commercialization efforts. Specifically, Defendants reported that Q3 2021 gross margin declined due to a $1.9 million inventory write-off, higher transportation and warehousing costs, and higher expenses associated with investments to commercialize new and customized products. Analysts were surprised by the magnitude of the Company's gross margin decline. For example, Piper Sandler noted in a report dated November 10, 2021 that Q3 2021 margins were the lowest in the Company's reported history.

145. Defendants also reported on the conference call dramatically increased operating expenses of $77 million compared to $44 million in the prior year same quarter, including increased expenses to support commercialization, and increased production trial activities. Defendants also reported a net loss of $54.8 million compared to a net loss of $19.3 million in the prior year same quarter.

146. During the conference call, Brown also said that the Company experienced delays with respect to many of its strategic QSR customers, including

moving from tests to fuller launches, that were disruptive to the Company's growth trajectory. Although Brown blamed the delays on the pandemic, a November 11, 2021 report issued by Credit Suisse stated, "But why should we believe macro factors are the reason for Beyond's slowdown when so many early-stage growth brands . . . are performing well," including the Company's competitor Impossible Burger.

147. As a direct result of this partial corrective disclosure, Beyond Meat's stock price declined over 13%, from a closing price of $94.48 per share on November 10, 2021 to a closing price of $81.93 per share on November 11, 2021, on a massive trading volume of 20.7 million shares. The NASDAQ Composite Total Return Index increased 1.3% and the S&P Food & Beverage Select Industry Total Return Index remained flat. The new Company-specific material information released on November 10, 2021, after the market closed, concerning decreased gross margin, increased expenses and QSR delays in moving from tests to fuller launches, was directly related to the misleading statements previously made by Defendants.

148. As set forth above in ¶¶82-87, Defendants continued to make misleading statements during the November 10, 2021 conference call, that served to limit the impact of Beyond Meat's financial results and maintained the artificial inflation in Beyond Meat's stock price.

**C. November 17, 2021**

149. On November 17, 2021, *Bloomberg* published an article titled *Beyond Meat's Delayed Chicken Launch Extends Post-IPO Woes*, highlighting the delays in product roll out and execution challenges Beyond Meat was facing.

150. As a direct result of the this partial corrective disclosure, the price of Beyond Meat's stock declined 3.6%, from a closing price of $83.48 per share on November 16, 2021, to a closing price of $80.47 per share on November 17, 2021. The NASDAQ Composite Total Return Index decreased 2.3% and the S&P Food & Beverage Select Industry Total Return Index decreased 0.6%. The new Company-specific material information released on November 17, 2021, concerning the product

launch delays and execution challenges Beyond Meat was experiencing, was directly related to the misleading statements previously made by Defendants.

151. As set forth above in ¶¶95-96, Defendants' public denials of any ongoing problems quoted in the *Bloomberg* article served to limit the impact of the *Bloomberg* article and maintained the artificial inflation in Beyond Meat's stock price.

**D. December 10, 2021**

152. On December 9, 2021, after the market closed, multiple media sources reported that Taco Bell had cancelled a planned test of Beyond Carne Asada due to ongoing quality concerns. According to those reports, the market viewed this cancellation as further evidence of ongoing problems Beyond Meat faced in bringing its products to market at scale.

153. As a direct result of this partial corrective disclosure, the price of Beyond Meat's stock declined 8%, from a closing price of $70.09 per share on December 9, 2021, to a closing price of $64.51 per share on December 10, 2021. The NASDAQ Composite Total Return Index remained flat and the S&P Food & Beverage Select Industry Total Return Index increased 0.8%. The new Company-specific material information released on December 10, 2021, after the market closed, concerning Taco Bell's test cancellation due to quality concerns, was directly related to the misleading statements previously made by Defendants.

**E. February 3, 2022**

154. On February 3, 2022 *Bloomberg* published an article reporting that three Del Taco stores had dropped Beyond Meat's version of ground beef. The article also reported that some of the Company's other foodservice customers were also dissatisfied with Beyond Meat's products and were either limiting or had already discontinued Beyond Meat menu items.

155. As a direct result of this partial corrective disclosure, the price of Beyond Meat's stock declined 9.4%, from a closing price of $64.00 per share on February 2, 2022, to a closing price of $58.01 per share on February 3, 2022. The NASDAQ

Composite Total Return Index only decreased 2.7% and the S&P Food & Beverage Select Industry Total Return Index decreased 0.8%. The new Company-specific material information released on February 3, 2022, concerning QSR customer dissatisfaction with Beyond Meat's products, was directly related to the misleading statements previously made by Defendants.

**F. February 25, 2022**

156. On February 24, 2022, after the market closed, Defendants reported disappointing financial results. On the conference call, Defendants reported that the Company's Q4 2021 gross margin declined to 14.1%, compared to 24.9% in Q4 2020, due to increased new product manufacturing.

157. On the conference call, Brown admitted that the higher manufacturing costs were attributable to production of Beyond's new chicken tender product because "we used higher-cost co-manufacturing partners, experienced lower throughput levels and other supply chain inefficiencies." Brown also admitted that the Company had to "shift[] a significant amount of volume to external co-manufacturers . . . away from our internal facility in Pennsylvania . . . in order to free up line time for commercialization."

158. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped 9.2%, from a closing price of $49.00 per share on February 24, 2022 to a closing price of $44.49 per share on February 25, 2022, on unusually high volume of 11.6 million shares traded. The NASDAQ Composite Total Return Index increased 1.7% and the S&P Food & Beverage Select Industry Total Return Index increased 3%. The new Company-specific material information released on February 24, 2022 after the market closed, concerning decreased gross margin and profitability due the Company's manufacturing inefficiencies and inability to scale production, was directly related to the misleading statements previously made by Defendants.

159. Analysts covering Beyond Meat were again surprised by the magnitude of the Company's gross margin decline. For example, a February 24, 2022 report

issued by Barclay's stated "Lowest gross margin in 4 years leads to higher-than-expected operating losses: At only 14.2%, weak gross margin lead to an operating loss of $77.7 [million], 1.8x higher than the loss we expected."

160. As set forth above in ¶¶110-114, Defendants continued to make misleading statements during the February 24, 2022 conference call, that served to limit the impact of Beyond Meat's financial results and maintained the artificial inflation in Beyond Meat's stock price.

**G. May 12, 2022**

161. On May 11, 2022, Defendants reported another quarter of disappointing gross margin decline related to Beyond Meat's inability to scale production for its strategic partners. Defendants reported gross margin of just 0.2% for Q1 2022, compared to 30.2% in the prior year same quarter. Beyond Meat's CFO admitted that the dramatic decrease in gross margin was due to the "expensive and inefficient" manufacturing process the Company took to launch Beyond Meat Jerky in partnership with PepsiCo. During the conference, Beyond's CFO further admitted that the launch of Beyond Meat Jerky was "unprecedented" for the Company because of its scale and that the launch was done in an "expensive and inefficient manner" because the Company had not yet established manufacturing processes for scaling. Brown added that Defendants had to "interrupt[] steady-state internal production" of its core products in order to commercialize Beyond Jerky and other customized products for its QSRs.

162. During the conference call, Defendants also reported that costs of goods sold increased $1.15 per pound during the quarter and that Beyond Jerky accounted for more than half of the costs, with the remainder being driven by increased manufacturing costs, including higher transportation and warehousing costs.

163. During the call, the CFO also reported that the Company's cash balance declined almost $190 million in the quarter, leaving the Company with about half of the $1 billion in capital raised just a year prior.

164. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped 4.2%, from a closing price of $26.17 per share on May 11, 2022 to a closing price of $25.08 per share on May 12, 2022, on a massive trading volume of 22.4 million shares. The NASDAQ Composite Total Return Index increased 3.4% and the S&P Food & Beverage Select Industry Total Return Index increased 0.9%. The new Company-specific material information released on May 11, 2022, after the market closed, manufacturing inefficiencies and inability to scale production was directly related to the misleading statements previously made by Defendants.

165. Analysts were stunned by Beyond Meat's Q1 2022 gross margin and cash spend during the quarter. For example, BTIG issued a report on May 12, 2022, stating "Beyond Meat reported gross margins of just 0.2%, much worse than our 11.7% estimate." Similarly, Barclay's issued a report on May 11, 2022 stating that "we were surprised by the weakness of profitability and the ongoing cash burn during the quarter," and "[w]e expect a negative price reaction" based on this news. Likewise, Bank of America Securities issued a report on May 12, 2022 lowering estimates and price target from $45.00 to $20.00 on news of the Company's "[m]argin lows [and] cash flows."

**H. July 28, 2022**

166. On July 27, 2022, after the market closed, J.P. Morgan issued a report stating "we believe that McDonald's . . . had broadly discontinued its US test of the McPlant burger made with Beyond Meat." J.P. Morgan spoke with McDonald's employees at 25 locations that previously carried the product and "each said that the item is no longer on the menu." The report stated that "clearly this news isn't good for the narrative . . . it's hard to see [Beyond Meat] stock multiple expanding when one of the more visible customers back away."

167. As a direct result of this partial corrective disclosure, Beyond Meat's stock price dropped over 3%, from a closing price of $32.44 per share on July 27, 2022 to a closing price of $31.43 per share on July 28, 2022. The NASDAQ

Composite Total Return Index increased 2.0% and the S&P Food & Beverage Select Industry Total Return Index increased 1.1%. The new Company-specific material information released on July 27, 2022, after the market closed, concerning the failed US test of the McPlant burger with the Beyond Meat patty, was directly related to the misleading statements previously made by Defendants.

**I. October 14, 2022**

168. On October 14, 2022, before the market opened, Beyond Meat filed its Form 8-K with the SEC that announced "a plan to reduce the Company's current workforce by approximately 200 employees, representing approximately 19% of the Company's total global workforce" and that the "decision was based on cost-reduction initiatives intended to reduce operating expenses." The SEC Form 8-K also announced the departure of Philip E. Hardin (CFO) and Beyond Meat's Global; Chief Growth Officer and President, North America, and that the Company was reducing its full year guidance.

169. As a direct result of this corrective disclosure, the price of Beyond Meat's stock declined 9.7%, from a closing price of $14.78 per share on October 13, 2022, to a closing price of $13.35 per share on October 14, 2022. The NASDAQ Composite Total Return Index decreased 3.1% and the S&P Food & Beverage Select Industry Total Return Index decreased 2.7%. The new Company-specific material information released on October 14, 2022, concerning the 19% global workforce reduction to cut the Company's operating expenses, and the executive departures, was directly related to the misleading statements previously made by Defendants.

170. Analysts covering Beyond Meat reacted negatively to this news. Barclays reported on October 14, 2022 that while "[a]ccording to management, these actions will help the company become cash flow-positive by 2H23," "we are more cautious and expect positive cash flow by 2H24." BTIG reported on October 14, 2022 that "Beyond Meat's announcement this morning of workforce reductions, executive departures, and slashing of forward guidance puts all the bad news out on the table."

Piper Sandler also reported on October 14, 2022 that Beyond Meat "[was] now targeting to achieve positive cash flow from operations by 2H23. While this is possible, it depends on many variables in a volatile environment, and timing beyond our visibility horizon. We do not assume it will happen."

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

171. At all relevant times, the market for Beyond Meat common stock was an efficient market for the following reasons, among others:

(a) Beyond Meat's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

(b) The Company had more than 62.9 million shares outstanding as of February 26, 2021.[13] During the Class Period, on average, more than 3.3 million shares of Beyond Meat stock were traded on a daily basis, demonstrating a very active and broad market for Beyond Meat stock and permitting a very strong presumption of an efficient market.

(c) As a regulated issuer, Beyond Meat filed periodic public reports with the SEC.

(d) Beyond Meat regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

(e) Beyond Meat was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period, including, for example, J.P. Morgan, Barclays, BTIG,

[13] As of November 9, 2022 the Company had more than 63.7 million shares outstanding.

and Piper Sandler. Each of their reports was publicly available and entered the public marketplace.

(f) There were several active market-makers in Beyond Meat stock at all times during the Class Period.

(g) Unexpected material news about Beyond Meat was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

172. As a result of the foregoing, the market for Beyond Meat common stock promptly digested current information regarding Beyond Meat from publicly available sources and reflected such information in Beyond Meat's share prices. Under these circumstances, all purchasers of Beyond Meat common stock during the Class Period suffered similar injury through their purchase of Beyond Meat common stock at artificially inflated prices, and a presumption of reliance applies.

## XI. CLASS ACTION ALLEGATIONS

173. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Beyond Meat common stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

174. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Beyond Meat shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by Beyond Meat, its transfer agent or securities' brokers, and may be

notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

175. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

176. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

177. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein.

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Beyond Meat.

(c) Whether the price of Beyond Meat's stock was artificially inflated during the Class Period.

(d) To what extent the members of the Class have sustained damages and the proper measure of damages.

178. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
## For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Both Defendants

179. Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

180. This Count is brought by Plaintiffs on behalf of themselves and the Class.

181. This Count is brought against Defendants.

182. During the Class Period, each of the Defendants named in this Count disseminated or approved the statements as specified above in ¶¶64-66, 69-71, 74, 82, 84, 86, 110, 112-113, which they knew and/or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud.

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Beyond Meat common stock during the Class Period.

184. Defendants, individually and together, directly and indirectly, by the use, means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Beyond Meat's business, operations, and financial condition as specified herein.

185. Defendants had actual knowledge of the misrepresentations of material fact set forth herein, and/or recklessly disregarded the true facts that were available to them.

186. As a result of the dissemination of the materially misleading information and/or failure to disclose material facts, as set forth above, the market price of Beyond Meat common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to and/or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Plaintiffs and the other Class members purchased Beyond Meat common stock during the Class Period at artificially high prices and were damaged thereby.

187. Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Beyond Meat common stock, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased Beyond Meat common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and misleadingly inflated by these Defendants' misleading statements.

188. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Beyond Meat common stock.

189. By reason of the foregoing, Defendants have violated §10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**
**For Violation of §20(a) of the Exchange Act Against Both Defendants**

190. Plaintiffs repeat and reallege every allegation contained above as if set forth herein. This claim is asserted against Defendants Brown and Beyond Meat.

191. Brown acted as a controlling person of Beyond Meat within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of his high-level position with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Brown had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are misleading. Brown was provided with, and/or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In addition, Brown had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. Beyond Meat controlled Brown and the Company's other officers and employees.

192. As set forth above, each Defendant violated §10(b) and Rule 10b-5 by their wrongful acts as alleged in this Complaint. By virtue of their control, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action by certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel.

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

D. Awarding injunctive and such other equitable relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiffs demands a trial by jury.

DATED: September 6, 2024

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
LAURIE L. LARGENT
MATTHEW I. ALPERT
JOSEPH J. TULL

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
malpert@rgrdlaw.com
jtull@rgrdlaw.com

Lead Counsel for Plaintiffs