UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

SASKATCHEWAN HEALTHCARE           )
EMPLOYEES' PENSION PLAN,          )
et al.,                           )
                                  )
          Plaintiffs,             )
                                  )   2:23-CV-3602-MWF
               vs.                )
                                  )
BEYOND MEAT, INC., et al.,        )
                                  )
          Defendants.             )
_____

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Monday, November 25, 2024

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiffs:

        ROBBINS GELLER RUDMAN & DOWD LLP
        By:  Spencer Burkholz, Attorney at Law
            Laurie Largent, Attorney at Law
        655 West Broadway, Suite 1900
        San Diego, California 92101

For the Defendants:

        LATHAM & WATKINS LLP
        By:  Michele Johnson, Attorney at Law
            Renatta Gorski, Attorney at Law
        650 Town Center Drive, 20th Floor
        Costa Mesa, California 92626

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

THE CLERK:  Calling item number two, case number CV-23-3602-MWF, Saskatchewan Healthcare Employees' Pension Plan vs. Beyond Meat, Inc., et al.

Counsel, please state your appearance for the record.

MR. BURKHOLZ:  Good morning.  Spence Burkholz, I'm here with Laurie Largent for the plaintiffs.

THE COURT:  Good morning.

MS. JOHNSON:  Good morning, Your Honor.  Michele Johnson, Latham & Watkins for the defendants.

THE COURT:  Good morning.  You don't have a tentative --

MS. GORSKI:  Renatta Gorski for defendants.

THE COURT:  As you know, there is usually a tentative.  Let me give you my thoughts here.

I read the prior order, I read your briefs, I discussed it with my law clerk.  My very tentative view was to once again grant the motion, but when I read the bench memo, I just -- and then the time came to edit that and turn it into a tentative, I just felt myself just reluctant.

What is going on here is that based on the text of these various things, you have a scenario, which frankly from the plaintiffs does not seem very strong, does not seem likely to ever result in a verdict, but of course, at this very early stage, that is just not the case.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

But this, as I made clear in my last order, this is not just some *Twombly/Iqbal* motion to dismiss, that there are, between Rule 9 and the Act, these legal hooks that potentially maybe likely get it over the hump to something that is a legal decision that can be decided now.

But at some point -- so drilling down on the specifics of all of the statements, and looking at very specific things on the law, you get a result that is not terribly favorable for the plaintiffs, and which essentially was the prior order.

And then -- you may be seated.  And then on the second -- on the other hand, you have something on the broad thing that it just -- just seems here that decisions were made by management who perhaps were -- perhaps made mistakes, perhaps were incompetent, or overly ambitious or greedy, which resulted in a situation with which the plaintiffs understandably are not at all happy.

But there is this whole big order in between where was this -- was there this realization that the scaling up wasn't working, and was that something which the defendants were eager to keep from the world; the shareholders, specifically.  And, is that really something that should be decided at this early stage?

So that is why I -- while my tentative view, in a sense, is in favor of the defendants, it's so tentative that

I didn't really want to commit it to writing, I just wanted to sort of share these thoughts, because it really, the burden is obviously, at this very early stage, of course with the very big assist of what I ruled last time to get this -- to get it dismissed.

It's -- it's tough, but because I said of Rule 9 and the Act, it is certainly possible. Obviously, I ruled the way I did last time. But now that push would come to shove, and there frankly would be no real reason to not dismiss it entirely, it's just plaintiffs really aren't even asking for leave to amend, because what could they possibly do?

So here we are. So with those tentative thoughts, let me hear first from the defendants as the moving party, not why you have a strong case, because clearly you have an exceptionally strong case, but the point -- but you aren't arguing to a jury right now.

Why as a matter of law should this case be dismissed?

MS. JOHNSON: Thank you, Your Honor.

And I appreciate those thoughts very much.

We almost had the same discussion, a similar discussion last time we were here with respect to we are at an early stage, should this go forward or should under the PSLRA, the statement-by-statement analysis doesn't come up with a false statement pled with particularity.

The Court's order last time said the plaintiff engaged in puzzle pleading, saying, here, you know, are 37 statements, and here are a bunch of things that should have been disclosed, and the Court can't put them together to decide whether the statements are properly alleged to be false, so they are not.

THE COURT:  Yeah, but that was an easier decision last time, bluntly, because I knew I could grant leave to amend.  Now the rubber definitely is hitting the road, and the can is not going to get any further kicked down the road.

So that makes it a tougher decision.

Go ahead, counsel.

MS. JOHNSON:  Understood.

So let's look at what they did with leave to amend. They dropped a number of the statements.  They have 14 left, 12 of which were the same exact statements that they alleged last time, with no additional facts to say, here is why they are false.

Instead, what the plaintiffs have done is narrowed in on all of these statements about good relationships with QSR partners, and strong and continuing plans with, you know, relationships with Taco Bell, or plans with McDonald's.  All of those statements, while true, I would submit, were false and misleading because they didn't also disclose that they would not be able to commercially and cost effectively scale.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

But the problem with that is that the PSLRA requires particularized facts; not conclusory statements.

Number one, those allegations were already in the last Complaint.  They were a bit more scattershot, but they were already there, and the Court found that was not enough.

Two, the risk factors that they specifically -- that Beyond Meat specifically warned investors about are exactly that, we may not be able to scale, we may not be able to ramp, we have costs, we have expenses, a litany of very specific warnings saying, this is an innovative industry.  We are trying to disrupt a giant mainstay of the -- of the world.  And it might be hard to do, and it might be expensive, and we might not be able to -- and specific factors about what might cause those expenses.

And, third, even the allegations of the Complaint itself later in the class period suggests that they were scaling, that there were launches with KFC.  Plaintiffs' own exhibit with the articles that they have now attached, they excerpted them last time, now they have attached the whole articles, and one can see why maybe they didn't the first time, because there is all sorts of positive news about launching at scale.  The KFC launch was the most talked about launch at KFC ever on social media, and it was at scale.

There were launches in -- full scale launches in McDonald's in the U.K. and Ireland, all stores.  These things

are in the Complaint, they are in the exhibits the plaintiffs have attached, and there is not a contradictory word about, oh, you all should have said that you won't be able to scale cost effectively.  There is indications that they did scale.

So those -- what plaintiffs have done with their ability to amend is add next to nothing, other than the full text of those articles, which show, like I say, you know, for example, a Taco Bell spokesperson itself said, Our relationship is strong and continuing, and we look forward to...

They have added nothing about the risk disclosures, because they are right there plain as day that says this might be hard, this might be not cost effective, and they have not added additional facts beyond just tailoring, basically, the argument about why those statements are false.

And scienter, I think fares even more poorly, if that is possible.  The Court found that scienter was not properly pled.  It is completely appropriate, and not just appropriate, but required --

THE COURT:  Well, I think that is a very generous reading of the prior order on that, in regard to scienter. And I think that the plaintiffs responded, the plaintiff responded then to what the thoughts were on scienter in amending this Complaint.

MS. JOHNSON:  There is only one remaining individual

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

defendant who sold nothing.

Their idea on scienter is basically that he spoke about these topics, and that he was the CEO, and toured some McDonald's restaurants, and was, according to them, hands on.

Now, I would point out that some of the articles actually criticize him for the opposite, saying that he was a visionary leader that wasn't equipped for day-to-day management.

The articles cite unnamed former and current employees who come nowhere close to the *Zucco* standards of identifying who they are with enough particularity to suggest that they have some reasonable basis for their knowledge.

But more -- equally as important is they don't contradict any of the statements.  They don't say when or how the CEO could have known that allegedly Beyond Meat would not be able to cost effectively scale, especially with all of the facts in the record of -- at this stage, at this stage, about scaling.

And then the corrective disclosure at the very, very end says, we are going to refocus, not completely away from QSRs, but refocus on our retail, so that we achieve profitability more quickly.  That is the business of doing business.  That is criticizing management.  That is, we would have done things differently in hindsight.  And that is not what the standard requires.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

So I think on scienter what they have done is shrink -- there are no trading allegations. There are simply that he spoke, and was involved, and then they rely again, of course, on the Core Operations Doctrine, which is, number one, contradicted by the articles, if you are going to credit the articles.

And, number two, what is it that he knew -- let's assume he knew everything, what is it that he knew that would have allowed him to predict that they would not be able to cost effectively scale in the way that they had hoped?

And the way that this Complaint is written, you know that because many of the supposed false statement dates are the same dates as the corrective disclosures. That shows you that the company is being forthright. They are saying good news and bad news as it happens.

And there is no suggestion, or inference that you can take from that under *Tellabs*, under the PSLRA at this stage that the company was somehow hiding, rather than disclosing in realtime, the developments that were occurring at the company.

THE COURT: All right. Thank you. And I'll give you a chance to respond.

What do the plaintiffs have to say here?

MS. JOHNSON: Thank you.

MR. BURKHOLZ: Thank you, Your Honor.

Spence Burkholz for the plaintiffs.  I have about five to seven minutes of comments, if it's okay with the Court --

THE COURT:  That's fine.

MR. BURKHOLZ:  -- to try to respond to the Court's comments and defendants.

So the issue before the Court, which you mentioned last time is, are these allegations plausible, right?  And --

THE COURT:  Well, if this was purely a Rule 8 issue, then that is all it would be.

I mean, the -- here, we do have Rule 9 and the Act, which, as I said, goes towards letting the defendants cast this successfully or not as much more of a legal issue than they would be able to do in the absence of Rule 9 and the Act.

MR. BURKHOLZ:  That's true.

But, you know, the plaintiffs do get the inferences of disputed facts at this stage, unlike at summary judgment. And we think you need to look at the statements in context. I mean, this is a company that came public in 2019 at $25 a share.  By the beginning of the class period, it was trading at $150 a share.  And that was based on the future growth of this company.  It was both new products for the retail business, as well as these QSR, these three big restaurant chains.

So at the start of the class period, we know where the stock price was, we know where it ended at the end of the class period, 90 percent reduction. Clearly, not due to the market, its peer group was up 5 percent during that time period. So the issue is, did they timely disclose the negative facts along the way, right?

And we would argue that the problems that they had with their new products, that basically this was a reckless gamble, that they didn't disclose all of the facts that were going on. And when they spoke about the then three new partnerships, Statements 1 to 3, I mean, they did say, we have been scaling and preparing for this.

And in Statements 4 and 5, they said, the margins are going to be fine, the new Pennsylvania plant, everything is going fine there.

So what should have they disclosed? That is the core issue. Well, under *Brody*, the case that we both cite, did they create a state of affairs that was different than what existed? Was the speaker aware of undisclosed facts that undermined the statement's accuracy, and then for the opinion statements under *Omnicare*, was the speaker -- did they omit facts that made it misleading to a reasonable person reading the statements in context? So context does matter.

These adverse material facts were, what was going on

in the year 2000, in the first part of 2021, these are paragraphs 30 to 50 of our Complaint.  And I think what we've done with this Amended Complaint, is we've done a better job of tethering the statements to the facts.  And to clarify that it wasn't just the QSRs, but it was actually new products for their retail business, which was just the burgers and the sausages that was part of this growth story.  So it wasn't just limited to the QSRs.  So we feel like we have done a better job in that sense.

So what we do know is that there were these negative things happening throughout 2000.  And, you know, whether it's reflected later in the articles, the details of our investigation, which confirm the articles, we know that, you know, they had these problems with the fact that they had to get additional manufacturing lines.  You know, they couldn't use the manufacturing lines that they had for the burgers and the sausages for these new products.  They tried the chicken product throughout the year 2000.  They had comanufacturers, they couldn't do it, commercialize it at a profitable rate, which is extremely important, the margins.

So they were having the problem with the chicken product all through 2000.  Then in early 2001, they have the problem with the pepperoni product for Pizza Hut, you know, shipping it to Europe and back, millions in useless machinery.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

So it's not a situation where there is just kinks in the manufacturing process, which, you know, you are going to have issues with manufacturing.

But was it so severe that a reasonable investor, looking at buying the stock at the beginning of the class period at $150 a share, with expectations of revenues going from 435 to 850, basically doubling revenues in the next two years, earnings per share going from $0.20 to $0.80.  The investors at that time, they are looking at this company with these new, huge partnerships, and they are basically being told, We are ready to go.  We can scale it.  And I think they would want to know what was happening, the disaster that was happening at this, especially the Pennsylvania plant, which they purchased, they had used before they purchased in August of 2000, fired everybody, brought new people in, and the details are certainly in the Complaint.

So what we know what happened is by the fall of 2021, into October, August/October timeframe, the analysts and the investors are like, where are the sales?  There is this preannouncement in October, terrible results in November.  The gross margins are down from 27 to 21 percent, like the worst in their history.  You've got the *Bloomberg* article coming out with, you know, details of the behind-the-scenes issues, the major issues that are going on.  Five top executives are departing at that point.  Forget what

happened at the end of the class period, right then you've got the CFO and the COO leaving.

So what do they do?  They deny things in the article.  They know they've got a crisis situation, and they basically double down.  The stock now is at 60 to $70 a share from 143.  They double down on their statements.  You can have a false statement and a corrective disclosure at the same time.  There is nothing in the law that says you can't have that.

In fact, it's pretty common in cases that companies will try to keep things going, and give the impression that everything is okay.  And they did double down to stop the bleeding in the article, False Statement 11.  And then the press release in November, they said, you know, we are steadily executing our business.  And the analysts believed them.  The analysts believed the gross margin headwinds are going to be gone.  We are going to have hundreds of millions of revenues in the next year.

And so, then we get to February 2021, and the gross margins are now at 14 percent, poor sales, the cost from basically the new chicken product doesn't work, the pepperoni product doesn't work.  Now they are going to do the jerky products with PepsiCo.

And on the call, you have False Statement Number 12, they say the costs are temporary, they are not going to

continue.  And then within three months, the margins are now down to less than 1 percent, half of it due to the beef jerky product, which that didn't just happen in three months, that had been going on for the last year.

The final two statements are just a last ditch effort to save face to say, in Statements 13 and 14, that we are going to have full lunches of these products.

And before I get to scienter, I just do want to comment on the issue of they were launching products.  It was raised at the last hearing, and raised more so in the reply brief.  They did launch products in Europe and Australia, but those were immaterial.  They were after the class period. And I don't know about this KFC situation, because that really wasn't a full launch, there is some tests that went on there.

But they launched products overseas, if they were so material, they were not a part of the U.S. focus strategy, which was $800 million of revenues in the next two years; in fact, the stocks of $5 a share two years later as of now.  So whatever launch they did was immaterial at the time.

And then turning quickly to scienter.

THE COURT:  Before you get to scienter --

MR. BURKHOLZ:  Okay.

THE COURT:  -- while what you are -- what you are suggesting is based on what happened there couldn't -- those

statements couldn't possibly have been believed when made, but if the whole point of the PSLRA is to go against this old-style Milberg Weiss race to the courthouse based on the inferences that could arise from the drop in the share price alone, how -- how do you get over that on -- it's not that what you've said doesn't make sense, of course, I mean, it makes perfect sense, but how do you then deal with the fact that this is not simply this *Twombly/Iqbal* situation?

MR. BURKHOLZ:  Yeah.  We have a requirement to plead statements in particularity, and why they are false with contemporaneous statements.  And I would submit that the facts from the year 2000 leading into early 2001 are sufficient to raise an issue of fact, at least, at this stage under the case law, enough to get by to discovery, that the statements were misleading because they omitted material facts that an investor would want to know at that time.  That is Statements 1 through 4, basically.

THE COURT:  And which cases do you believe are most helpful to you in the sense of reversing the grant of a motion to dismiss, reversing a summary judgment, reversing a Rule 50 ruling in favor of the defense?  What would you say are the cases that are most helpful to you in that regard?

MR. BURKHOLZ:  Well, I -- I have been doing this law for 30 years now, and I should know them all off the top of my head, because my firm has been involved in many of them.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

I know we have obtained reversals in cases.  I don't have them off the top of my head.  We could certainly submit a short brief on it.

But, you know, we actually -- you know, we have been able to reverse more so at the motion to dismiss stage than at summary judgment, much more difficult there, because there is a different test.

But we have been successful around the country in reversing MTD decisions when -- and I'm not going to compare this case to other cases.  Every case, you know, rises and falls on its own facts, and the Court's interpretation of the facts with the statute.  Different courts look at different cases differently.

And I would just submit that there is enough facts here that we've met the standard for at this particular stage, at least, for showing an issue of fact.

THE COURT:  Thank you.

And then let me hear you scienter.

MR. BURKHOLZ:  So quickly on scienter, you do have the Core Operations Doctrine, and it doesn't just sit alone.  It's pretty hard to believe, this was the biggest time in the corporation's life probably.  I mean, they had to raise $1 billion for liquidity a month after they made the three false statements at the beginning of the class period, and without that, this thing would have fallen apart.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And to think that they didn't know exactly what was going on with the production for these three, forget the retail products, but for the three main partnerships, it is kind of absurd under the case law.

And, you know, we would submit that it's -- you know, it's the *Tellabs* decision that came from the Supreme Court back on remand, which we cite on page 15 and 16 of our brief, you know, they call it a reckless gamble. You can take a gamble with your business, but you've got to disclose all the material facts to investors. And executives sometimes don't like to do that. It's not a positive thing.

And the risk disclosures don't get you there sitting in an 8K or a 10K, especially if -- and the law is pretty clear on this -- especially if the facts have come to fruition at the time when you are saying, Well, we are going to have problems with increased costs.

And unless the court has questions on loss causation, I'll sit down at this time.

THE COURT:  Thank you.

And let me give the defendants a chance to respond.

MS. JOHNSON:  Thank you, Your Honor.

Starting by saying all we have to allege is plausibility, I think is incorrect. The standard is specific. And I'll just use two statements that he mentioned as examples.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

He mentioned Statements 4 and 5, and said basically what those statements say is that our margins are going to be fine.  That is not what the statements say.  And what the PSLRA requires is to actually look at the statements, and compare them to what the contrary facts are that are alleged.

Statement 4 is, Here are the investment spending that is going to support Beyond Meat's strategic QSR customers "continuing improvements and throughput across our manufacturing network, and certain product and process innovations and reformulations."

They are describing what they are doing to address the QSR investment spending.  That is not a statement that our margins are going to be fine.  That is a statement of what they are doing, and nothing contradicts that.  I'll just do one more.

Statement 5.  For our food service customers, we are "continuing to optimize commercial production at the Pennsylvania plant that we acquired last year in support of our strategic QSR customers."

There are no allegations that they were not working to continue to optimize commercial production.  Instead, plaintiffs point to unspecified production issues at different facilities in Columbia, Missouri; not the Pennsylvania plant.

That is what we are doing with the PSLRA.  They

don't just get to say these statements were basically saying, don't worry, everything is fine.  Instead, the PSLRA requires, look at the statement, and then look at what the alleged contradictory facts are.  They don't match up.  And that is what is appropriate at the motion to dismiss stage.

He said that the statements that were made by Beyond Meat throughout is that we were -- we are ready to go, we can scale this.  The risk disclosure said basically the opposite, here are all the ways that it might not work, and saying that we are working towards addressing the problems, are not false, and not contradicted.

And, in fact, the operational challenges were disclosed throughout the class period as they came up.

And I think an instructive case on that is the *Twitter* case from the Ninth Circuit, where *Twitter* made disclosures about its products, and what it was doing, did not also disclose in realtime that there were bugs.  And the Ninth Circuit affirmed the dismissal of that case, saying that is not what is required.

Realtime updates, disclosing all the facts that were going on, I think is how counsel referenced it, is not the law under the PSLRA, and not the law in the Ninth Circuit.

THE COURT:  All right.  Thank you.

Let me ask a very specific question of the plaintiffs, because I do need to move on to the other cases,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

but I want to say that I appreciate your making use of the leave to amend. You would be surprised how often that doesn't happen. But there is also no shame at some point just saying, look, we have done our best, perhaps we will ask the Ninth Circuit to look at this, we don't think you got it right.

Here, would there be any point in leave to amend? I'm not sure what else you could possibly do.

MR. BURKHOLZ: The only thing is, Your Honor, that we did do an investigation. We have CWs. We didn't -- they corroborated the articles. There is no requirement that you identify the CWs in your Complaint. So the facts are all there. But that is pretty much what we would do.

THE COURT: Well, no, the facts which, you know, are obviously under Rule 12, presumed to be true, the facts are what matter at this point; not the evidentiary specifics.

MR. BURKHOLZ: Right.

So if that is the case, then no. You know, the facts are what they are, and if, you know, if the Court doesn't find them adequate, then we will take our shot elsewhere.

THE COURT: Thank you, counsel.

MR. BURKHOLZ: Thank you.

THE COURT: All right. I appreciate your briefs. I appreciate your arguments. The matter is taken under

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

submission.

                          *****      *****      *****


I certify that the foregoing is a correct transcript from the

record of proceedings in the above-titled matter.




    --------------------------


Amy C. Diaz, RPR, CRR              November 26, 2024

S/  Amy Diaz